07 CV 11207

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIAM and PATRICIA WOODWARD,
Individually and On Behalf of All Others
Similarly Situated                                    )
                                                      )
                                                      )
                                                      )
                        Plaintiffs,                   )
                                                      )
            vs.                                       )
                                                      )
CITIGROUP INC., CHARLES PRINCE,                       )
ROBERT E. RUBIN, C. MICHAEL                           )
ARMSTRONG, ALAIN J.P. BELDA,                          )
GEORGE DAVID, KENNETH T. DERR,                        )
JOHN M. DEUTCH, ROBERTO                               )
HERNÁNDEZ RAMÍREZ, ANDREW N.                          )
LIVERIS, ANN MULCAHY, RICHARD D.                      )
PARSONS, JUDITH RODIN, ROBERT L.                      )
RYAN, FRANKLIN A. THOMAS, ANN                         )
DIBBLE JORDAN, KLAUS KLEINFELD                        )
AND DUDLEY C. MECUM, and JOHN AND                     )
JANE DOES 1-20.                                       )
                        Defendants.

**Case No.**

**CLASS ACTION**

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**



## I. INTRODUCTION

1.     Plaintiffs William and Patricia Woodward ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Citigroup Inc. ("Citigroup", "Citi", or the "Company"), including Citi's proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the Citigroup 401(k) Plan (the "Citigroup Plan") and the Citibuilder 401(k) Plan for Puerto Rico (the "Citibuilder Plan"), (collectively, the "Plans"), a review of the Forms 5500 filed by the Plans with the U.S. Department of Labor, interviews with participants of the Plans, and a review of available documents governing the operations of the Plans.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II. NATURE OF THE ACTION

2.     This is a class action brought on behalf of the Plans pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.

3.     The Plans are retirement plans sponsored by Citi.

4.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets from January 1, 2007 to the present (the "Class Period").

5.     Plaintiffs allege that Defendants allowed the heavy, imprudent investment of the Plans' assets in Citi common stock throughout the Class Period despite the fact that they clearly

1

knew or should have known that such investment was unduly risky and imprudent due to Company's serious mismanagement and improper business practices, including, among other practices: (a) Citi's rapid expansion into high-risk financial products without corresponding risk management controls; (b) the Company's failure to limit its exposure to losses from subprime mortgages and mortgage-backed securities; (c) the Company's failure accurately to account for its subprime-related assets; and (d) the Company's misrepresentations regarding its financial condition, all of which caused Citi's financial statements to be misleading and which artificially inflated the value of shares of Citi stock and the Citigroup Common Stock Fund in the Plans. In short, during the Class Period, the Company was seriously mismanaged and faced deteriorating financial circumstances that rendered Citi stock an unduly risky and inappropriate investment option for participants' retirement savings.

6.      Specifically, Plaintiffs allege in Count I that the Defendants who were responsible for the investment of the Plan's assets breached their fiduciary duties to the Plan's participants in violation of ERISA by failing to prudently and loyally manage the Plan's investment in Citi stock. In Count II, Plaintiffs allege that the Defendants, who were responsible for the selection, monitoring and removal of the Plan's other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count III, Plaintiffs allege that the Defendants breached their duty to inform the Plan's participants by failing to provide complete and accurate information regarding the soundness of Citi stock and the prudence of investing and holding retirement contributions in Citi equity.    In Count IV, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

7.    As more fully explained below, during the Class Period, Defendants imprudently permitted the Plans to hold and acquire billions of dollars in Citi stock despite the fundamental problems the Company faced.  Based on publicly available information for the Plans, it appears that Defendants' breaches have caused the Plans to lose nearly *$1.7 billion dollars* of retirement savings.

8.    This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).   In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

9.    ERISA §§ 409(a) and 502(a)(2) authorize participants such as the Plaintiffs to sue in a representative capacity for losses suffered by the Plans as a result of breaches of fiduciary duty.  Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plans whose Plan accounts were invested in Citi common stock during the Class Period.

10.    In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

## III. JURISDICTION AND VENUE

11.  **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.  **Personal Jurisdiction.**  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

13.  **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Citi has its principal place of business in this district.

## IV. PARTIES

**A.  Plaintiffs**

14.  Plaintiffs William and Patricia Woodward are residents of Holtsville, New York. Plaintiff William Woodward began working for Citibank, a subsidiary of Citi, in 1991 and is a current employee.  Plaintiff Patricia Woodward began working for Citibank, a subsidiary of Citi, in 2001 and is a current employee.  Plaintiffs are current participants in the Citigroup 401(k) Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Citi shares in the Plan during the Class Period.

**B.  Defendants**

15.  **Defendant Citigroup Inc.,** a Delaware corporation, is a holding company with its principal place of business at 399 Park Avenue, New York, New York.  Citigroup is one of the

world's largest wealth management, capital markets, and advisory companies with approximately $2.2 trillion in assets under management. The Company has over 154,000 employees in the United States and approximately 183,000 employees outside the United States. Citi has five major business segments: Global Consumer Group, Corporate and Investment Banking, Global Wealth Management, Alternative Investments and Corporate/Other. Citigroup common stock is listed on the New York Stock Exchange and trades under the ticker symbol "C."

16.    **Director Defendants.** The Citigroup Board of Directors (hereinafter the "Board") is the governing body of Citigroup under its charter, its bylaws, and applicable Delaware law. On information and belief the members of the Board during the Class Period included:

a.    **Defendant Charles Prince** served as Chairman of the Board of Citigroup from 2003 until his retirement on November 4, 2007. Defendant Prince also served as the Company's Chief Executive Officer from 2003 until his retirement.

b.    **Defendant Robert E. Rubin** has served as a Director of Citigroup since 1999.

c.    **Defendant C. Michael Armstrong** has served as a Director of Citigroup since 1989.

d.    **Defendant Alain J.P. Belda** has served as a Director of Citigroup since 1997.

e.    **Defendant George David** served as a Director of Citigroup since 2002.

f.    **Defendant Kenneth T. Derr** has served as a Director of Citigroup since 1987.

g.    **Defendant John M. Deutch** has served as a Director of Citigroup since

1996.

h.     **Defendant Robert Hernandez Ramirez** has served as a Director of Citigroup since 2001.

i.     **Defendant Andrew N. Liveris** has served as a Director of Citigroup since 2005.

j.     **Defendant Ann Mulcahy** has served as a Director of Citigroup since 2004.

k.     **Defendant Richard D. Parsons** has served as a Director of Citigroup since 1996.

l.     **Defendant Judith Rodin** has served as a Director of Citigroup since 2004.

m.     **Defendant Robert L. Ryan** has served as a Director of Citigroup since 2007.

n.     **Defendant Franklin A. Thomas** has served as a Director of Citigroup since 1970.

o.     **Defendant Ann Dibble Jordan** has served as a Director of Citigroup from 1989 until April 2007.

p.     **Defendant Klaus Kleinfeld** served as a Director of Citigroup from 2005 until his resignation on August 15, 2007.

q.     **Defendant Dudley C. Mecum** served as Director of Citigroup since 1986.

17.    As is explained in more detail below, the Board had certain responsibilities with respect to the Plans, including oversight responsibilities, and the Board and its members were therefore fiduciaries of the Plans.  The Board and its members listed above are referred to as the "Director Defendants."

18.    **Personnel and Compensation Committee Defendants.** As explained in more detail below, the Personnel and Compensation Committee ("Compensation Committee") is appointed by the Board and had responsibility for various oversight responsibilities. The Defendants identified in this paragraph are referred to as the "Compensation Committee Defendants." On information and belief, the Compensation Committee Defendants during the Class Period are as follows:

a.    **Defendant Alain J.P. Belda** has served as a member of the Compensation Committee.

b.    **Defendant Kenneth T. Derr** has served as a member of the Compensation Committee.

c.    **Defendant Richard D. Parsons** has served as a member of the Compensation Committee and is the Chair of the Compensation Committee.

d.    **Defendant Ann Dibble Jordan** has served as a member of the Compensation Committee.

19.    **Plans Administration Committee of Citigroup, Inc. Defendants**. As explained more fully below, the Plans assigned certain fiduciary responsibilities and duties to the Plans Administration Committee of Citigroup, Inc. ("Administration Committee"). The Administration Committee members have full authority and power to administer and construe the Plans.

20.    The identities of the members of the Administration Committee are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 1-10. Once the identities of the Administration Committee members are ascertained, Plaintiff will seek leave to join them under their true names. The Administration Committee and its members are referred to as the "Administration Committee Defendants."

21.    **Investment Committee Defendants**.  As explained in more detail below, the Investment Committee Defendants have the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds.  The identities of the Investment Committee Defendants are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 11-20.  Once the identities of the Investment Committee Defendants are ascertained, Plaintiff will seek leave to join them under their true names.  The Investment Committee Defendants (John and Jane Does 11-20) are referred to as the "Investment Committee Defendants."

## V.  THE PLANS

### A.    The Citigroup Plan and the Citibuilder Plan

22.    The Plans, sponsored by Citigroup, are "employee pension benefit plans," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plans are neither a defendant nor a plaintiff.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants and beneficiaries.

23.    The assets of an employee benefit plan, such as the Plans here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Citigroup Plan were held in trust by Citibank, N.A., while the assets of the Citibuilder Plan were held in trust by Banco Popular de Puerto Rico pursuant to the trust agreement.  All contributions made to the Plans constitute a form of deferred compensation.

24.    The Citigroup Plan became effective on October 1, 1987, while the Citibuilder Plan became effective on January 1, 2001.  The purpose of the Plans is to encourage employees to save for retirement.  *See* Citigroup Inc. 401(k) Plan, Annual Report (Form 11-K) (Dec. 31,

2006) (hereinafter the "2006 Citigroup Plan 11-K") at 4; Citibuilder 401(k) Plan for Puerto Rico,

Annual Report (Form 11-K) (Dec. 31, 2006) (hereinafter the "2006 Citibuilder Plan 11-K") at 4.

25.    A full-time employee is eligible to participate in the Citigroup Plan beginning with the first pay period following the date of hire. Effective January 1, 2007, part-time employees scheduled to work 20 hours or more a week will be eligible to contribute to the Citigroup Plan on the first day of the first pay period following their date of hire. Part-time employees who become eligible to participate in the Citigroup Plan effective January 1, 2007, or later, will be enrolled to contribute automatically 90 days after the eligibility date. If the participants do not want to be enrolled automatically in the Citigroup Plan, they have a 90-day grace period from their eligibility date to decline enrollment. 2006 Citigroup Plan 11-K at 18; 2006 Citibuilder Plan 11-K at 16.

26.    At all relevant times, the Plans had two separate components: (1) a contributory component, which consisted of participant contributions, and (2) a matching component, ("Company Matching Contributions") which consisted entirely of employer contributions.

27.    Participants in the Plans are permitted to defer a percentage of their base compensation for investment in the Plans. Participants in the Citigroup Plan are allowed to contribute up to 50 percent of their eligible pay, up to an annual maximum of $15,000. 2006 Citigroup Plan 11-K at 6. Participants in the Citibuilder Plan are allowed to contribute up to 10 percent of their eligible pay, up to an annual maximum of $8,000. 2006 Citibuilder Plan 11-K at 5.

28.    Throughout the Class Period, the Plans offered various investment options for participant contributions, including the Citigroup Common Stock Fund. 2006 Citigroup Plan Form 11-K at 7.

29.    Throughout the Class Period, the Company made Company Matching Contributions to the Plans. To be eligible for Company Matching Contributions a participant

9

had to have qualifying compensation of $100,000 or less and had to be employed for a minimum period, generally one year for a full-time employee. Company Matching Contributions varied depending on a participants' compensation. The Company matched $1 to $3 for each $1 a participant contributed, up to an annual maximum of 3% of eligible pay or $1500 annually. 2006 Citigroup Plan 11-K at 7; Citibuilder Plan 11-K at 5. Effective January 1, 2008, the Company Match will increase to a maximum of 6% of eligible pay for all compensation levels. 2006 Citigroup Plan 11-K at 18; Citibuilder Plan 11-K at 18.

30.    Company Matching Contributions are made in the form of Citi common stock and are held in the Citigroup Common Stock Fund. Company Matching Contributions were required to stay in the Citigroup Common Stock Fund for five Plan years, unless the participant had attained age 55. 2006 Citigroup Plan 11-K at 7; 2006 Citibuilder Plan 11-K at 5.

31.    Effective January 1, 2007, the Plans were amended so that past and future Company Matching Contributions could be transferred into other Plan investments. 2006 Citigroup Plan 11-K at 18; 2006 Citibuilder Plan 11-K at 18.[1]

32.    Participants become fully vested in Company Matching Contributions upon the completion of three years of service. 2006 Citigroup Plan 11-K at 8; 2006 Citibuilder Plan 11-K at 6.

33.    Upon information and belief, the Citigroup Common Stock Fund was not a required feature of the Plans. Rather, whether to offer the Citigroup Common Stock Fund as an investment option in the Plans was a discretionary decision made by the Plans' fiduciaries, by and through the Investment Committee Defendants.

---

[1] These amendments are consistent with, and went into effect at the same time as the relevant provisions of, the Pension Protection Act of 2006. Pension Protection Act of 2006 § 901(a)(1), I.R.C. § 401(a)(35) (allowing a plan participant with at least three years of service to divest the portion of the account invested in employer securities that is attributable to employer contributions in other investment options).

34.    Nothing in the Plans limits the ability of the Plans' fiduciaries to remove the Citigroup Common Stock Fund as an investment alternative or divest assets invested in the option as prudence dictates.

**B.    ESOP Fiduciaries are Bound by Core ERISA Fiduciary Duties.**

35.    The portion of Citigroup Plan invested in the Citigroup Common Stock Fund is designated as a purported ESOP. 2006 Citigroup Plan 11-K at 4.

36.    An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). On information and belief, the Citigroup Plan did not satisfy all of the statutory and regulatory mandates with respect to ESOP design and/or operation.

37.    Even if the portion of the Citigroup Plan designated as an ESOP satisfies all of the applicable regulatory requirements for this designation, just like 401(k) plan fiduciaries generally, fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

38.    Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the purported ESOP component of the Citigroup Plan, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.

**C.    The Plans Incurred Significant Losses during the Class Period.**

39.    During the Class Period, Citi Common Stock represented significant portion of the Plans' assets.

40.    As of December 31, 2006, the Citigroup Plan held approximately 74 million shares of Citi stock, then having a market value of approximately $4.1 billion, and representing 32 percent of the net assets of the Citigroup Plan. 2006 Citigroup Plan 11-K at 20.

41.    As of December 31, 2006, the Citibuilder Plan held approximately 133 thousand shares of Citi stock, then having a market value of approximately $7.4 million, and representing 22 percent of the net assets of the Citibuilder Plan.  2006 Citibuilder Plan 11-K at 10.

42.    The Plans have incurred substantial losses as a result of the Plans' investment in Citi stock.  Following revelations of the Company's serious mismanagement and improper business practices, including, among other practices: (a) Citi's rapid expansion into high-risk financial products without corresponding risk management controls; (b) the Company's failure to limit its exposure to losses from subprime mortgages and mortgage-backed securities; (c) the Company's failure accurately to account for its subprime-related assets, and (d) the Company's misrepresentations regarding its financial condition.  Citi stock has declined approximately 38 percent since the beginning of the Class Period.

## VI. DEFENDANTS' FIDUCIARY STATUS

### A.    The Nature of Fiduciary Status.

43.    **Named Fiduciaries.**  Every ERISA plan must have one or more "named fiduciaries."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

44.    **De Facto Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any

moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he

has any discretionary authority or discretionary responsibility in the administration of such plan."

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

45.    Each of the Defendants was a fiduciary with respect to the Plans and owed

fiduciary duties to the Plans and the participants under ERISA in the manner and to the extent set

forth in the Plans' documents, through their conduct, and under ERISA.

46.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.

§ 1104(a)(1), to manage and administer the Plans, and the Plans' investments solely in the

interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and

with like aims.

47.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all

aspects of the Plans' management and administration.  Rather, as set forth below, Defendants

were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or

exercised by each of them, and, as further set forth below, the claims against each Defendant are

based on such specific discretion and authority.

48.    Instead of delegating all fiduciary responsibility for the Plans to external service

providers, on information and belief Citi chose to assign the appointment and removal of

fiduciaries to the monitoring Defendants named herein.  These persons and entities in turn

selected Citi employees, officers and agents to perform most fiduciary functions.

49.    ERISA permits fiduciary functions to be delegated to insiders without an

automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C.

§ 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the plan sponsor.

**B.    Citi's Fiduciary Status.**

50.    Citi, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan and, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Citi is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

51.    Additionally, under basic tenants of corporate law, Citi is imputed with the knowledge that the Defendants had regarding the misconduct alleged herein, even if not communicated to Citi.

52.    Consequently, in light of the foregoing duties, responsibilities, and actions, Citi was both a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

53.    Citi, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, on information and belief, Citi relied and continues to rely directly on the Director Defendants, the Compensation Committee Defendants, and the other individual Defendants named herein to carry out its fiduciary responsibilities under the Plans and ERISA.

**C.    The Director Defendants' Fiduciary Status.**

54.    Under Delaware law and Citi's charter and bylaws, the Board had the authority to manage the affairs, property and business of Citi.  Because Citi was, as alleged above, a fiduciary of the Plans during the Class Period, so, necessarily, was the Board and its members, which had the ultimate authority for the affairs of Citi.

55.    Upon information and belief, the Director Defendants are charged with the appointment of the following fiduciaries of the Plans:  the Compensation Committee members the Administration Committee members, and the Investment Committee members.  Accordingly, the Director Defendants had the duty to monitor, and to remove, the Compensation Committee Defendant, the Administration Committee Defendants, and the Investment Committee Defendants.  Thus, according to Department of Labor regulations, the Director Defendants exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

56. Consequently, in light of the foregoing duties, responsibilities, and actions, the Director Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**D.    Compensation Committee Defendants' Fiduciary Status.**

57.    According to the Compensation Committee Charter the Compensation Committee Defendants had various responsibilities, including the duty to "[a]nnually review employee compensation strategies; benefits and equity programs."  Compensation Committee Charter at 2.

58.    The Compensation Committee was to regularly report to the Board of Citi.  *Id.* at 3.

59.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**E.     Administration Committee Defendants' Fiduciary Status.**

60.     According to the Citigroup Inc. 401(k) Plan Prospectus and Summary Plan Description, the Administration Committee has the "power and discretion to determine all benefits and resolve all questions pertaining to the administration, interpretation, and application of Plan provisions either by rules of general applicability or by particular decisions." *See* Citigroup Inc. 401(k) Plan Prospectus and Summary Plan Description (Jan. 15, 2007) (hereinafter the "SPD") at 2.

61.     On information and belief, in order to comply with ERISA, the Administration Committee exercised responsibility for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner, by providing participants with information and materials required by ERISA. *See e.g.,* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). In this regard, on behalf of the Company, the Administration Committee disseminated the Plan documents, such as the SPD, and related materials which, among other things, incorporated by reference Citi's misleading SEC filings, thus converting such materials into fiduciary communications.

62.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Administration Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or

discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

F.    **Investment Committee Defendants Fiduciary Status**

63.    The Investment Committee Defendants had the responsibility of selecting the investments in the Plans and monitoring the performance of the investment funds, including the Company Stock Fund in the Plan.  *See* June 11, 2007 Memorandum to Citigroup Employees from Michael Schlein.

64.    The Investment Committee Defendants exercised this responsibility when they created a new investment fund line-up effective September 4, 2007, in which the Citigroup Common Stock Fund continued as an investment option.  *Id.*

65.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Administration Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## VII.  FACTS BEARING ON FIDUCIARY BREACH

A.    **Citi Was an Imprudent Investment for the Plans during the Class Period Because of its Serious Mismanagement, Precipitous Decline in the Price of its Stock and its Rapidly Deteriorating Financial Condition.**

1.    **Summary.**

66.    During the Class Period, Citi has been plagued by severe problems that rendered it imprudent for the Plans' fiduciaries to continue to offer Citi stock as an investment option for the Plans, to continue Company Matching Contributions in Citi stock, and to continue to maintain the Plans' massive investment in the stock.  As a result of these problems, discussed in

detail below, Citi stock posed an unduly large risk of significant loss and this risk is not one that could be prudently borne by employee retirement plans.

67.    The risk of large loss was due to a variety of factors, including:

- Citi's rapid expansion into high-risk financial products without implementing the business skill-set to manage and understand the risk and its changing nature;

- Citi's dramatic increase in exposure to the high risks of subprime-backed securities;

- The Company's aggressive growth of its CDO business, even as credit markets deteriorated and subprime mortgage defaults increased;

- Citi's ill-timed expansion of its subprime business, though the acquisitions of ABN AMRO Mortgage Group and the Affordable Housing Debt Business of Capmark Financial Group Inc.;

- The Company's failure to set aside adequate loan-loss reserves in anticipation of future losses, despite the well-known delinquencies;

- Citi's failure to properly manage, and to disclose the risk posed by, its off-shore affiliated structured-investment vehicles ("SIVs"), which resulted in the Company's unanticipated infusion of billions of dollars during the Class Period;

- Faced with an ever-increasing warehouse of CDOs and subprime backed securities, Citi continued to inflate the value of those assets by calculating their worth without regard to the actual market conditions affecting the value of subprime and asset-backed securities; and

- Despite its efforts to conceal a portion of its losses, the Defendants knew, or should have known, that the magnitude of Citi's subprime exposure necessarily

meant that its true financial condition would come to light and severely impact its inflated share price.

68.     Throughout the Class Period, the Defendants misrepresented the Company's financial condition and failed to provide accurate information regarding its failure to manage risk and the severe financial losses consequent of that mismanagement. These misrepresentations caused the price of Citi stock to be artificially inflated during the Class Period.

69.     Throughout the Class Period, the Company suffered from grave mismanagement and corresponding deterioration of its financial condition. As the consequences of this conduct have come to light, Citi's share price has lost approximately 38 percent of its value. Accordingly, under these circumstances, investment in Citi stock was imprudent, as reflected in the enormous losses suffered by the Plans.

**B.     The Fall of the Subprime Lending Industry.**

70.     As early as 2004, industry watchdogs began expressing growing fears that relaxed lending practices were increasing risks for borrowers and lenders in overheated housing markets. *See* Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005. The lowered standards for loan qualification entailed a corresponding rise in the likelihood of missed payments and loan defaults. The prevalence of adjustable-rate loans, combined with the loosened lending standards, made it more likely that early payment defaults would occur in the event of an interest rate hike or change in the housing market.

71.     In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well. *Id.*; *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Testimony Before the Committee on Banking, Housing and Urban Affairs, U.S.*

*Senate: Federal Deposit Insurance Corporation on Mortgage Market Turmoil: Causes and Consequences*, Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/ spmar22071.html. The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the marketplace that bank regulators were concerned about the underwriting standards and generally lax risk management practices of subprime lenders.

72.    In 2005 and 2006, the Federal Reserve instituted a series of interest rate hikes and the interest rates on variable rate loans, including mortgage loans, began to rise. Subprime borrowers who were able to afford the initially low "teaser rate" loan payments no longer could meet their monthly payment obligations. At the same time, home values began to decline sharply, leading some borrowers to walk away from loans when they could not afford the increased monthly mortgage and could not readily re-sell the property for a profit. As a result, many borrowers no longer paid their mortgages, causing defaults to increase significantly.

73.    As of mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time since 2002. By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely -- as of October 2005 the delinquency rate was twice that recorded on new subprime loans a year earlier. *See* Ruth Simon & James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

74.    According to the FDIC, total subprime delinquencies rose from 10.33 percent in the fourth quarter of 2004 to 13.33 percent in the fourth quarter of 2006 and foreclosures rose from 1.47 percent to 2.0 percent over the same period. Testimony of Sandra L. Thompson, *supra*.

75.    AMR subprime loans accounted for the largest rise in delinquency rates, an increase from 9.83 percent to 14.44 percent between the fourth quarter of 2004 and the fourth

quarter of 2006; whereas foreclosures rose from 1.5 percent to 2.7 percent during the same period. *Id.*

76.     In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency, many shortly after origination. *See* Simon & Hagerty, *More Borrowers*, *supra.*

77.     The imminent collapse of the subprime lending industry was widely-documented. In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market. Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006. Shortly after, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings.

**1.      Citi's High-Risk Subprime-Related Transactions and Mismanagement of its Risk Made the Company's Stock a Highly Risky Investment During the Period.**

78.     Despite multiple warnings from industry analysts and government regulators, Citi continued to engage in risky and inappropriate business practices throughout the Class Period. As discussed below, those practices extended throughout the Company's Securities & Banking ("S&B") division and resulted in such severe losses that then-CEO Defendant Prince concluded that the "only honorable course for me to take as Chief Executive Officer is to step down." Current Report (Form 8-K) (Nov. 8, 2007) at Ex 99.1.

**a.      Citi's Plunge Into the High-Risk CDO Business.**

79.     Between 2003 and 2006, Citi dramatically expanded its subprime-related business operations. In addition to its role as an originator and servicer of subprime loans, Citi expanded its S&B operations to include assembling, selling, and holding riskier financial instruments, including leveraged loans, structured credit products, and subprime mortgage-backed securities.

80.    The transformation centered on Citi's rapidly increasing involvement with underwriting CDOs, resulting in Citi's ascent to among the top players in the lucrative business. By 2005, Citi and Merrill Lynch dominated the CDO underwriting ranks - comprising one third of the CDO underwriting market.  Richard Beales and Jennifer Hughes, *Merrill and Citigroup Top CDO Field*, Financial Times, Aug. 31, 2005.

81.    Bundling loans into salable securities involves significantly more risk and uncertainty than traditional interest rate and credit products.  CDOs hold inventories of asset-backed or income securities at various risk levels.  Underwriters then market rights to the income from these various levels in tranches set by debt type and risk levels.  The securities are inherently complex and their values depend on several variables, including market, credit, liquidity, and other conditions affecting the various constituent securities.

82.    The securities became increasingly popular in the early 2000's, when low interest rates made regular bond yields less attractive and spurred significant growth in consumer and mortgage borrowing.

83.    Despite these factors, Citi rushed forward into the CDO market without establishing sufficient risk-management processes to safeguard its business and to limit its exposure to market volatility.

84.    A central component of Citi's CDO underwriting was the bundling of subprime mortgage securities into CDO products.  "Subprime" mortgage loans refer to loans with unconventional terms, such as discounted "teaser" interest rates, an inordinately high loan to equity ratio, or an extended period for repayment, or describe loans made to borrowers with low income and/or poor credit history who do not qualify for standard ("prime") mortgage loan terms.  To create liquidity for these subprime mortgages, lenders combined them with other asset-backed securities into CDOs.

85.     As early as 2005, the CDO market exhibited signs of weakness due to changing credit conditions.  *Id.*  By 2006, Citi resorted to even-riskier CDO transactions, and maintained its own CDO positions, despite the investment's increasing discordance with market fundamentals.  As *The Wall Street Journal* reported:

> As the market boomed, greed set in.  By 2006, investors buying the riskiest slices of ABS CDOs, called the equity, could virtually dictate their own terms.  And investment banks were willing to bend over backward if it helped win the business of arranging a deal.  One example: Rather than funding the highest-rated portion of a CDO with long-term debit, banks often used much cheaper short-term commercial-paper programs.
>
> That saved the CDO money, meaning more interest could be paid to the equity investors.  Some banks even agreed to step in if lenders suddenly snubbed the short-term debt.  That is exactly what happened, and this 'liquidity put' has landed Citigroup with $25 billion, and Bank of America with $15 billion, of exposure to commercial paper backing CDOs.

Comment from breakingviews, *The Nine Lives of CDOs*, Wall St. J., Nov. 26, 2007.

86.     By September 2006, analysts had voiced concerns regarding the continuing demand for mortgage-backed securities.  Kenneth Bruce, a Merrill Lynch analyst, warned clients that demand for subprime bonds "could dissipate quickly," exposing their holders to losses.  Bruce specifically warned that an "asset fire-sale" could cause prices to fall.  Al Yoon, *"Irrational" Mortgage Bond Prices Polarize Markets*, Reuters, Sept. 26, 2006.

87.     Despite that risk, Citi continued to underwrite CDOs and, increasingly, retained CDO holdings in its own portfolio.  Despite months of warning signs, Citi failed to reduce its exposure to CDOs, resulting in the massive losses to the Company, which are discussed below.

**b.     Citi Failed to Reduce its Subprime Exposure in the Midst of the Deteriorating Market Environment.**

88.     Housing market troubles emerged in 2005, but Citi continued its aggressive underwriting of subprime loans both for its own servicing portfolio, as well as for packaging the loans for resale as part of CDOs.

89.    Subprime mortgage exposure grew even riskier in 2006, when the subprime lenders further lowered their standards, sourcing no-documentation and low-documentation loans, known in the industry as "liar loans." This practice constituted as much as 40 percent of subprime mortgages issued in 2006, up from 25 percent in 2001. Gretchen Morgenson, *Crisis Looms In Mortgages*, N.Y. Times, Mar. 11, 2007. Mortgage industry research reported in April 2006 revealed that 90 percent of borrowers had overstated their incomes by 5 percent or more and had inflated their incomes by more than half in 60 percent of the cases. *Id.*

90.    Despite these risks, Citi not only continued to underwrite CDOs, it increased its loan origination activities. In fact, although the value of its mortgage servicing rights (MSRs) declined in 2005, Citi increased both its originations and its acquisition of MSRs in 2006. By December 31, 2006, the Company held $5.4 billion of MSR exposure – up from $4.3 billion the year before. Annual Report (Form 10-K) (Dec. 31, 2006) at 94. As reported in the Company's Annual Report:

| In millions of dollars | 2006 | 2005 |
|---|---|---|
| Balance, beginning of year | $4,339 | $4,149 |
| Originations | 1,010 | 842 |
| Purchases | 673 | 107 |
| Amortization (2) | — | (859) |
| Gain (loss) on changes in value of MSRs (1) | — | (158) |
| Provision for impairments (2) | — | 258 |
| Changes in fair value of MSRs due to changes in inputs and assumptions | 309 | — |
| Other changes (3) | (892) | — |
| Balance, end of year | $5,439 | $4,339 |

*Id.* at 145.

91.    According to *The Wall Street Journal*, only Countrywide Financial had more subprime mortgage exposure in its portfolio for the first six months of 2007, as Citi serviced $88 billion in subprime mortgage debt. Laurie P. Cohen, *Citigroup Feels Heat to Modify Mortgages*, Wall St. J., Nov. 26, 2007.

92.     The Company's continued accumulation of mortgage-debt exposure was imprudent in light of the market conditions, as Citi's own analyst, Brad Ball, had pointed out with respect to another subprime lender, Capital One:

> "Given recent turmoil in the subprime mortgage sector, Alt-A loans have faced greater scrutiny by secondary market investors, seemingly driving pricing and gain-on-sale margins much lower," writes Bradley Ball, an analyst at Citigroup. "We would also expect overall origination volumes to fall as the company will likely take a more cautious underwriting stance. Since Capital One seeks to sell its mortgage loans immediately in the secondary market, non-interest income will likely be affected in the first quarter."

Laurie Kulikowski, *Capital One Hits a Subprime Snag*, TheStreet.com, Apr. 18, 2007.

93.     Still, Citi further exposed itself to mortgage-related losses by making subprime-focused acquisitions.  In March of 2007, Citigroup acquired ABN AMRO Mortgage Group, which the Company cast as a strong revenue source, without noting the added risks:

> Revenues increased 23%, driven by growth in net interest revenues and net servicing revenues, higher gains on sales of loans, and the acquisition of ABN AMRO Mortgage Group in March 2007. Net interest revenues grew 14% as growth in average loans, up 13%, offset a decline in net interest margins.

Current Report (Form 8-K) (July 20, 2007) at 3.

94.     As the credit markets deteriorated during the summer, Citi ignored its increased exposure to subprime losses, and instead focused on building revenue, regardless of the potential risks involved.  Defendant Prince explained the Company's priorities:

> "We have very clear priorities to drive growth and we are executing on all of them. We generated record revenues, up 20%, and record earnings from continuing operations, up 18%."

Current Report (Form 8-K) (July 20, 2007) at Ex 99.1.

95.     And later, despite continuing deterioration of the credit and housing markets, Citi moved again to expand its exposure to subprime, this time purchasing assets of failed subprime

mortgage lender, ACC Capital. The acquisition, which included servicing rights to the lender's $45 billion mortgage portfolio, puzzled Citi's own employees. As *The New York Times* reported: "Industry specialists say that Citigroup probably paid substantially less than it would have several months ago, as the subprime market has deteriorated. But internally, some Citigroup employees have openly questioned whether the company is catching a falling knife." Eric Dash, *Citigroup Buys Parts of a Troubled Mortgage Lender*, N.Y. Times, Sept. 1, 2007.

96.     Not until September 2007 did Citi move to limit its exposure to the already-developed subprime financial sinkhole. Until then, Citi's unit, First Collateral Servicing had continued to take new mortgage bank clients, despite the uncertainty of their financial condition. In September 2007, the Company stopped providing warehouse financing to mortgage lenders. Jody Shenn, *Citigroup Unit Won't Take New Mortgage Bank Clients*, Bloomberg News, Sept. 7, 2007.

97.     The reckless mismanagement of Citi's mortgage-underwriting business affairs extended throughout the Class Period and set the Company and its shareholders, including the Plans, on a course for massive losses once the Company's actual financial condition was disclosed.

### c.     The Massive, Undisclosed Threat Posed By Citi's SIVs

98.     Separate from its extensive CDO and mortgage servicing exposures, the Company failed to manage its massive investments in off-shore affiliates, which are also invested in subprime-backed securities and heavily reliant on credit market conditions.

99.     As with the Company's subprime exposure, Citi failed to recognize the market conditions affecting the SIVs and timely to act to shield the Company from losses due to the illiquid markets for commercial paper held by the SIVs.

100.    For several years, Citi has maintained seven off-shore SIVs, which issue tens of billions of dollars in short-term debt, and use the money to buy higher-yielding assets with longer maturities.

101.    Until recent weeks, the Company had provided little or no information regarding the SIVs, which collectively hold about $83.1 billion in assets. Based on counsel's investigation, Citi only referenced its largest SIV, Centauri, once in its securities filings between 2003 and November 6, 2007.

102.    As the subprime-market collapsed and credit market conditions worsened, SIVs like Centauri were faced with falling portfolio values and an increasingly illiquid market for their commercial paper.

103.    In September 2007, Citi responded to such concerns by affirming the financial health of the SIVs and discounting the concerns about liquidity:

> Citigroup has told investors in its SIVs that they are sound and pose no problems.
>
> "Quite simply, portfolio quality is extremely high and we have no credit concerns about any of the constituent assets," said a recent letter from Paul Stephens and Richard Burrows, directors in Citigroup's London-based group that oversees the bank's SIVs. "Citi's SIVs remain robust and their asset portfolios are performing well."

David Reily, Carrick Mollenkamp, and Robin Sidel, *Conduit Risks Are Hovering Over Citigroup*, Wall St. J., Sept. 5, 2007.

104.    In fact, the SIV portfolio values and liquidity concerns posed a grave risk to Citi. By October, the Company was actively lobbying the government and Wall Street to raise money for a $100 billion Super-SIV to purchase the SIV commercial paper, so that it would not be sold at the heavily-discounted prices of the illiquid market.

105.    As discussed below, Citi did not disclose its mishandling of its SIVs until its bailout plan failed to materialize, forcing the Company to infuse billions of dollars into the SIVs.

**2.    Citi's Reckless Business Management and Failure to Manage Risk Are Revealed.**

106.    On October 1, 2007, Citi reported its expected third quarter earnings and, through the curious means of a previously-recorded (as opposed to live) earnings call, the Company began to reveal some of its massive losses.

107.    Citi reported significant losses, including billions of dollars in write-offs and a 44 percent decline in securities and banking revenue:

> Markets & banking revenues declined 24%, reflecting record transaction services revenues, up 38%, offset by a 44% decline in securities and banking. Securities and banking revenues declined due to write-downs and losses related to dislocations in the mortgage-backed securities and credit markets, including:
>
> • Write-downs of $1.35 billion pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments.
>
> • Losses of $1.56 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.
>
> • Losses of $636 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.
>
> U.S. markets & banking revenues declined 87% and international revenues grew 7%. International revenues included strong double-digit revenue growth in Asia, Latin America, and Mexico.

Current Report (Form 8-K) (Oct. 1, 2007) at Exhibit 99.1.

108.    As summarized in *The Wall Street Journal Online*:

> Citigroup told the market Monday that a smorgasbord of problems – many tied to the credit crunch – will cost it $5.9 billion in the third quarter, a blow that could push profits for the period down 60% from the prior year... Citibank said that it will trim $1.4 billion from the value of loans it extended for activities like leveraged buyouts. Citigroup was also a big player in the once-hot business of taking mortgage-backed securities and debt from big deals, and slicing and dicing them up into new types of investment products. When the perceived risks attending such products

> mushroomed and potential investors in them began shying away, banks like Citigroup were left with stockpiles of securities with falling values. Today, Citigroup confronted that reality, saying it would also write down the value of securities backed by subprime mortgages and LBO loans by $1.3 billion....

Matt Phillips, *Citigroup's Write-Down*, The Afternoon Report, Wall St. J. Online, Oct. 1, 2007.

109. Over the next several weeks, the financial press questioned whether Citi's disclosures on October 1, 2007 (when the stock closed at $47.72 per share) fully reflected the Company's losses.

110. On November 4, 2007, Citi answered both questions, announcing additional write-downs, the resignation of Defendant Prince, and disclosing, for the first time, the full extent of its CDO exposure. The Company's press release stated:

> Citigroup Inc. announced today significant declines since September 30, 2007 in the fair value of the approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking ("S&B") business. Citi estimates that, at the present time, the reduction in revenues attributable to these declines ranges from approximately $8 billion to $ 11 billion (representing a decline of approximately $5 billion to $7 billion in net income on an after-tax basis).

Current Report (Form 8-K) ( Nov. 4, 2007).

111. Announcing his resignation, Defendant Prince remarked:

> "We have made strong progress in our strategy for building for the future, evidenced in the momentum we have achieved in most of our businesses. *Nevertheless, it is my judgment that given the size of the recent losses in our mortgage-backed securities business, the only honorable course for me to take a Chief Executive Officer is to step down.* This is what I advised the Board."

*Id.* (emphasis added).

112. The newly-disclosed information prompted a substantial decline in Citi's share price. The stock, which closed at $41.90 on October 31, 2007, steadily declined to $33.10 at closing on November 9, 2007.

113.    The Company's disclosure not only affected the stock price, but also spurred growing skepticism about Citi's overall financial condition.

At an emergency meeting of the Citi board Sunday, the nation's largest bank announced Prince's widely expected departure, but also estimated it would take additional losses of $8 billion to $11 billion.

In the third quarter, it already took a hit of $6.5 billion in asset markdowns and other credit-related losses. And Monday, Citigroup revised down its results for that quarter by $166 million, after correcting the value of the company's exposure to complex instruments called collateralized debt obligations.

Citigroup, in a filing with the Securities and Exchange Commission, says it earned $2.21 billion in the third quarter, or 44 cents per share. It had reported earnings of $2.38 billion, or 47 cents per share, when it initially posted third-quarter results on Oct. 15.

Citigroup also revised its exposure to collateralized debt obligations, or CDOs, to $43 billion.

Deutsche Bank analyst Mike Mayo, who only Thursday estimated Citigroup would be forced to take $4 billion in writedowns in the fourth quarter, now expects Citigroup to post a loss. He added that he thought Wall Street's 2008 estimates of $1.01 per share for Citi earnings were too optimistic

Citigroup said despite the additional writedown it will retain its dividend and return capital ratios to adequate levels by the second quarter of 2008. CIBC Wolds Markets Corp. analyst Meredith Whitney said that is not likely.

Whitney said in a research note the anticipated fourth-quarter losses, coupled with $2.7 billion paid out in dividends, will strain capital levels even further. Citigroup also could face more writedowns and charges or have to sell assets at discounted prices, leading to further declines in capital levels.

Meanwhile, the company remains entrenched in a mire of off-the-books investment vehicles funded by risky debt. Though Citigroup says it has no contractual obligation to put those losses on their books, they may end up doing so.

Madlen Read, *Citigroup Seeks CEO, Takes More Losses*, Associated Press, Nov. 5, 2007.

114.    The Company's share price continued to fall throughout November, as questions persisted regarding additional write-downs relating to Citi's subprime businesses. *The Wall Street Journal* reported that:

> Investors and analysts believe that Citigroup Inc. may face more pain after announcing last week that it expected to take write-downs of $8 billion to $11 billion.
>
> ***
>
> Citigroup, which packaged subprime-backed bonds into CDOs, may face the toughest questions. Earlier this month, Citigroup disclosed for the first time that it had $43 billion in CDO exposure. This accounted for the bulk of the $55 billion in exposure by Citi to subprime-backed securities.
>
> Citigroup appears to have written down its CDO holdings by about 20%, compared to write-downs of 30% by Merrill Lynch and Morgan Stanley, Sanford C. Bernstein analyst Howard Mason says. If Citigroup is forced to take further hits because of the deterioration in the market for even the most senior and safe portions of CDOs ... the bank could see additional CDO write-downs of $2 billion to $ 4 billion....

Carrick Mollenkamp, David Reilly, and Edward Taylor, *Subprime Hits Seem Likely To Keep Coming*, Wall St. J., Nov. 15, 2007.

115.    On top of the massive subprime write-downs, early-November events made clear that Citi's SIVs, previously described as robust investment funds, are in dire financial straits. On November 6, 2007, Citi "provided $7.6 billion of emergency financing to seven structured investment vehicles it runs after they were unable to repay maturing debt." Neil Unmack and Jody Shenn, *Citigroup SIVs Draw $7.6 Billion of Emergency Funds*, Bloomberg News, Nov. 6, 2007. On November 9, 2007, Moody's, the ratings agency, announced that it would review the ratings assigned to capital notes issued by three of Citi's seven SIVs. Paul J. Davies, *SIVs Face Fight To Survive, Says Moody's*, Financial Times, Nov. 9, 2007.

116.    Citi, which has maintained that it will not bring the seven SIVs onto its balance sheet, has now provided its SIVs with $10 billion in liquidity funding. *HSBC Fund Bailout Raises Citi Questions*, Associated Press, Nov. 26, 2007. Still, the financial condition of its SIVs

31

is in doubt, as rating agencies continue to scrutinize the debt issued by the SIVs. On December

4, 2007, *The Wall Street Journal* reported that:

> Among the funds that face new scrutiny are those affiliated with Citigroup
> Inc., the biggest operator of the funds, which are known as SIVs. Moody's
> said it had downgraded or put on review for a possible downgrade debt
> totaling $64.9 billion that was issued by six Citigroup SIVs. A Citigroup
> spokesman said the SIVs continue to focus on liquidity and reducing debt.
> Assets in the bank's SIVs have fallen steadily to $66 billion from $83
> billion on Sept. 30. Asset sales help raise cash.

Carrick Mollenkamp, *Moody's Warns Over Ratings Of Some SIVs*, Wall St. J., Dec. 4, 2007.

117.    Citi also faces questions regarding its accounting for the off-balance sheet entities

and whether it should follow HSBC's lead and bring its SIV debt onto its balance sheet. Madlen

Read, *HSBC Fund Bailout Raises Citi Questions*, Associated Press, Nov. 26, 2007.

118.    On November 5, 2007, the financial press reported that the SEC was investigating

Citi's SIVs:

> The Wall Street Journal reported Friday that the Securities and Exchange
> Commission is looking into whether Citigroup has been accounting
> correctly for transactions it has done with its SIVs. A Citigroup
> spokeswoman was quoted in the Journal saying the bank is confident that
> it has accounted for its SIVs correctly. But, conspicuously, Citigroup
> didn't mention its SIVs, at least explicitly, in the Sunday press release on
> losses.
>
> ***
>
> If the SEC review does find irregularities with the SIV trading, there's a
> chance Citigroup would have to reflect at least some of its SIV exposure
> on its balance sheet. Because of the doubts about Citigroup's capital
> strength, any move to reflect the SIVs on the balance sheet could deepen
> worries over the bank's financial footing. However, other analysts believe
> Citigroup has adequate capital to deal with an SIV shock and more losses
> from mortgage-related assets and bad loans.

Peter Eavis, *After Prince, More Problems For Citi*, Fortune, Nov. 5, 2007.

119.    Although Citi has maintained that its seven SIVs have subprime exposure of less

than $350 million (a relatively small amount), the Company's recent quarterly-filing describes

the proposed Super SIV's purpose as functioning as a Master Liquidity Enhancing Conduit "that intends to buy assets from SIVs advised by Citigroup and other third-party institutions." Quarterly Report (Form 10-Q) (Nov. 5, 2007).

120.    By late November, faced with its own capital shortfall, Citi resorted to an extraordinary transaction in order to shore up its short-term financial condition.  In exchange for an infusion of $7.5 billion, Citi issued Abu Dhabi Investment Authority eleven percent annual interest debentures, convertible to a 4.9 percent equity interest in Citi.  Current Report (Form 8-K) (Nov. 26, 2007).

121.    While the $7.5 billion infusion will help Citi avoid cutting its shareholder dividend, it did not assuage concerns about Citi's long-term financial health:

> Still, other analysts remained worried, noting that Citi may still have to sell assets and raise more capital next year.
>
> "Further capital raises and balance sheet actions may be necessary in 2008, as balance sheet risks linger," John McDonald, an analyst at Banc of America Securities, wrote in a note to investors.

Steve Goldstein, Greg Morcroft, and Alistair Barr, *Citigroup Gets $7.5 Billion Infusion From Abu Dhabi,* Marketwatch.com, Nov. 27, 2007.

122.    In an editorial column, *The Wall Street Journal* commented:

> …We hate to spoil the party, but it strikes us as unfortunate, if not a tragedy, that America's largest bank had to go hat in hand to Arab sheiks because of bad management and a blundering U.S. monetary policy.
>
> ***
>
> Citigroup did have to shore up its balance sheet, and we suppose petrodollars are a better source of capital that U.S. taxpayers under a "too big to fail" doctrine.  On the other hand, where were Mr. Rubin and the bank board when Citi was betting so much on subprime?  Given the 11% the bank is paying to Abu Dhabi, Citigroup's other equity holders might also be better off down the road had they taken a dividend cut instead.

*Citi of Arabia*, Wall St. J., Nov. 27, 2007.

**3.    Citi's Persistent Failure to Manage Risk.**

123.    As Citi dove ever deeper into the unsteady subprime waters, its risky business was exacerbated by extended its failure to establish or maintain adequate risk-assessment processes or risk-management strategies. This failure extended to the Board of Directors, which, despite its charge to ensure the Company's long-term value, failed even to ask the simple question of what would happen to Citi's $55 billion CDO and subprime-mortgage exposure if and when the credit market retrenched.

124.    The institutional risk management failure stems in part from the Company's apparent appetite for risk and increased revenues. Throughout the Class Period, Defendant Prince was under-fire for Citi's share price, which had lagged behind that of Citi's competitors, despite the Company's global footprint and brand. According to the financial press, Prince's strategy at Citi focused on short-term results:

> Mr. Prince has also cut new investment spending in half and ramped up the acquisition engine for small deals, trading long-term growth for a much faster payoff. And with the choice of Mr. Crittenden, he has once again showed his willingness to adapt. Inside Citigroup, employees believe that Mr. Prince may have as long as another year to prove himself but he must start delivering some results soon. Outside the company, some shareholders are demanding a much shorter leash.

Eric Dash, *Citigroup Has a C.F.O. Now What?*, N.Y. Times, Feb. 27, 2007.

125.    Given the size of the Company's subprime exposure, its systemic risk management failure is nearly beyond comprehension, let alone justification. This was underscored by personnel turnover following the Company's disclosure of its losses. In addition the resignation of Defendant Prince, Citi also moved to replace its Senior Risk Officer, Dave Bushnell. Mike Barris, *Bermudez to Be Citigroup Risk Officer*, Wall St. J., Nov. 17, 2007.

4.    **During the Class Period, Citi Disseminated Incomplete and Inaccurate Information to Participants in the Plans.**

126.    Throughout the Class Period, Citi repeatedly made false statements regarding its financial condition and false assurances regarding the sufficiency of its risk-management processes to participants in the Plans. These false statements caused the price of Citi stock to be artificially inflated during the Class Period.

127.    In January 2007, the Company ensured investors that it had been, and would remain, highly-disciplined in managing its risk.

> Our 2007 priorities are clear: generating sustainable growth in U.S. consumer, growing international consumer, corporate and investment banking and wealth management businesses more quickly, focusing sharply on expense management, and remaining highly disciplined in credit management.

Current Report (Form 8-K) (Jan. 19, 2007).

128.    On that date, the Company's stock closed at $54.50 per share.

129.    Throughout the Class Period, the Company maintained that it had in place adequate risk management processes, both within its constituent businesses and on a company-wide basis. On February 23, 2007, Citi released its 2006 Annual Report, which insured investors that "Citigroup's risk management framework balances strong corporate oversight with well-defined independent risk management functions within each business." Annual Report (Form 10-K) (Dec. 31, 2006) at 59.

130.    On July 20, 2007, Citi touted its "record" revenue performance in an earning release that failed to present any information regarding the severity of the Company's subprime exposure. On that date, the Company's stock closed at $50.73 per share.

131.    As late as August, the Company minimized concerns about its financial condition. As *The Wall Street Journal* reported:

Three weeks ago, Mr. Prince, the chief executive of Citigroup, brushed aside concerns that the era of easy money for buyout deals was about to end, optimistic that the banking giant was "still dancing."

But as credit problems that started in subprime mortgages have pushed into the broader market, many on Wall Street think the music has stopped. Mr. Prince says the recent pullback feels "sharp," but he is insistent that Citigroup will keep moving.

"We see a lot of people on the Street who are scared," Mr. Prince, 57, said during an interview Wednesday in his wood-paneled office at Citigroup's Park Avenue headquarters. "We are not scared. We are not panicked. Our team has been through this before."

Eric Dash , *Is the Dance Over? Citigroup is Upbeat*, Wall St. J., Aug. 3, 2007.

132.    On August 6, 2007, the first full trading day after the story appeared, the Company's stock rose nearly $3 per share, closing at $48.35.

133.    In late October, when Citi's actual financial condition was undoubtedly known to its officers and directors, the Company again delayed disclosing the truth.

Facts coming out in the media, including those in the Fortune article, "Robert Rubin on the Job He Never Wanted," make clear that Citigroup delayed for more than a week – from Saturday, October 27th until Sunday, November 4th – in announcing material information about the multi-billion dollar write-downs it expects to record in this quarter. In the more than a week that passed, there were five trading days – October 29th through November 2nd – in which investors buying and selling Citigroup stock did not know that the write-downs were coming.

Carol Loomis, *Citi's Giant Write-downs: What Did it Know, and When Did It Know It?*, Fortune, Nov. 12, 2007.

134.    On October 29, 2007, the stock closed at $42.69.  By November 5, 2007, following the Company's disclosure, the stock had fallen approximately 36 percent, to a closing price of $35.90.

**C.    Defendants Knew or Should Have Known That Citi Stock Was an Imprudent Investment.**

135.    During the Class Period, as described herein, Defendants knew or, had they properly discharged their fiduciary obligations, would have known that Citi stock was an imprudent

investment for the Plans due to Citi's serious mismanagement and improper business practices, including, among other practices: (a) Citi's rapid expansion into high-risk financial products without corresponding risk management controls; (b) the Company's failure to limit its exposure to losses from subprime mortgages and mortgage-backed securities; (c) the Company's failure accurately to account for its subprime-related assets; and (d) Citi's misrepresentations regarding the Company's financial condition.

136.    As a result, Citi's stock price and the price of the Fund were artificially inflated making them an imprudent investment for the Plans.

137.    As a result of Defendants' knowledge of the public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Citi stock did not effectively inform the Plans' participants of the past, immediate, and future risks of investing in Company stock.

138.    Defendants also failed to take into account the changing risk profile of the Citi stock investment as a result of the above circumstances and the Company's deteriorating financial circumstances as demonstrated by objective indicators for evaluating a company's ongoing viability.

139.    The Defendants failed to conduct an appropriate investigation into whether Citi stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Citi's tremendous problems so that participants could make informed decisions regarding their investments in the Plans.

140.    An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, investment by the Plans in Citi stock was excessively and unduly risky, and, thus, imprudent. A prudent fiduciary acting under similar

circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions. Such action was particularly appropriate here since, upon information and belief, the Plans did not require the fiduciaries to offer Citi stock as a Plan investment option, or maintain any investment in the stock.

141.    Because Defendants knew or should have known that Citi was not a prudent investment option for the Plans, they had a fiduciary duty to protect the Plans and the participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Citi stock.

142.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures, as necessary; divesting the Plans of Citi stock; discontinuing further contributions to and/or investment in Citi stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Citi they could not loyally serve the Plans and the participants in connection with the Plans' acquisition and holding of Citi stock.

143.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plans' investment in Citi stock. In fact, Defendants continued to invest and to allow investment of the Plans' assets in Company stock even as Citi's problems came to light.

144.    In addition, the Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.

145.    When it came to their own personal holdings of Citi stock, however, Defendant Prince and Defendant Rubin sold millions of dollars of the stock, effectively cashing in while hanging the Plans' participants out to dry. Such conduct violated the duties of prudence and loyalty under ERISA.

**D.     Defendants Failed to Provide the Plans' Participants with Complete and Accurate Information about the True Risks of Investment in Citi Stock in the Plans.**

146.     ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.     A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

147.     During the Class Period, upon information and belief, Defendants made direct and indirect communications with participants in the Plans which included statements regarding investments in Company stock.     These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents, in which Defendants failed to disclose that Company stock was not a prudent retirement investment, and which were incorporated by reference in Plan documents.     The Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plan.     2006 Citigroup Plan 11-K at 12; 2006 Citibuilder Plan 11-K at 10.

148.     Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

> (a).     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

> (b).     Out of loyalty, employees tend to invest in company stock;

> (c).     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d).    Employees tend not to change their investment option allocations in the plan once made;

(e).    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f).    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g).    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

149.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the concentration of the Plans' funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plans and thus the participants from their heavy investment in an imprudent retirement vehicle, Citi stock.

150.    In addition, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plans could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plans.

151.    Specifically, Defendants failed to provide the Plans' participants with complete and accurate information regarding Citi's serious mismanagement and improper business practices, including, among other practices: (a) Citi's rapid expansion into high-risk financial products without corresponding risk management controls; (b) the Company's failure to limit its exposure to losses from subprime mortgages and mortgage-backed securities; (c) the Company's

failure accurately to account for its subprime-related assets, and (d) Citi's misrepresentations regarding the Company's financial condition.

152.    In July 2007, long after the subprime-crisis was evident, Citi ignored the risk that permeated its S&B business and, instead, trumpeted its revenue strength, reporting its second quarter earnings on July 20, 2007:

> CITI REPORTS RECORD INCOME FROM CONTINUING OPERATIONS OF $6.2 BILLION, UP 18%
>
> RECORD EPS FROM CONTINUING OPERATIONS OF $1.24, UP 18%
>
> RECORD REVENUES OF $26.6 BILLION, UP 20%
>
> RECORD INTERNATIONAL RESULTS WITH REVENUES UP 34%, NET INCOME UP 35%
>
> RECORD REVENUES AND NET INCOME IN MARKETS & BANKING AND WEALTH MANAGEMENT
>
> New York, NY, July 20, 2007 — Citigroup Inc. (NYSE:C) today reported net income for the 2007 second quarter of
>
> $6.23 billion, or $1.24 per share, both up 18%. International revenues and net income were a record, up 34% and
>
> 35%, respectively. Return on equity was 20.1%.
>
> Management Comment
>
> "We have very clear priorities to drive growth and we are executing on all of them. We generated record revenues, up 20%, and record earnings from continuing operations, up 18%, both driven by our record international results," said Charles Prince, Citi Chairman and Chief Executive Officer.
>
> "We continued to generate revenue and volume growth in our U.S. consumer franchise, while making excellent progress in re-weighting Citi toward our other businesses, especially our international franchises, where revenues and net income increased over 30%. Our capital markets-driven businesses performed extremely well and international consumer revenues and volumes grew at a double-digit pace," said Prince.
>
> "We also began to implement the structural expense initiatives announced in April, which are generating improved efficiencies. These initiatives,

coupled with strong revenue growth, drove positive operating leverage this quarter and helped offset increased credit costs."

"We made excellent progress in expanding our business through targeted acquisitions, completing three international transactions, including an increase in our ownership of Nikko Cordial Corporation in Japan to 68%," said Prince.

*Citi 2nd Quarter Earnings Release*, July 20, 2007, available at http://www.citigroup.com/citigroup/press/2007/070720a.htm.

153.    Even as late as September 2007, Citi provided inaccurate information about the Company's financial condition.    Responding to concerns about the Citi SIV's, the Company reassured investors of the strength of its SIV investments :

Citigroup said in a prepared statement, "We are very comfortable with the quality of the highly rated assets in the SIVs portfolios.    We enjoy rigrous thresholds."

Carrick Mollenkamp and Margot Patrick, *Citigroup Moves to Quell SIV Concerns*, Wall St. J., Sept. 7, 2007.

154.    In October, just weeks before Citi would acknowledge the SIV crisis and infuse billions of dollars to its SIVs, the Company again affirmed the strength of the SIVs:

• Citi has seen the market for third party funding improve recently, with the SIVs' raising more than $1.5 billion of commercial paper funding from third party sources in the last week.

• While Citi will not consolidate the assets of the SIVs, Citi has and will, from time to time, continue to provide liquidity to the SIVs on an arm's length basis on commercial terms consistent with those provided by unaffiliated third parties.

*Citi-Advised    SIV    Fact    Sheet*,    Oct.    19,    2007,    available    at http://www.citigroup.com/citigroup/fin/data/siv071019.pdf.

155.    These misrepresentations are consistent with the Company's communications throughout the Class Period, during which the participants were not informed of the true risks of investing their retirement assets in the Plans in Citi stock.

**E.    Defendants Suffered From Conflicts of Interest.**

156.    As ERISA fiduciaries, Defendants are required to manage the Plans' investments,

including the investment in Citi stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries. This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

157.    Conflicts of interest abound when a company that invests plan assets in company stock founders. This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other. As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'" *Martin v. Feilen,* 965 F.2d 660, 670 (8th Cir.1992) (citation omitted). Here, Defendants breached this fundamental fiduciary duty.

158.    Defendants failed to investigate whether to take appropriate and necessary action to protect the Plans, and instead, chose the interests of the Company over the Plans by continuing to offer Citi stock as an investment option for participant contributions, continuing to make Company Matching Contributions in Citi stock, and continuing to maintain investments in Citi stock in the Plans. Moreover, while Defendant Prince and Defendant Rubin dumped shares they personally held, they did nothing to protect the Plans from losses due to the Plans' imprudent investment in Citi stock.

| Name | Date | Number of Shares | Type of Transaction | Proceeds |
|---|---|---|---|---|
| Prince, Charles | 22-Jan-07 | 81,088 | Disposition (Non Open Market) at $54.55 per share. | $4,423,350.00 |
| | 17-Apr-07 | 13,419 | Disposition (Non Open Market) at $52.93 per share. | $710,267.00 |
| | 17-May-07 | 13,395 | Disposition (Non Open Market) at $54.91 per share. | $735,519.00 |
| | 13-Jul-07 | 38,342 | Disposition (Non Open Market) at $52.84 per share. | $2,025,991.00 |
| | | | Total: | $7,895,127.00 |
| Rubin, Robert E | 22-Jan-07 | 77,500 | Sale at $55.05 per share. | $4,266,375.00 |

| | |
|---|---|
| **Total:** | $4,266,375.00 |
| **Grand Total:** | $12,161,502.00 |

## VIII. THE RELEVANT LAW

159.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil

action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

160.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part,

> any person who is a fiduciary with respect to a plan who breaches any of
> the responsibilities, obligations, or duties imposed upon fiduciaries by this
> subchapter shall be personally liable to make good to such plan any losses
> to the plan resulting from each such breach, and to restore to such plan any
> profits of such fiduciary which have been made through use of assets of
> the plan by the fiduciary, and shall be subject to such other equitable or
> remedial relief as the court may deem appropriate, including removal of
> such fiduciary.

161.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to

seek equitable relief from defendants, including, without limitation, injunctive relief and, as

available under applicable law, constructive trust, restitution, and other monetary relief.

162.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

163.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."

*Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Citigroup Common Stock Fund, which invested in Citi stock, to ensure that each investment is a suitable option for the plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

164.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part,

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

165.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be,

as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

166. Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

### IX. ERISA § 404(c) DEFENSE INAPPLICABLE

167. ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

168.    ERISA § 404(c) does not apply here for several reasons.

169.    First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Citi stock as an investment option in the Plans as this is not a decision that was made or controlled by the participants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan").

170.    Second, ERISA § 404(c) does not apply to any Citi stock in the component of the Citigroup Plan that purports to be an ESOP as Plan participants do not have any control over the decision to invest Plan assets in Citi in the Citigroup Plan's ESOP component. Instead, the Citigroup Plan fiduciaries controlled such assets.

171.    Third, even as to participant-directed investment in Citi stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Citi stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Citi stock as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investment.

172.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the

Plans, the Plaintiffs and the Class (as defined below) for losses caused by the Plans' investment

in Citi stock is established upon proof that such investments were or became imprudent and

resulted in losses in the value of the assets in the Plans during the Class Period.

## X. DEFENDANTS' INVESTMENT IN CITI STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

173.    Some courts have applied a presumption of prudence to decisions by plan

fiduciaries to invest plan assets in company stock in plans that qualify as "ESOPs" under the

Internal Revenue Code and rules of the Department of the Treasury promulgated thereunder.

The presumption is based on the dual purpose of an ESOP to allow employee ownership on the

one hand, and save for retirement on the other. *Moench v. Robertson*, 62 F.3d 553, 569, 571 (3d

Cir. 1995) (explaining dual purpose of ESOP plans and adopting presumption of prudence to

balance these concerns).

174.    As these courts have made clear, when a presumption of prudence applies, "[a]

Plaintiff may then rebut this presumption of reasonableness by showing that a prudent fiduciary

acting under similar circumstances would have made a different investment decision." *Kuper v.

Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

175.    Plaintiffs dispute that the Citigroup Plan qualifies as an ESOP. Nonetheless, even

if the Citigroup Common Stock Fund components of the Citigroup Plan is deemed an ESOP, any

presumption of prudence on the part of Defendants' decisions to make and maintain investment

in Citi stock is overcome by the facts alleged here, including, among other averments:

- A precipitous stock price decline from over $55.70 to under $34.31 during the Class Period;

- Risk of further imminent collapse of the Company's stock price based on the Company's practices as described in detail herein;

- Serious, if not gross, mismanagement evidenced by, among other things,

  - rapidly expanding into high-risk financial products without corresponding risk management controls;

  - failing to limit its exposure to losses from subprime mortgages and mortgage-backed securities;

  - failing to accurately account for its subprime-related assets; and

  - artificially inflating the Company's share price by misrepresenting the Company's financial condition.

176.    The imprudence of continued investment by Defendants in Citi stock during the Class Period under the circumstances present here is recognized in Department of Labor regulations:

> [B]ecause every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. 2509.94-1. Defendants had available to them investment alternatives to Citi stock that had either a higher rate of return with risk commensurate to Citi stock or an expected rate of return commensurate to Citi stock but with less risk.

177.    Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in Citi stock, and, effectively, to do nothing at all to protect the Plans from significant losses as a result of such investment during the Class Period.

## XI.  CAUSES OF ACTION

**A.    Count I:  Failure to Prudently and Loyally Manage the Plans and Assets of the Plans.**

178.    Plaintiffs incorporate by this reference the paragraphs above.

179.    This Count alleges fiduciary breach against the following Defendants:  the Compensation Committee Defendants and the Investment Committee Defendants (the "Prudence Defendants").

180.    As alleged above, during the Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

181.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included, on information and belief, managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest Company Matching Contributions to the Plans and directing the trustee regarding the same, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently.

182.    Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans.  Specifically, during the Class Period, these Defendants knew or should have known that Citi common stock no longer was a suitable and appropriate investment for the Plans, but was, instead, a highly speculative and risky investment in light of the Company's improper business practices, serious

mismanagement, misstatement and omissions that caused the price of Citi stock to be artificially inflated, and the impending collapse of the price of the stock as a result of these dire circumstances. Nonetheless, during the Class Period, these Defendants continued to offer Citi stock as an investment option for participant contributions, provide Company Matching Contributions in Citi stock, and maintain the Plans' enormous investment in the stock.

183.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

184.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in Citi stock even in light of the losses, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plans. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Citi stock under these circumstances.

185.    The Prudence Defendants' decisions respecting the Plans' investment in Citi stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plans' contributions and

assets in Citi stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

186.    The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

187.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

188.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

- o  The composition of the portfolio with regard to diversification;

- o  The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

- o  The projected return of the portfolio relative to the funding objectives of the plan.

189.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Citi stock because, among other reasons:

- •  The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plans:  (a) Citi's rapid expansion into high-risk financial products without corresponding risk management controls; (b) the Company's failure to limit its exposure to losses from subprime mortgages and mortgage-backed securities; (c) the Company's failure accurately to account for its subprime-related assets, and (d) the Company's misrepresentations regarding its financial condition, which artificially inflated the share price of the Company;

- •  The risk associated with the investment in Citi stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- •  This abnormal investment risk could not have been known by the Plans' participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

53

- Knowing of this extraordinary risk, and knowing the Plans' participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plans or any participant from investing the Plans' assets in Citi stock; and

- Further, knowing that the Plans were not diversified portfolios, but were heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plans of Company stock if it became or remained imprudent.

190.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. On information and belief, the compensation and tenure of the Prudence Defendants was tied to the performance of Citi stock and/or the publicly reported financial performance of Citi. Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

191.    The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investment in Citi; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Citi stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to Citi's inappropriate practices; and by otherwise placing their own and Citi's

improper interests above the interests of the participants with respect to the Plans' investment in Citi stock.

192.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plans suffered significant losses.  If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost over $1.7 billion dollars of retirement savings.

193.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.      Count II:  Failure to Monitor Fiduciaries**

194.    Plaintiffs incorporate by this reference the allegations above.

195.    This Count alleges fiduciary breach against the Director Defendants (the "Monitoring Defendants").

196.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

197.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|

| Director Defendants | Compensation Committee Defendants, Administration Committee Defendants, and Investment Committee Defendants. | ¶¶ 54 - 56 |

198.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

199.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

200.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

201.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the

monitored fiduciaries appreciated the true extent of Citi's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Citi stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Citi stock despite their knowledge of practices that rendered Citi stock an imprudent investment during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

202.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost over $1.7 billion dollars of retirement savings.

203.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.    Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries.**

204.    Plaintiffs incorporate by this reference the allegations above.

205.    This Count alleges fiduciary breach against Citi and the Administration Committee Defendants (the "Communications Defendants").

206.    At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

207.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included the communications and material disclosures to the Plans' participants and beneficiaries.

208.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan.  This duty applies to all of the Plans' investment options, including investment in Citi stock.

209.    Because investments in the Plans were not diversified (*i.e.* the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested heavily in Citi stock), such investment carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Citi stock.

210.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Citi's serious mismanagement and improper business practices and public misrepresentations, and the consequential artificial inflation of the value of Citi stock, and, generally, by conveying incomplete information regarding the

58

soundness of Citi stock and the prudence of investing and holding retirement contributions in Citi equity. These failures were particularly devastating to the Plans and the participants; a heavy percentage of the Plans' assets were invested in Citi stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

211. Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plans' investment in Citi stock.

212. Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that the Defendants failed to provide complete and accurate information to any of the Plans' participants.

213. Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

214. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

215. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**D.    Count IV:  Co-Fiduciary Liability**

216. Plaintiffs incorporate by this reference the allegations above.

217. This Count alleges co-fiduciary liability against the following Defendants: all Defendants (the "Co-Fiduciary Defendants").

218.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

219.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

220.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

221.    Citi, through its officers and employees, was unable to meet its business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices, and, thus, knowledge of such practices is imputed to Citi as a matter of law.

222.    Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock.  Yet, they failed to undertake any effort to remedy these breaches.  Instead, they compounded them by downplaying the significance of Citi's failed and

inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plans.

223.    **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Citi knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for the Plans' participants.  Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Citi stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.

224.    **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

225.    The Monitoring Defendants' failure to monitor the Prudence Defendants enabled that committee to breach its duties.

226.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost over $1.7 billion dollars of retirement savings.

227.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by

61

their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XII. CAUSATION

228.   The Plans suffered nearly *$1.7 billion dollars* in losses because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in Citi stock during the Class Period, in breach of Defendants' fiduciary duties.

229.   Defendants are liable for the Plans' losses in this case because: (a) the ESOP's investment in Citi stock was the result of the Prudence Defendants' decision to invest Company contributions in Citi stock; and (b) as to the portion of the Plans' assets invested in Citi stock as a result of participant contributions and/or Company Matching Contributions, the Prudence Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

230.   Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Citi stock as an investment alternative when it became imprudent, and divesting the Plans of Citi stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that they, and indirectly, the participants suffered.

## XIII. REMEDY FOR BREACHES OF FIDUCIARY DUTY

231.   The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in Citi stock during the Class Period.

232.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

233.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

234.    With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans' participants would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them. Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Citi stock that the Plans would have acquired had the Plans' fiduciaries taken appropriate steps to protect the Plans. The Court should adopt the measure of loss most advantageous to the Plans. In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

235.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C.

1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

236.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## XIV.  CLASS ACTION ALLEGATIONS

237.    **Class Definition.**  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiar-
> ies of the Plans at any time between January 1, 2007 and the present and
> whose accounts included investments in Citi stock.

238.    **Class Period.**  The fiduciaries of the Plans knew or should have known at least by January 1, 2007 that the Company's material weaknesses were so pervasive that Citi stock could no longer be offered as a prudent investment for a retirement plan.

239.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, based on the Plans' Form 5500 for Plan year 2005, over 190 thousand participants or beneficiaries in the Plans.

240.    **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b)      whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)      whether Defendants violated ERISA; and

(d)      whether the Plans have suffered losses and, if so, what is the proper measure of damages.

241.    **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), their claim on behalf of the Plans are not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

242.    **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

243.    **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

65

244.    **Other Rule 23(b) Requirements.** Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### XV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Citi stock;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.     An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated: December 12, 2007.

Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**

By:

Lynda J. Grant (LG-4784)
Catherine A. Torell (CT-0905)
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Steven J. Toll
Bruce F. Rinaldi
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005-3964
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Marc I. Machiz
1 South Broad Street
Suite 1850
Philadelphia, PA 19107
Telephone: (215) 825-4016
Facsimile: (215) 825-4001

**KELLER ROHRBACK L.L.P**
Lynn L. Sarko
Derek W. Loeser
Erin M. Riley
Tyler L. Farmer
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

***Counsel for Plaintiffs***