UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------x
STEPHEN GRAY, individually and on         :
behalf of all others similarly situated,  :
                                          :
            Plaintiff,                    :        Civil Action No: 07 Civ. 9790 (SHS)
                                          :
v.                                        :
                                          :
CITIGROUP INC., CHARLES PRINCE,           :
THE PLANS ADMINISTRATIVE                  :
COMMITTEE OF CITIGROUP INC.,              :
THE 401(k) INVESTMENT                     :
COMMITTEE, and JOHN DOES 1 - 20,          :
                                          :
            Defendants.                   :
------------------------------------------------------x
SHAUN ROSE, Individually and On           :
Behalf of All Others Similarly Situated,  :
                                          :
            Plaintiff,                    :        Civil Action No: 07 Civ. 10294
                                          :
v.                                        :
                                          :
CITIGROUP INC., CHARLES PRINCE,           :
THE PLANS ADMINISTRATIVE                  :
COMMITTEE OF CITIGROUP INC.,              :
THE 401(k) INVESTMENT                     :
COMMITTEE, and JOHN DOES 1 - 10,          :
                                          :
            Defendants.                   :
------------------------------------------------------x
MEREDITH TRANBERG, individually          :
and on behalf of all others similarly situated :
                                          :
            Plaintiff,                    :        Civil Action No: 07 Civ. 10341
                                          :
v.                                        :
                                          :
CITIGROUP INC., CHARLES PRINCE,           :
THE PLANS ADMINISTRATIVE                  :
COMMITTEE OF CITIGROUP INC.,              :
THE 401(k) INVESTMENT                     :
COMMITTEE, and JOHN DOES 1 - 20,          :
                                          :
            Defendants.                   :
------------------------------------------------------x
```

```
-------------------------------------------------------x
ANTON RAPPOLD, individually and on      :
behalf of all others similarly situated, :
                                         :
            Plaintiff,                    :      Civil Action No: 07 Civ. 10396
v.                                        :
                                          :
CITIGROUP INC., CITIBANK, N.A.,          :
CHARLES PRINCE, THE PLANS                 :
ADMINISTRATIVE COMMITTEE OF              :
CITIGROUP INC., THE 401(k)               :
INVESTMENT COMMITTEE, and JOHN           :
and JANE DOES 1 - 10,                     :
                                          :
            Defendants.                   :
-------------------------------------------------------x
SAMIER TADROS, on Behalf of All           :
Others Similarly Situated,                :
                                          :
            Plaintiff,                     :      Civil Action No: 07 Civ. 10442
v.                                        :
                                          :
CITIGROUP INC., CHARLES O.               :
PRINCE, C. MICHAEL ARMSTRONG,            :
ALAIN J.P. BELDA, GEORGE DAVID,          :
KENNETH T. DERR, JOHN M. DEUTCH, :
  ROBERTO HERNANDEZ RAMIREZ,             :
ANN DIBBLE JORDAN, KLAUS                 :
KLEINFELD, ANDREW N. LIVERIS,            :
ANNE MULCAHY, RICHARD D.                 :
PARSONS, JUDITH RODIN, ROBERT E.         :
RUBIN, ROBERT E. RUBIN, FRANKLIN         :
A. THOMAS, JOHN DOES 1-20 (BEING         :
CURRENT AND FORMER MEMBERS               :
OF THE PLANS ADMINISTRATIVE              :
COMMITTEE OF CITIGROUP INC.)             :
and JOHN DOES 21-40 (BEING               :
CURRENT AND FORMER MEMBERS               :
OF THE INVESTMENT COMMITTEE              :
OF THE CITIGROUP INC. 401(K) PLAN), :
                                          :
            Defendants.                   :
-------------------------------------------------------x
```

```
-------------------------------------------------x
STEPHAN FIORINO, individually and on      :
behalf of all others similarly situated,  :
                                          :
              Plaintiff,                   :     Civil Action No: 07 Civ. 10458
v.                                         :
                                          :
CITIGROUP INC., CITIBANK N.A.,            :
CHARLES PRINCE, THE PLANS                 :
ADMINISTRATIVE COMMITTEE OF               :
CITIGROUP INC., THE 401(k)                :
INVESTMENT COMMITTEE, and                 :
JOHN DOES 1 - 20,                         :
                                          :
              Defendants.                  :
-------------------------------------------------x
JAMES BOLLA, individually and on behalf :
 of all others similarly situated,        :
                                          :
              Plaintiff,                   :     Civil Action No: 07 Civ. 10461
v.                                         :
                                          :
CITIGROUP INC., CITIBANK N.A.,            :
CHARLES PRINCE, THE PLANS                 :
ADMINISTRATIVE COMMITTEE OF               :
CITIGROUP INC., THE 401(k)                :
INVESTMENT COMMITTEE, and                 :
JOHN DOES 1 - 20,                         :
                                          :
              Defendants.                  :
-------------------------------------------------x
```

```
-------------------------------------------------------x
MARK GEROULO, individually, on behalf :
of the CITIGROUP 401(k) Plan, the      :
CITIBUILDER 401 (K) PLAN FOR          :
PUERTO RICO, and all others similarly, :
                                       :
              Plaintiff,               :      Civil Action No: 07 Civ. 10472
                                       :
v.                                     :
                                       :
CITIGROUP, INC., CITIBANK, N.A.,       :
THE PLAN ADMINISTRATIVE                :
COMMITTEE OF CITIGROUP, INC.,          :
MICHAEL E. SCHLEIN, JOHN DOES          :
1-10, THE CITIGROUP 401(k) PLAN        :
INVESTMENT COMMITTEE and JOHN          :
DOES 10-20, C. MICHAEL                 :
ARMSTRONG, ALAN J.P. BELDA,            :
GEORGE DAVID, KENNETH T. DERR,         :
JOHN M. DEUTCH, ROBERTO                :
HERNANDEZ, ANN DIBBLE JORDAN,          :
ANDREW N. LIVERIS, DUDLEY C.           :
MECUM, ANNE M. MULCAHY,                :
RICHARD D. PARSONS, ANDRALL E.         :
PEARSON, CHARLES PRINCE, JUDITH        :
RODIN, ROBERT E. RUBIN, FRANKLIN       :
A. THOMAS, SANFORD I. WEILL,           :
                                       :
              Defendants.              :
-------------------------------------------------------x
```

```
-------------------------------------------------x
ALAN STEVENS, on Behalf of Himself       :
and All Others Similarly Situated,       :
                                         :
            Plaintiff,                    :      Civil Action No: 07 Civ. 11156
                                         :
v.                                       :
                                         :
CITIGROUP INC., CITIBANK, N.A,           :
CHARLES PRINCE, C. MICHAEL               :
ARMSTRONG, ALAIN J.P. BELDA,             :
GEORGE DAVID, KENNETH T. DERR,           :
JOHN M. DEUTCH, PETER JOHNSON,           :
ROBERTO HERNANDEZ RAMIREZ,               :
ANDREW N. LIVERIS, ANNE                  :
MULCAHEY, RICHARD D. PARSONS,            :
JUDITH RODIN, ROBERT E. RUBIN,           :
ROBERT L. RYAN, FRANKLIN A.              :
THOMAS, THE PLANS                        :
ADMINISTRATION COMMITTEE OF              :
CITIGROUP, INC., THE INVESTMENT          :
COMMITTEE and JOHN DOES 1-30,            :
                                         :
            Defendants.                   :
-------------------------------------------------x
STEPHEN GOLDSTEIN, on Behalf of          :
Himself and a Class of Persons Similarly :
Situated,                                :
                                         :
            Plaintiff,                    :      Civil Action No: 07 Civ. 11158
                                         :
v.                                       :
                                         :
CITIGROUP INC., THE PLANS                :
ADMINISTRATION COMMITTEE OF              :
CITIGROUP, INC., MICHAEL E.              :
SCHLEIN, CHARLES PRINCE, C.              :
MICHAEL ARMSTRONG, ALAIN J.P.            :
BELDA, GEORGE DAVID, KENNETH T. :
DERR, JOHN M. DEUTCH, ROBERTO            :
HERNANDEZ RAMIREZ, ANDREW N.             :
LIVERIS, ANNE MULCAHEY,                  :
RICHARD D. PARSONS, JUDITH               :
RODIN, ROBERT E. RUBIN, ROBERT L. :
RYAN, AND FRANKLIN A. THOMAS,            :
And JOHN DOES 1-30,                      :
                                         :
            Defendants.                   :
```

```
-------------------------------------------------x
CHRIS SOUTHARD, on Behalf of All          :
Others Similarly Situated,                 :
                                           :
            Plaintiff,                      :      Civil Action No: 07 Civ. 11164
v.                                         :
                                           :
CITIGROUP INC., CHARLES O.                 :
PRINCE, C. MICHAEL ARMSTRONG,              :
ALAIN J.P. BELDA, GEORGE DAVID,            :
KENNETH T. DERR, JOHN M. DEUTCH,           :
ROBERTO HERNANDEZ RAMIREZ,                 :
ANN DIBBLE JORDAN, KLAUS                    :
KLEINFELD, ANDREW N. LIVERIS,              :
ANNE MULCAHY, RICHARD D.                    :
PARSONS, JUDITH RODIN, ROBERT E.           :
RUBIN, ROBERT E. RUBIN, FRANKLIN           :
A. THOMAS, JOHN DOES 1-20 (BEING           :
CURRENT AND FORMER MEMBERS                 :
OF THE PLANS ADMINISTRATIVE                :
COMMITTEE OF CITIGROUP INC.)               :
and JOHN DOES 21-40 (BEING                 :
CURRENT AND FORMER MEMBERS                 :
OF THE INVESTMENT COMMITTEE                :
OF THE CITIGROUP INC. 401(K) PLAN),        :
                                           :
            Defendants.                     :
-------------------------------------------------
FRANCIA BRICK, individually and on         :
Behalf of all others similarly situated,    :
                                           :
            Plaintiff,                      :      Civil Action No: 07 Civ. 11369
v.                                         :
                                           :
CITIGROUP INC., CHARLES PRINCE,            :
THE PLAN'S ADMINISTRATIVE                  :
COMMITTEE OF CITIGROUP, INC.,              :
THE 401(k) INVESTMENT COMMITTEE,           :
And JOHN DOES 1-10,                        :
                                           :
            Defendants.                     :
-------------------------------------------------
```

```
----------------------------------------------------------x
WILLIAM and PATRICIA WOODWARD, :
individually and on Behalf of All Others     :
Similarly Situated,                          :
                                             :
                 Plaintiffs,                 :        Civil Action No: 07cv11207
                                             :
v.                                           :
                                             :
CITIGROUP INC., CHARLES PRINCE,              :
ROBERT E. RUBIN, C. MICHAEL                  :
ARMSTRONG, ALAIN J. P. BELDA,                :
GEORGE DAVID, KENNETH T. DERR,               :
JOHN M. DEUTCH, ROBERTO                      :
HERNANDEZ RAMIREZ, ANDREW N.                 :
LIVERIS, ANN MULCAHEY, RICHARD               :
D. PARSONS, JUDITH RODIN, ROBERT             :
L. RYAN, FRANKLIN A. THOMAS, ANN:
DIBBLE JORDAN, KLAUS KLEINFELD               :
AND DUDLEY C. MECUM, and JOHN                :
and JANE DOES 1-10,                          :
                                             :
                 Defendants.                 :
----------------------------------------------------------
```

**DECLARATION OF MARC I. MACHIZ IN SUPPORT OF
PLAINTIFFS SHAUN ROSE AND MARK GEROULO'S REPLY
IN FURTHER SUPPORT OF THEIR SUPERSEDING MOTION FOR
CONSOLIDATION OF RELATED ACTIONS AND APPOINTMENT OF
INTERIM LEAD PLAINTIFFS, CO-LEAD COUNSEL AND LIAISON COUNSEL**

1.     I, Marc I. Machiz, am a partner with the law firm of Cohen, Milstein, Hausfeld &

Toll, P.L.L.C, and the head of the Cohen Milstein Employee Benefits Practice Group.

2.     For twelve years prior to joining Cohen Milstein, I held the position of Associate

Solicitor of Labor for the Plan Benefits Security Division at the United States Department of

Labor. In that position, I served as the Government's chief lawyer for the enforcement of Title I

of ERISA, including ERISA's fiduciary responsibility provisions which are at issue in this

litigation, and chief legal advisor to the agency within the Department of Labor, now known as

the Employee Benefits Security Administration, which enforces and interprets Title I of ERISA.

3.     Since 1978, my practice has focused almost exclusively on Title I of ERISA, and

more than half of that time I have been an attorney or supervising attorney at the Department of

Labor.

4.     I am a charter fellow of the American College of Employee Benefits Counsel.

(http://www.acebc.com/index.asp), an organization dedicated to elevating the standards and the

advancing the public's understanding of the practice of employee benefits law. I am also a

member of the BNA Pension and Benefits Reporter Advisory Board, and the plaintiff's co-chair

of the subcommittee on Preemption of the Employee Benefits Committee of the Labor Section of

the ABA. I have been a frequent speaker on ERISA issues for almost two decades, appearing on

panels for the ABA, ALI-ABA, PLI, the New York Bar, the District of Columbia Bar and others

3

as well as a guest lecturer on ERISA topics at the Georgetown School of Law and the George Washington University School of Public Health.

5.     The Cohen Milstein's Employee Benefits Practice Group which I head has been actively engaged in a wide range of ERISA class actions, including cases similar to this case. In addition to serving as class counsel in *Banyai v. Mazur*, 2007 WL 959066, *1 (S.D.N.Y. 2007), a case involving the misappropriation of ERISA plan assets, which is currently pending before this Court, lawyers in the Cohen Milstein Employee Benefits Practice Group has been involved in a variety of ERISA class actions involving a wide range of ERISA claims (*i.e.*, retiree healthcare cutbacks, ESOP purchase of stock, pension benefit terminations and cutbacks). These cases include:

- *Tharaldson et al.*, No. 3:05-CV-00115-RRE-KKK (D.N.D.) (excessive payment for employer stock in closely held ESOP)

- *Wagener v. SBC Pension Benefit Plan-Non Bargained Program*, 407 F.3d 395 (D.C. Cir. 2005) (benefit dispute)

- *Zhu v. Fujitsu Group 401(K) Plan*, 2005 WL 735097, *1 (N.D. Cal. 2005) (vesting violation)

- *Stoffels v. SBC Communications, Inc.*, 238 F.R.D. 446 (W.D.Tex. 2006) (failure to treat employee benefit arrangement as an ERISA pension plan)

- *Simpson v. Firemen's Fund Insurance Co.* (N.D. Cal.) (ERISA 510 violation)

- *Beam v. HSBC Bank USA*, 2003 WL 22087589. *1 (W.D.N.Y. 2003) (excessive payment for employer stock in closely held ESOP)

- *Mehling v. New York Life Ins. Co. et al No. 99-CV-5417* (E.D.Pa.) (excessive fees for management of pension plan assets)

- *Hargrave v. TXU, Corp.*, No. 02-2573 (N.D. Tex.) (class counsel in connection with a settlement of a case challenging the prudence of investment by a 401(k) plan in employer stock-settlement preliminarily approved)

- *Redington et al. v. The Goodyear Tire and Rubber Company,* 5:07-CV-1999 (N.D. Ohio) (termination of retiree healthcare benefits)

6.    In addition, Cohen Milstein has served in a leadership capacity in number of ERISA company stock cases involving allegations very similar to those asserted in this proceeding, including two cases (those involving Merck & Co., Inc. and Marsh & McLennan) in which it has worked with Schatz & Nobel.   These company stock cases include:

- *In re Williams Companies ERISA Litigation,* 231 F.R.D. 416 (N.D.Okla. 2005)

- *In re Dynegy, Inc. ERISA Litigation,* 309 F.Supp.2d 861 (S.D.Tex. 2004)

- *In Re Merck & Co., Inc. Securities, Derivative & "ERISA"* Litigation, Case No: 3:05-CV-01151-SRC-TJB (D.N.J.) (with SNI)

- *Walsh v. Marsh & McLennan,* No. 01-CV-8157-SWK (S.D.N.Y) (with SNI)

7.    Cohen Milstein maintains offices in five different cities in the United States, including New York City, and is closely affiliated with Cohen, Milstein, Hausfeld & Toll, LLP in London, U.K.

8.    Lynda J. Grant, the securities partner resident in the New York office, has been practicing securities litigation for 25 years, and has acted or is presently acting as local or liaison counsel in other ERISA actions.  A copy of the Firm Resume is attached hereto as Exhibit A.

I, Marc I. Machiz, pursuant to 28 USC § 1746 hereby declare under penalty of perjury that the foregoing is true and correct.

Dated January **10**, 2008

_____
Marc I. Machiz

4





# COHEN MILSTEIN
## HAUSFELD & TOLL PLLC

## Firm Resume

January 2, 2008



COHEN MILSTEIN
HAUSFELD & TOLL^PLLC

For decades, Cohen, Milstein, Hausfeld & Toll, P.L.L.C. has represented individuals, small businesses, institutional investors, and employees in many of the major class action cases litigated in the United States for violations of the antitrust, securities, environmental, consumer protection, civil rights/discrimination, ERISA and human rights laws. Cohen Milstein is also at the forefront of numerous innovative legal actions that are expanding the quality and availability of legal recourse for aggrieved individuals and businesses both domestic and international. Over its history, Cohen Milstein has obtained many landmark judgments and settlements for individuals and businesses in the United States and abroad. The firm's most significant past cases include:

- In re Vitamins Antitrust Litigation, MDL No. 1285 (D.D.C.). Cohen Milstein served as co-lead counsel for two certified classes of businesses that directly purchased bulk vitamins and were overcharged as a result of a ten year global price-fixing and market allocation conspiracy. Chief Judge Hogan approved four major settlements between certain vitamin defendants and Class Plaintiffs, including a landmark partial settlement of $1.1 billion. In a later trial before Chief Judge Hogan concerning four Class Plaintiffs' remaining unsettled Vitamin B4 (choline chloride) claims, a federal jury in Washington unanimously found Japan's second largest trading company, Mitsui & Co., Ltd., its wholly-owned U.S. subsidiary Mitsui & Co. (U.S.A.), Inc., DuCoa, LP, a choline chloride manufacturer based in Highland, Illinois, and DuCoa's general partner, DCV, Inc. liable for participating in the conspiracy and ordered them to pay $49,539,234, which is trebled to $148,617,702 under the federal antitrust laws. The case was subsequently settled against those defendants.

- Dukes v. Wal-Mart Stores, Inc., No. C-01-2252 (N.D. Cal.). Cohen Milstein is one of the co-lead counsel in this discrimination case. In June 2004, U.S. District Court Judge Martin Jenkins ruled that six current and former Wal-Mart employees from California may represent all female employees of Wal-Mart who worked at its U.S. stores anytime after December 26, 1998 in a nationwide sex discrimination class action lawsuit (appeal pending). As the largest civil rights class action ever certified against a private employer, the Judge described the case as "historic in nature, dwarfing other employment discrimination cases that came before it." The action charges that Wal-Mart discriminates against its female retail employees in pay and promotions. The class in this case includes more than 1.5 million current and former female employees of Wal-Mart retail stores in America, including Wal-Mart discount stores, super centers, neighborhood stores, and Sam's Clubs.

- In re Lucent Technologies Securities Litigation, Civ. Action No. 00-621 (JAP) (D.N.J.). A settlement in this massive securities fraud class action was reached in late March 2003. The class portion of the settlement amounts to over $500 million in cash, stock and warrants and ranks as the second largest securities class action settlement ever completed. Cohen Milstein represented one of the co-lead plaintiffs in this action, a private mutual fund.

- Nate Pease, et al. v. Jasper Wyman & Son, Inc., et al., Civil Action No. 00-015 (Knox County Superior Court, Me.). In 2004, a state court jury from Maine found three blueberry processing companies liable for participating in a four-year price-fixing

1



and non-solicitation conspiracy that artificially lowered the prices defendants paid to approximately 800 growers for wild blueberries. The jury ordered defendants Cherryfield Foods, Inc., Jasper Wyman & Son, Inc., and Allen's Blueberry Freezer, Inc. to pay $18.68 million in damages, the amount which the growers would have been paid absent the defendants' conspiracy. After a mandatory trebling of this damage figure under Maine antitrust law, the total amount of the verdict for the plaintiffs is just over $56 million. The Firm served as co-lead counsel.

- In re StarLink Corn Products, Liability Litigation, MDL No. 1403. (N.D. Ill.). Cohen Milstein successfully represented U.S. corn farmers in a national class action against Aventis CropScience USA Holding and Garst Seed Company, the manufacturer and primary distributor of StarLink corn seeds. StarLink is a genetically modified corn variety that the United States government permitted for sale as animal feed and for industrial purposes, but never approved for human consumption. However, StarLink was found in corn products sold in grocery stores across the country and was traced to widespread contamination of the U.S. commodity corn supply. The Firm, as co-lead counsel, achieved a final settlement providing more than $110 million for U.S. corn farmers, which was approved by a federal district court in April 2003. This settlement was the first successful resolution of tort claims brought by farmers against the manufacturers of genetically modified seeds.

- In re Diet Drug Litigation (Fen-Phen), MDL No. 1203 (E.D. Pa.). As a member of the Plaintiffs' Management Committee and Sub-Class Counsel, Cohen Milstein played a major part in the success of the Fen-Phen diet drug litigation and settlement (In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation, MDL 1203). CMHT and other plaintiffs' counsel achieved the largest settlement ever obtained in a mass tort case - $3.75 billion – on behalf of millions of U.S. consumers who used Pondimin (fenfluramine) or Redux (dexfenfluramine), either alone or in combination with phentermine, diet drugs that are associated with heart valve damage.

- Snyder v. Nationwide Mutual Insurance Company, No. 97/0633 (Sup. Ct. N.Y. Onondaga Cty.). Cohen Milstein served as one of plaintiffs' principal counsel in this case on behalf of persons who held life insurance policies issued by Nationwide through its captive agency force. The action alleged consumer fraud and misrepresentations. Plaintiffs obtained a settlement valued at more than $85 million. The judge praised the efforts of Cohen Milstein and its co-counsel for having done "a very, very good job for all the people." He complimented "not only the manner" in which the result was arrived at, but also the "time … in which it was done."

- Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al., No. 1:01CV02313 (D.D.C.). Cohen Milstein has been co-lead counsel in this case since its inception in 2001. Plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol. Bristol's scheme included a conspiracy with American BioScience, Inc., a generic manufacturer, to block generic competition. Cohen, Milstein's investigation and



prosecution of this litigation on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigations brought by the Federal Trade Commission and State Attorneys General offices.

- Kruman v. Christie's International PLC, et al., Docket No. 01-7309.  A $40 million settlement on behalf of all persons who bought or sold items through Christie's or Sotheby's auction houses in non-internet actions was approved in this action.  Cohen Milstein served as one of three leading counsel on behalf of foreign plaintiffs.  The Court noted that approval of the settlement was particularly appropriate, given the significant obstacles that faced plaintiffs and plaintiffs' counsel in the litigation.  The settlement marked the first time that claims on behalf of foreign plaintiffs under U.S. antitrust laws have been resolved in a U.S. court, a milestone in U.S. antitrust jurisprudence.

- In re Infant Formula Consumer Antitrust Litigation (multiple state courts).  Cohen Milstein instituted price-fixing cases on behalf of indirect-purchasers in 17 states under state antitrust laws against three companies who conspired to drive up the price of infant formula.  The cases resulted in settlements of $64 million for purchasers of infant formula.

- Domestic Air Transportation Antitrust Litigation (N.D. Ga.)  Plaintiffs alleged a conspiracy among major airlines to set prices.  In one of the largest consumer class actions ever brought to a successful conclusion, Cohen Milstein was one of the lead counsel and obtained a settlement of travel discounts and cash totaling $458 million for the class of individuals and businesses.

- In re The Exxon Valdez Litigation, No. A89-095 Civ. (D. Ak.).  The firm was selected from dozens of law firms around the country by federal and state judges in Alaska to serve as co-lead counsel for plaintiffs in the largest environmental case in United States history that resulted in a jury verdict of more than $5 billion (reversed and remanded for revised punitive damages award; further proceedings pending).

- Holocaust Litigation.  In the historic Swiss Banks litigation, CMHT served, *pro bono,* as co-lead counsel for Holocaust survivors against the Swiss banks that collaborated with the Nazi regime during World War II by laundering stolen funds, jewelry and art treasures.  Cohen Milstein obtained a $1.25 billion settlement, leading the presiding judge to call the firm's work "indispensable."  *See In re Holocaust Victim Assets Litig.*, Case No. CV 96-4849 (ERK) (MDG) (Memorandum of Chief Judge Korman dated July 26, 2002).  The Firm was also a lead counsel in litigation by survivors of World War II-era forced and slave labor in litigation against the German companies that profited from using the labor of concentration camp inmates.  This litigation, which resulted in an unprecedented settlement of $5.2 billion, was resolved by multinational negotiations involving the defendants, plaintiffs' counsel, and the governments of several countries for approximately two million claimants.

Cohen Milstein has contributed over 37,000 hours of time to human rights and *pro bono* cases since 1996.  As an example, the Firm represented eight survivors and/or



COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

families of the victims of the September 11, 2001 attack on the Pentagon before the Federal compensation fund. Cohen Milstein has obtained a substantial recovery for each, including the highest recovery to date, $6.8 million, for an injured individual.

- Roberts v. Texaco, Inc., 94-Civ. 2015 (S.D.N.Y.). Cohen Milstein represented a class of African-American employees in this landmark litigation that resulted in the then-largest race discrimination settlement in history ($176 million in cash, salary increases and equitable relief). The Court hailed the work of class counsel for, *inter alia,* "framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole ...".

- Conanan v. Tanoue, No. 00-CV-3091 (ESH). Cohen Milstein represented African-American employees at the Federal Deposit Insurance Corporation (FDIC) in this race discrimination suit, which settled for $14 million. The settlement provides the largest payment made in an employment discrimination class action based on race against a federal agency.

- Trotter v. Perdue Farms, Inc., Case No. 99-893 (RRM) (JJF) (MPT), D. Del. This suit on behalf of hourly workers at Perdue's chicken processing facilities – which employ approximately 15,000 people – forced Perdue to pay employees for time spent "donning and doffing," that is, obtaining, putting on, sanitizing and removing protective equipment that they must use both for their own safety and to comply with USDA regulations for the safety of the food supply. The suit alleged that Perdue's practice of not counting donning and doffing time as hours worked violated the Fair Labor Standards Act and state law. In a separate settlement with the Department of Labor, Perdue agreed to change its pay practices. In addition, Perdue is required to issue retroactive credit under one of its retirement plans for "donning and doffing" work if the credit would improve employees' or former employees' eligibility for pension benefits. CMHT was co-lead counsel.

In addition, Cohen Milstein is an innovator in new areas of the law. Cohen Milstein was in the forefront of filing antitrust claims on behalf of indirect purchasers in 1993 and 1994, when it filed state-court actions in 18 states on behalf of indirect purchasers of infant formula. This was the first effort to systematically and simultaneously pursue treble damages claims on behalf of indirect-purchasing consumers in all states where antitrust laws permitted such claims. This approach, and variations of it, have since become the accepted model for pursuing antitrust damages on behalf of indirect-purchasing consumers. The Firm also has been in the forefront of the development of international antitrust theory and litigation of claims. As the global economy has produced worldwide conglomerates, so, too, has the nature of antitrust violations changed. For example, in *Kruman v. Christie's International PLC, et al.* Docket No. 01-7309 and *In re Bulk Vitamins Antitrust Litigation*, MDL 1285 (D.D.C.), both the parties and the anticompetitive actions were played out on a world, rather than domestic, stage. The firm also represents and won Lead Plaintiff status for domestic and foreign investors in a foreign company's bonds, in a PSLRA litigation being pursued in the United States, *In re Parmalat Securities Litigation*, Master Docket 04 Civ 0030 (LAK) (S.D.N.Y.). The Firm has affiliated offices around the world, in the United Kingdom, Italy, South Africa, Panama and Australia.



Cohen Milstein has also served as lead or co-lead counsel, or on Plaintiffs' Executive Committee(s), in many dozens of antitrust, securities, consumer protection or product liability, civil rights, and human rights class action cases.



### History

Cohen, Milstein, Hausfeld & Toll, P.L.L.C. was established in March 1986 and is based in Washington, D.C. with offices in New York, Philadelphia, Chicago, San Francisco and London. From 1969 until 1986, the Firm was the Washington, D.C. office of the Philadelphia law firm currently known as Kohn, Swift & Graf, P.C..

Cohen Milstein has had one of the most varied and extensive plaintiffs' practices in the United States, and it has played a prominent role in major litigations since 1969. These cases include:

In re North Atlantic Air Travel Antitrust Litigation, Civ. Action No. 84-1103 (D.D.C.); the Firm, as co-lead counsel, obtained a class settlement of $30 million in coupons for air travelers between the United States and England.

In re Screws Antitrust Litigation, MDL No. 443 (D. Mass.); the Firm, as co-lead counsel, obtained a class settlement of approximately $50 million.

Ocean Shipping Antitrust Litigation, MDL No. 395 (S.D.N.Y); the Firm, as co-lead counsel, obtained a class settlement of approximately $50 million.

In re Corrugated Container Antitrust Litigation, MDL No. 310 (S.D. Tex.); the Firm was one of a handful of firms involved in the successful trial of this massive antitrust case which was eventually settled for approximately $366 million.

Murphy, Derivatively On Behalf of Nominal Defendant National Health Laboratories Incorporated v. Perelman, Case No. 659511 (Cal. Sup. San Diego Cty.); as one of co-lead counsel in the derivative action, the firm and others obtained a global settlement of class and derivative litigation for $65 million.

In re Flat Glass Antitrust Litigation, MDL No.1200, (W.D. Pa.); the Firm as co-lead counsel obtained a total of $ 61.7 million in settlement funds on behalf of glass shops, window manufacturers, and others who directly purchased the affected products from the defendants.

Buspirone Antitrust Litigation, MDL No. 1413 (S.D.N.Y.); as one of four co-lead counsel, the Firm and others obtained a $90 million settlement for the class.

Masonite Hardboard Siding Litigation, Civ. Action No. 996787 (Cal. Super. Ct.); the Firm, as one of the lead counsel, obtained a settlement valued at hundreds of millions of dollars.

Polybutylene Pipe Litigation, Civ. Action No. W 2004-017770COA-R3-CV (W.D. Tenn.); the Firm helped obtain a settlement valued at $900 million.

Biben v. Card, No. 84-0844-CV-W-6 (W.D. Mo.); the Firm, as one of two co-lead counsel, negotiated settlements for $11.9 million, which was 93% of class members' damages.



In re Newbridge Networks Securities Litigation, Civ. Action No. 90-1061 (D.D.C.); the Firm, as co-counsel, obtained a cash and stock class settlement valued at approximately $20 million.

Jiffy Lube Securities Litigation, Civ. Action No. Y-89-1939 (D. Md.); the Firm, as co-lead counsel, obtained class settlements for a total of $12 million.

In re Saxon Securities Litigation, Civ. Action No. 82 Civ. 3103 (S.D.N.Y.); the Firm, as co-lead counsel, obtained a class settlement of approximately $20 million.

Grossman v. Waste Management, Civ. Action No. 83 Civ. 2167 (N.D. Ill.); the Firm, as co-lead counsel, obtained a class settlement of approximately $13 million.

In re Warner Communications Securities Litigation, 618 F. Supp. 735 (S.D.N.Y. 1986); the Firm was one of plaintiffs' counsel in this case where a class settlement of $18.4 million was obtained.

In re Tandon Securities Litigation, No. CV86-4566 (C.D. Cal.); the Firm played a major role in this class action where settlement was valued at approximately $16 million.

Immunex Securities Litigation, No. C92-548WD (W.D. Wash.); the firm was one of lead counsel where the largest securities class action settlement in Seattle -- $14 million – was recovered.

In re Caremark Securities Litigation, Case No. 94 C 4751 (N.D. Ill.); the Firm, as co-lead counsel, obtained a class settlement of $25 million.

In re Commercial Explosives Antitrust Litigation, Consolidated Case No. 2:96md 1093S (D. Utah); the Firm, as co-lead counsel, obtained a settlement of $77 million.



COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

## Awards & Recognition

**50 Most Powerful People in DC**
GQ Magazine
September, 2007
Michael Hausfeld named #40.

**Beacon of Justice Award**
From the National Legal Aid and Defender Association
Summer 2007
For Cohen Milstein's work on the Guatanamo cases.

**Fierce Sister Award**
Summer 2007
For Cohen Milstein's work on the comfort woman case.

**500 Leading Plaintiffs' Lawyers in America**
Lawdragon
January-February, 2007

**Top Antitrust Plaintiffs' Firm**
Competition Law 360
February 14, 2007
Cohen Milstein named #1

**International World-shakers**
The Lawyer (UK)
February 8, 2007
Michael Hausfeld named as one of top 40 international lawyers "making waves" in the UK

Joseph Sellers has been selected by his peers to be included in the upcoming 2007 edition of **The Best Lawyers in America®** in the specialty of Civil Rights Law.

**500 Leading Litigators in America**
LawDragon
Spring 2006
Michael Hausfeld, Steven Toll and Joseph Sellers are named to the list.

**The Plaintiffs' Hotlist**
The National Law Journal
October 9, 2006

**100 Most Influential Lawyers**
The National Law Journal
June 19, 2006
Michael Hausfeld is named as one of "the most influential lawyers in America."

**Runner up for Matter of the Year**
Global Competition Review
February, 2005
On Empagran matter, praised for ingenuity in how the case was prosecuted



**Attorney Profiles - Partners**

## Herbert E. Milstein

Herbert E. Milstein began practicing law with Jerry S. Cohen in 1970 – the birth of the Firm. Mr. Milstein has been lead or principal counsel in many of the best known securities class actions litigated during the past 37 years. He is the senior member of the Securities Fraud/Investor Protection practice group.

Mr. Milstein is the author of numerous articles on topics involving class action litigations and the Federal securities laws. He recently authored an article on current issues involving federal securities laws. He also wrote a separate article in the book entitled *The Burger Years*. He is the author of a monograph on the attorney-client privilege.

As an adjunct Professor of Law at Georgetown University Law Center from 1980-1987, he taught complex litigation and continues to lecture on securities litigation and class actions at law schools and seminars sponsored by the American Bar Association, state bar associations, and continuing legal education organizations. In 1985, he received a Silver Gavel award from the American Bar Association for his distinguished example of public service.

Mr. Milstein formerly served on the staff of the Securities and Exchange Commission for five and one-half years, and last held the position of Chief Enforcement Attorney, Division of Corporate Regulation. From 1976-1980, Mr. Milstein served as Equity Receiver for National American Life Insurance Company, appointed by Judge Charles R. Richey, in *SEC v. National Pacific Corp.* For that work, the Chairman of the SEC said Mr. Milstein and the Firm served "with distinction."

Formerly the President of the National Association of Securities and Commercial Law Attorneys (NASCAT), he also served as Treasurer of that organization for six years. He is a member of the American Law Institute, and a member and former Chairman of the Executive Council of the Securities Law Committee of the Federal Bar Association.

Mr. Milstein is currently on the Board of Directors of several organizations, including the Appleseed Foundation and The Studio Theatre of Washington, DC.

Mr. Milstein graduated from Harvard College (*cum laude*, 1958) and Columbia University School of Law (LL.B., 1961).

Mr. Milstein is admitted to practice in the District of Columbia and Massachusetts.

## Michael D. Hausfeld

Michael Hausfeld, one of the country's top civil litigators, joined the Firm in 1971. He is the head of the Antitrust and International practice groups.

Mr. Hausfeld's career has included some of the largest and most successful class actions in the fields of human rights, discrimination and antitrust law. He long has had an abiding interest in



COHEN MILSTEIN
HAUSFELD & TOLL ᴾᴸᴸᶜ

social reform cases, and was among the first lawyers in the U.S. to assert that sexual harassment was a form of discrimination prohibited by Title VII; he successfully tried the first case establishing that principle. He represented Native Alaskans whose lives were affected by the 1989 Exxon Valdez oil spill; later, he negotiated a then-historic $176 million settlement from Texaco, Inc. in a racial-bias discrimination case.

In *Friedman v. Union Bank of Switzerland*, Mr. Hausfeld represented a class of victims of the Holocaust whose assets were wrongfully retained by private Swiss banks during and after World War II. The case raised novel issues of international banking law and international human rights law. He successfully represented the Republic of Poland, the Czech Republic, the Republic of Belarus, the Republic of Ukraine and the Russian Federation on issues of slave and forced labor for both Jewish and non-Jewish victims of Nazi persecution during World War II. He currently represents Jubilee 2000, Khulumani, and other NGOs in litigation involving abuses under apartheid law in South Africa, and is pursuing a RICO litigation against the tobacco industry with regard to the sale of and representations on "light" cigarettes.

Mr. Hausfeld has a long record of successful litigation in the antitrust field, on behalf of both individuals and classes, in cases involving monopolization, tie-ins, exclusive dealings and price fixing. He is or has been co-lead counsel in antitrust cases against manufacturers of genetically engineered foods, managed healthcare companies, bulk vitamin manufacturers, technology companies and international industrial cartels. He is actively involved in ongoing investigations into antitrust cases abroad, and was the only private lawyer permitted to attend and represent the interests of consumers worldwide in the 2003 closed hearings by the EU Commission in the Microsoft case.

Chief Judge Edward Korman (E.D.N.Y.), has noted that Mr. Hausfeld is one of the two "leading class action lawyers in the United States." He has been profiled in, and recognized by, many articles and surveys. Most recently, a *Forbes* magazine article reported on Mr. Hausfeld's work to establish an international alliance for the protection of consumers and investors worldwide. He was named one of thirty master negotiators in *Done Deal: Insights from Interviews with the World's Best Negotiators*, by Michael Benoliel, Ed.D. *The Wall Street Journal* profiled him and his practice, and he has been recognized by *The National Law Journal* as one of the "Top 100 Influential Lawyers in America." He has been described by one of the country's leading civil rights columnists as an "extremely penetrating lawyer", and by a colleague (in a *Washington Post* article) as a lawyer who "has a very inventive mind when it comes to litigation. He thinks of things most lawyers don't because they have originality pounded out of them in law school." *The New York Times* referred to Mr. Hausfeld as one of the nation's "most prominent antitrust lawyers," and *Washingtonian Magazine* has listed Mr. Hausfeld in several surveys as one of Washington's 75 best lawyers, saying he "consistently brings in the biggest judgments in the history of law" and that he is "a Washington lawyer determined to change the world -- and succeeding."

His most recent awards include the 2002 B'Nai Brith Humanitarian of the Year award; the Simon Wiesenthal Center Award for Distinguished Service; and the U.S. Department of Energy's Human Spirit Award, presented "in tribute to a person who understands the obligation to seek truth and act on it is not the burden of some, but of all; it is universal."

1



He is a frequent speaker on antitrust, human rights and international law, most recently participating in a panel discussion at the Spring Meeting of the ABA Section of Antitrust Law entitled "International Antitrust: Developments After Empagran and Intel" and at the School of Oriental and African Studies (SOAS) Annual Meeting in London entitled "Human Rights in An Integrated World: The Apartheid Reparations Litigation in the USA." He taught Masters Degree courses at Georgetown University Law Center from 1980 to 1987, and was an Adjunct Professor at the George Washington University Law School from 1996 to 1998 and now sits on its Board of Directors.

Mr. Hausfeld is a graduate of Brooklyn College, receiving a B.A. in Political Science with a minor in Russian History (*cum laude*, 1966) and the National Law Center, George Washington University (J.D., *with honors*, 1969). He was a member of the Order of the Coif and the Board of Editors for the George Washington Law Review (1968-69).

Mr. Hausfeld is admitted to practice in the District of Columbia.

### Steven J. Toll

Steven J. Toll joined the Firm in 1979 and has been lead or principal counsel in some of the most highly publicized stock fraud cases over the past 28 years. He has been Managing Partner of the Firm since 1997 and is Head of the Securities Fraud/Investor Protection practice group. Mr. Toll was profiled in the February 1996 *Washington Business Journal* as one of five attorneys that stand out as the "cream of the crop" in the Washington D.C. legal community. In the Fall 2006 edition of LawDragon, he was named as one of the 500 Leading Lawyers in America.

In July 2005, Mr. Toll was lead trial counsel in one of the few securities class actions to go to trial involving Globalstar, a satellite manufacturer. Mr. Toll successfully argued the motions before and during trial and ultimately achieved a settlement of $20 million shortly before the case was scheduled to go to the jury. In approving the settlement, U.S. District Judge Kevin Castel remarked that Mr. Toll and his colleagues had "done a terrific job in presenting the case for the plaintiffs."

Some of Mr. Toll's other notable cases include those against Lucent Technologies, which was settled in 2001 for approximately $575 million, at the time, the second largest securities class action settlement ever achieved; *Southmark Securities Litigation*, where he helped achieve a settlement of $70 million from the company's auditors, Drexel Burnham and Michael Milken; *Norman v. Salomon Smith Barney,* where he negotiated a $50 million settlement on behalf of customers of Salomon's Guided Portfolio Management Program, who alleged that Salomon invested their money in companies in order to boost Salomon's investment banking business, *In re ECI Telecom Securities Litigation* (E.D.Va.)(telecom company accused of presenting false revenue and earnings figures; recovery of $22.75 million); *Gilat Securities Litigation* (company accused of misreporting revenue for a period of years -- recovery of $20 million).

Mr. Toll also served as co-lead counsel in one of the most publicized frauds of the 1990s -- Cascade International (S.D. Fla.) where the mastermind of the fraud, Victor Incendy, is still a fugitive from justice. The case settled on the eve of trial against Raymond James Inc. -- the only securities class action ever successfully litigated against a brokerage firm for its role as a research analyst.

2

COHEN MILSTEIN
HAUSFELD & TOLL™

He is currently leading the Firm's team serving as co-lead counsel in one of the most highly publicized fraud cases of this era, the securities fraud class action involving Parmalat, the Italian dairy manufacturer; the case is known as Europe's "Enron," because of the similarities of the fraudulent schemes and the non-existence of billions of dollars of assets that had been recorded on Parmalat's financial statements. He is also heading up numerous securities fraud cases against other public companies.

He has written for and spoken at various conferences about securities law issues, including, *inter alia, The Plaintiffs' Perspective, Securities Regulation and the New Law*, National Legal Center for the Public Interest, No. 1, Sept. 1996; *The Sarbanes-Oxley Bill Provides No Assistance To Investors Seeking To Recovery From Corporate Fraud*, ABA Annual Meeting, August 2002; and *The Analyst Cases Involving Merrill Lynch, and Its Internet Analyst Henry Blodget, and Salomon Smith Barney and Its Telecommunications Analyst Jack Grubman*, Mass Torts Made Perfect (presented January 2003).

Mr. Toll is an honors graduate of the Wharton School of the University of Pennsylvania (B.S., Accounting, *cum laude*, 1972). He graduated from Georgetown University Law Center (J.D., 1975) where he was Special Project Editor of the Tax Lawyer.

Mr. Toll is admitted to practice in Virginia and the District of Columbia.

**Lisa M. Mezzetti**

Lisa Mezzetti, a Partner at Cohen Milstein, joined the Firm in 1984, and is a member of the Securities Fraud/Investor Protection and the Consumer Protection practice groups.

In her securities work, Ms. Mezzetti represented the corporate plaintiff in a private litigation alleging damages from the purchase of a healthcare technology company; in a separate matter, she represented 1,900 plaintiffs in a series of 25 federal court suits concerning municipal bonds. Her shareholder class actions include *In re VeriSign Securities Litigation* (settled for approximately $78 million); *Murphy, Derivatively On Behalf of Nominal Defendant National Health Laboratories Inc. v. Perelman* (Cal. Super. San Diego Cty.) (global settlement of class and derivative litigations for total of $65 million); *Flecker v. Hollywood Entertainment Corp.* (D. Or.) ($15 million settlement, reached the day before trial was to begin); *Biben v. Card* (W.D. Mo.)(93% of class members' damages recovered in settlement) and, currently, *In re Parmalat Securities Litigation* (S.D.N.Y.), which is litigating the alleged largest fraud in European corporate history. She also has represented parties in securities arbitrations (both as claimant's counsel or defense counsel for the broker) and defended clients in investigations and enforcement actions of the Securities and Exchange Commission.

In consumer cases, Ms. Mezzetti is or was one of the lead counsel in *In re Lupron Marketing and Sales Practices Litigation* (D. Mass.) (brought against pharmaceutical companies on pricing policies and methods; combined $150 million settlement); *Howard v. Ford Motor Co.* (Cal. Sup. Ct.) (order of the Court on equitable count required prospective recall of 1.7 million cars; settled immediately before scheduled second jury trial); and *Fischl v. Direct Merchants Credit Card Bank, N.A.* (Henn. Cnty. Minn.) (brought by credit card consumers, alleging improper charges

3



and payment processes; settlement included credits for overpayments and changes in business practices). She has litigated class actions under the ERISA laws, and brought one of the first class actions filed under the federal Family and Medical Leave Act.

Ms. Mezzetti is a public arbitrator for the National Association of Securities Dealers, hearing disputes between customers and brokers. She speaks at legal education seminars and has been quoted in the media on issues concerning both consumer law and securities class actions. Ms. Mezzetti was a panelist at the Federal Trade Commission's Workshop on Consumer Class Actions and at the annual conference of the Association of Trial Lawyers of America on unfair trade practices and deceptive trade practices statutes. The transcript of the FTC workshop, and her related article, *The Coupon Can Be the Ticket: The Use of "Coupon" and Other Non-Monetary Redress in Class Action Settlements* (co-authored with Whitney Case) are published at 18.4 Geo. J. Legal Ethics 1431 (2005). She also speaks on corporate governance issues at conferences of institutional investors, and was a guest panelist on a Washington, D.C. cable television show concerning hiring and working with stock brokers and financial advisors.

Before joining Cohen Milstein, Ms. Mezzetti was a litigation associate of Shea & Gould of New York City.

Ms. Mezzetti serves as a member of the Boards of Directors of The International Alliance for Women (a worldwide organization that supports and promotes women entrepreneurs, professionals and executives) and The Financial Women's Association of New York. She has served on the D.C. Advisory Board of The Joffrey Ballet of Chicago.

Ms. Mezzetti graduated from the Columbus School of Law, Catholic University of America in 1980, where she served as a Vice-Chancellor of the Moot Court Board. In 1986, she received a Master of Laws degree, with a specialty in Securities Regulation, from Georgetown University Law Center. Her bachelor's degree was awarded by Stonehill College (B.A, English., *magna cum laude*, 1977).

Ms. Mezzetti is admitted to practice in the District of Columbia and New York.

### Andrew N. Friedman

Andrew Friedman, a Partner at the Firm, joined Cohen Milstein in 1985. He is the head of the Consumer Protection practice group and a member of the Securities Fraud/Investor Protection practice group.

In the consumer protection area, Mr. Friedman is litigating numerous class actions including cases relating to various insurance companies' failure to deliver promised benefits to thousands of persons who held flood insurance policies and suffered damage to their houses in September 2003 from Hurricane Isabel, *Howell v. State Farm Insurance* (D. Md.) and defective automobile engine coolants, *In re General Motors Dex-Cool Products Liability Litigation* (S.D. Ill). He has been instrumental in securing significant recoveries on behalf of thousands of consumers. He was one of the principal counsel in *Snyder v. Nationwide Mutual Insurance Company* (Sup. Ct., Onondaga Cnty, N.Y.), a class action that resulted in a settlement valued at between $85 million and $103 million. As one of two co-lead counsel in a class action against Thomson Consumer

COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

Electronics, Mr. Friedman reached a court-approved agreement that made up to $100 million available for persons who paid for unreimbursed repairs to televisions.

Mr. Friedman also has been involved in many successful securities class actions. In July, 2005, Mr. Friedman served as one of lead trial counsel at the trial of a certified class action in *In re Globalstar Secururites Litigation* in the United States District court for the Southern District of New York. Near the end of the second week of trial, a cash settlement of $20 million was reached for the benefit of the certified class. The settlement was approved by Judge P. Kevin Castel, who was highly complimentary of counsel:

> This case has been litigated by top trial lawyers, each of whom, as to both lead counsel and the other counsel in the case, have been exceptionally fine in their presentation of the evidence. Mr. Toll, Mr. Friedman, Mr. Shalov, their colleagues Mr. Devore, Ms. Peterson, have all done a terrific job in presenting the case for the plaintiffs.

In addition, Mr. Friedman served as one of co-lead or principal counsel in *Norman Frank et al. v. David L. Paul* (recovery of over $18 million); *In re Jiffy Lube Securities Litigation* (D. Md.) (recovery of over $12 million); and *In re Immunex Securities Litigation* (W.D.Wash.) (recovery of $14 million, then the largest securities class action settlement in Seattle). Mr. Friedman was one of the Firm's attorneys selected by the County of Cuyahoga, Ohio to prosecute a lawsuit that sought to recover losses from the County's Secured Assets Fund Earnings Program (S.A.F.E.). The lawsuit alleged that broker/dealers and a financial institution assisted the County in engaging in unsuitable and inappropriate investments and trading activity. The case settled favorably for $9.5 million.

Mr. Friedman has been a speaker on numerous panels and legal education seminars on various topics, including securities class actions and accounting fraud. He was featured in a November 15, 1997 *Washington Post* article about securities class actions and profiled in the April 14, 2000 edition of *The Washington Business Journal*.

Prior to joining Cohen Milstein, Mr. Friedman served as an attorney with the U.S. Patent and Trademark Office.

Mr. Friedman graduated from Tufts University with a B.A. in Psychology (1980, *magna cum laude*, Phi Beta Kappa) and is a 1983 graduate of the National Law Center, George Washington University.

Mr. Friedman is admitted to practice in the District of Columbia and New York.

### Richard S. Lewis

Richard Lewis, a Partner at the Firm, joined Cohen Milstein in 1987 and is the head of the Unsafe Drugs & Environmental Health Threats practice group, for both domestic and international matters.

He has been appointed to serve as co-lead counsel in mass tort and class action cases including *In re StarLink Corn Products* (N.D. Ill) (settlement of $110 million) and *In re PPA* (asserting

5



COHEN MILSTEIN
HAUSFELD & TOLL^PLLC

claims by users of unsafe over-the-counter medicines). He has also been appointed to the MDL Steering Committee in *In re Prempro Products Liability Litigation* (E.D. Ark.).

In addition, Mr. Lewis served as lead counsel in numerous actions to obtain medical monitoring relief for communities exposed to toxic chemicals from hazardous waste disposal practices or unsafe drugs. These include *In re Diet Drug Litigation* (Fen-Phen) (E.D. Pa), which resulted in a $4 billion settlement providing medical monitoring in addition to individual personal injury awards in the hundreds of thousands of dollars, and *Harman v. Lipari,* a Superfund case that resulted in a settlement providing medical monitoring for thousands of residents who lived on or played near a landfill. He has litigated both individual and class childhood lead poisoning cases and he is presently lead counsel in a case against the lead pigment industry, *City of Milwaukee v. NL Industries Inc.* Mr. Lewis is also handling mass tort cases involving Vioxx, Celebrex, Bextra and Hormone Therapy, and environmental cases in India and Zambia.

Mr. Lewis graduated from Tufts University with a B.A. in English (*cum laude,* 1976), and earned his Master's in Public Health degree from the University of Michigan (1981) and his law degree from the University of Pennsylvania (J.D., *cum laude,* 1986). He was Comments Editor for the University of Pennsylvania Law Review (1985-86) and authored the Comment, *O.C.A.W. v. American Cyanamid: The Shrinking of the Occupational Safety and Health Act,* U. Pa. L. Rev. (July, 1985). After law school, he was a law clerk for the Honorable Stanley S. Brotman, U.S. District Court for the District of New Jersey.

Mr. Lewis is admitted to practice in the District of Columbia.

**Daniel S. Sommers**

Daniel Sommers, a Partner at the Firm, joined Cohen Milstein in 1988. He has served as the head of the firm's Securities Fraud/Investor Protection practice group and currently is the chief operating lawyer for that group.

During his career at Cohen Milstein, Mr. Sommers served as lead or co-lead counsel or otherwise played a significant role in numerous securities fraud class actions in federal courts throughout the United States. Many of those cases resulted in multi-million dollar recoveries for individual and institutional investors. For example, these cases include: Steiner *v. Southmark Corporation* (N.D.Tex.) (over $70 million recovery ); *In re PictureTel Inc. Securities Litigation* (D.Mass.) ($12 million recovery); *In re Physician Corporation of America Securities Litigation* (S.D. Fla.) ($10.2 million recovery); *In re Gilat Satellite Securities Litigation* (E.D.N.Y.) ($20 million settlement); *In re Pozen Inc. Securities Litigation* (M.D.N.C.) ($11.2 million settlement, approval pending); *In re Nextel Communications Securities Litigation* (D.N.J.) (up to $27 million recovery); *In re PSINet Inc. Securities Litigation* (E.D. Va.) ($17.8 million recovery); *In re Cascade International Inc. Securities Litigation,* (S.D. Fla.) (global settlement of approximately $10 million); and *In re ECI Telecom Securities Ltd. Litigation* (E.D.Va.) ($21.75 million). He currently is actively involved in the prosecution of the *In re Fannie Mae Securities Litigation* (D.D.C).

Mr. Sommers is also experienced in non-class action litigation. He represented TBG Inc., a multi-billion dollar privately-held overseas corporation, in a multi-party, complex action alleging

6



COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

fraud in a corporate acquisition and represented individuals in connection with investigations brought by the United States Securities and Exchange Commission. He also has represented publicly traded corporations in the prosecution and defense of claims. Mr. Sommers has litigated cases covering a wide-range of industries including the financial services, computer software, pharmaceutical, insurance, real estate and telecommunications industries among others. He also has substantial experience in cases presenting complex accounting and auditing issues.

Mr. Sommers is a frequent commentator on the federal securities laws and corporate governance issues and addresses institutional investor groups and others on these topics as illustrated below:

- Guest panelist on "It's Your Business," a nationally syndicated television program, where he spoke on investor lawsuits.
- Panelist at the George Washington University Law School, where he spoke on the practice of law from the plaintiff's perspective.
- Addressed the California State Association of County Retirement Systems, to whom he spoke on corporate governance and fiduciary duties and liabilities.
- Spoke at a District of Columbia Bar Association program in 2005 where he addressed "Attorney Liability in the Post-Enron, Post Sarbanes-Oxley Era."
- Panelist at a 2006 presentation to Illinois-based institutional investors on the topic of "The Growing Emphasis on Fiduciary Responsibility: Implications For Illinois Pension Funds and the Emergence of Guiding Principles."
- Addressed the Professional Liability Underwriting Society in 2007 on the topic of "Global Companies, Global Risk: Exposure Arising Outside the U.S."

In 2007, Mr. Sommers was appointed to serve as the chairman of the Investor Rights Committee of the Corporation, Finance and Securities Law Section of the District of Columbia Bar. In addition, he is a member of the Securities Litigation Committee of the American Bar Association and is a member of the National Association of Public Pension Attorneys.

He is a 1983 graduate of Union College, earning a B.A. in Political Science (*magna cum laude*), and a 1986 graduate of the George Washington University Law School. Mr. Sommers is admitted to practice in federal courts including the United States District Courts for the Districts of New Jersey, Maryland, Eastern District of Michigan and the District of Columbia as well as the United States Courts of Appeals for the District of Columbia, Fourth, Ninth, Tenth and Eleventh Circuits. Mr. Sommers is also admitted to practice before the Supreme Court of the United States.

Mr. Sommers is a member of the bar of the states of New York and New Jersey as well as the District of Columbia.

**Daniel A. Small**

Dan Small, a Partner at Cohen Milstein, joined the Firm in 1988 and is a member of the Antitrust practice group.

COHEN MILSTEIN
HAUSFELD & TOLL™

Among the antitrust cases on which Mr. Small is currently working are: *In re Microsoft Antitrust Litigation* (D. Md.), in which he serves as chair of the experts committee and *Rasmussen v. General Motors* (Cir. Ct., Milwaukee Cty., Wisc.) (and related cases in eight other states), a state-wide class action alleging conspiracy among auto manufacturers and distributors to maintain dual price systems between the United States and Canada. He was co-lead counsel for the end-user plaintiffs in *In re Buspirone Antitrust Litigation* (S.D.N.Y.), a case alleging monopolization and market allocation claims against a brand name drug manufacturer for delaying generic entry to the market that settled for $90 million. Mr. Small also was lead counsel for the plaintiffs in *Pease, et al. v. Jasper Wyman & Son, et al.* (Super. Ct., Knox Cty., Me), a price-fixing class action brought on behalf of Maine wild blueberry growers. The case was tried in November 2003, and the jury returned an $18.68 million verdict for the Class, which after trebling and other additions, resulted in a $56 million judgment.

Mr. Small's substantial appellate experience includes briefing and arguing *Free v. Abbott Laboratories* in the United States Supreme Court. The case presented the issue of whether a supplemental jurisdiction statute overruled *Zahn v. International Paper Co.* The Court split 4-4, with Justice O'Connor recusing herself. Mr. Small successfully briefed and argued appeals before the Seventh Circuit Court of Appeals in *In re Brand Name Prescription Drug Antitrust Litigation* (7th Cir. 1997) on the issue of whether the district court had subject matter jurisdiction, and in *Paper Systems, Inc. v. Nippon Paper Industries Co., Ltd.* (7th Cir. 2002) holding that the federal direct purchaser rule does not immunize a defendant from liability for the direct sales of its co-conspirators. Mr. Small also briefed and argued the appeal in *Mack v. Bristol-Myers Squibb* (Fla. 1st DCA 1996), the first opinion construing the Florida Deceptive and Unfair Trade Practices Act to permit indirect purchasers to sue for damages for antitrust violations.

He has been a speaker at events organized by the American Antitrust Institute, the Conference Board, the American Bar Association and the District of Columbia Bar, among others.

Mr. Small is a 1981 graduate of Colgate University, receiving a B.A. (*cum laude*) in History. He graduated from the American University's Washington College of Law in 1986 and joined Cohen Milstein after serving as Law Clerk to the Honorable Roger Vinson, U.S. District Judge for the Northern District of Florida (1986 to 1988).

Mr. Small is admitted to practice in Maryland and the District of Columbia.

**Joseph M. Sellers**

Joseph Sellers, a Partner at the Firm and head of the Civil Rights & Employment practice group, joined Cohen Milstein in 1997.

Mr. Sellers has represented victims of discrimination and other illegal employment practices individually and through class actions. He has tried several civil rights class actions to judgment before juries and has argued more than 25 appeals in the federal and state appellate courts, including the United States Supreme Court. He has served as class counsel, and typically lead counsel, in more than 30 civil rights and employment class actions.



Those cases have included: *Beck. v. Boeing Company* (W.D. Wash.), which included a class of more than 28,000 women employees at Boeing facilities in Washington state alleging sex discrimination in pay and overtime decisions; *Conway, et al. v. Deutsch* (E.D. Va.), for a class of all female undercover case officers at the CIA alleging sex discrimination in promotions and job assignments; *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), where the Court has certified the largest class in such a case: more than 1.5 million women employees at Wal-Mart stores, alleging sex discrimination in promotions and pay decisions; *Johnson, et al. v. Freeh* (D.D.C.), for a class of African-American FBI special agents alleging racial discrimination in promotion and job assignments; *Keepseagle v. Venamen* (D.D.C.), for a class of Native American farmers and ranchers denied equal credit opportunities by USDA; *Neal v. Director, D.C Dept. of Corrections* (D.D.C.), the first sexual harassment class action tried to a jury, for a class of women correctional employees and women and men subject to retaliation at the D.C. Department of Corrections; and *Trotter, et al. v. Perdue Farms* (D.Del.), for a company-wide collective action brought under the Fair Labor Standards Act for violations of federal wage and hour law.

Throughout his career, Mr. Sellers has also been active in legislative matters. He has testified more than 20 times before Committees of the United States Senate and House of Representatives on various civil rights and employment matters. He worked on the passage of the Civil Rights Act of 1991 and the Americans with Disabilities Act of 1990.

Mr. Sellers has trained lawyers at the U.S. Equal Employment Opportunity Commission and the U.S. Department of Justice on the trial of civil rights cases and has lectured extensively throughout the country on various civil rights and employment topics. He was an Adjunct Professor at the Washington College of Law at American University, where he taught Employment Discrimination law, and at the Georgetown University Law Center, where he taught a course on Professional Responsibility.

He served on the Clinton/Gore Transition Team in 1992 and 1993. He headed the teams reviewing the operations of the EEOC, the Office of the Assistant Attorney General for Civil Rights, and various sections of the Civil Rights Division of the Department of Justice. He also served as a Co-Chair of the Task Force of the D.C. Circuit on Gender, Race and Ethnic Bias and was appointed by panels of the D.C. Circuit Court of Appeals and the U.S. District Court for the District of Columbia.

At the request of the Ford Foundation and the American Bar Association, Mr. Sellers delivered a series of lectures and designed and delivered a mock trial on civil rights law to Chinese judges, lawyers and government officials.

Mr. Sellers has been recognized as one of the top lawyers in Washington and as one 10 the top plaintiffs' employment lawyers in the country He is a professionally-trained mediator and has served as the President of the Washington Council of Lawyers.

Prior to joining Cohen Milstein, Mr. Sellers served as head of the Employment Discrimination Project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs for over 15 years.



Mr. Sellers received a J.D. from Case Western Reserve School of Law (1979), where he served as Research Editor of the *Case Western Reserve Law Review*, and a B.A. in American History and Literature from Brown University (1975).

Mr. Sellers is admitted to practice in the District of Columbia.

**Mark S. Willis**

Mark Willis joined the Firm in 1989 and is a Partner in the Securities Fraud/Investor Protection practice group. Mr. Willis heads the Firm's international securities practice as well as its domestic client development work.

Mr. Willis focuses his practice on investor protection issues, including the enforcement of the federal securities laws. In that role he works with a number of European and domestic institutional investors on investor protection and corporate governance matters. He currently acts as co-lead counsel in the *In re Parmalat Securities Litigation* (S.D.N.Y.), the largest fraud in European corporate history that is frequently referred to as Europe's "Enron". Mr. Willis represents Italian, French and Belgian institutions in that action. He also represented Brussels-based KBC Asset Management in the *In re Royal Dutch/Shell Securities Litigation*. Among other notable cases, Mr. Willis litigated against Caremark International in which Caremark was accused of federal Medicare fraud, subsequently pled guilty and paid the U.S. Government a fine of approximately $160 million and $25 million in a civil settlement. Mr. Willis also litigated against National Health Labs, which resulted in a $65 million settlement, and settled claims against Nextel Communications and Motorola.

Mr. Willis has written extensively on corporate, securities and investor protection issues, often with an international focus. He authored Chapter 60 of *Securities Law Techniques*, titled *Admission of Securities to Official Listing on Stock Exchanges Within the European Union and the Subsequent Disclosure Obligations* (1998). He published a related article in the Fall 1997 issue of the International Law News, *A Brief Overview of the European Union's Efforts to Harmonize the Requirements for Listing Securities*. He also authored Chapter 196 of *Business Organizations with Tax Planning*, titled *Company Laws of the European Union* (1998). Mr. Willis wrote about investor protection issues in an article published in the July/August 2003 edition of *Professional Investor*, a United Kingdom-based journal for institutional investors and investment professionals. A second article, co-authored by Mr. Willis, appeared in the same publication's May 2005 edition. He was also the co-author of the Comment entitled *Corporation Code Sections 309 and 1203: California Redefines Directors' Duties Towards Shareholders,* Pepperdine Law Review, Volume 16, No. 4 (1989).

Mr. Willis has been a frequent speaker at institutional investor conferences on the issues of investor protection through the federal securities laws and the importance of using corporate governance measures to force companies to put the interests of their shareholders first. In addition to numerous forums in the United States, Mr. Willis was invited to address these topics at institutional investor conferences held in London and Paris in January 2003 and spoke at similar conferences in Munich and Milan in the Spring of 2005. He also addressed corporate governance issues at the Annual Conference of the National Council on Teacher Retirement in October 2004.



Mr. Willis obtained a Masters in International Law, with an emphasis in securities regulation, from the Georgetown University Law Center in 1993. He graduated from Pepperdine University School of Law in 1989 where he was a member of the Moot Court Team and won the Dalsimer Moot Court Competition. Mr. Willis received his B.A. in English History from Brigham Young University in 1986.

Mr. Willis is admitted to practice in the District of Columbia and Massachusetts.

**Marc I. Machiz**

Marc Machiz, a Partner at Cohen Milstein, joined the Firm in 2000 and is the head of the Employee Benefits (ERISA) practice group. He is the resident Partner of the Philadelphia office.

Mr. Machiz litigates ERISA class actions involving a range of benefits cases including inappropriate pension plan investments, the inappropriate investment in company stock by 401(k) plans, discharges to interfere with pension rights and illegal plan terminations including, among others, *Hans v. Tharaldson et al.*(D.N.D.) (purchase by ESOP of employer stock allegedly imprudently and for more than adequate consideration); *Mehling, et al. v. New York Life Insurance Co., et al.*, (E.D. Pa.) (investment in allegedly overpriced mutual funds proprietary to the sponsor) and *In re Williams Company ERISA Litigation* (N.D. Okla) (investment by 401(k) plan in allegedly inflated company stock); *In re Dynegy ERISA Litigation* (S.D. Texas ) (same); Simpson v. Firemen's Fund Insurance Co. (N.D. Cal.) (discharge of disabled employees allegedly to interfere with their attainment of health benefits); *Stoeffels v. SBC Communications, Inc.*, (S.D. Texas).(termination of retiree telephone concession alleged to be a pension plan); *Wagener v. SBC Communications Inc. Pension Plan* (D.D.C.) (alleged failure to pay promised pension benefits); *Zhu v. Fujitsu*, N.D. Cal.(alleged vesting violation); *Banyai v. Mazur* (S.D.N,Y.) (alleged illegal transfer of fund assets). Mr. Machiz has submitted amicus curiae briefs to the Supreme Court and lower courts on behalf of the Pension Rights Center and the National Association of Insurance Commissioners. He consults with the AFL-CIO on state legislation to expand healthcare coverage so as to minimize the chance that such legislation will be held preempted, and he represents Fiduciary Counselors. Inc. in evaluating the adequacy of both ERISA and Securities settlements on behalf of plans participating in settlements with their plans sponsors and the officers of the plan sponsors, including evaluation of settlements in the the Enron Securities litigation.

He joined the Plan Benefits Security Division ("PBS") of the Office of the Solicitor of Labor as a trial attorney in 1978, and was appointed Assistant Counsel for Fiduciary Litigation in 1982. At the start of 1984, he joined Beins, Axelrod and Osborne, P.C. practicing general labor and ERISA law on behalf of unions and multiemployer plans. In 1986 he returned to the Department of Labor as Counsel for General Litigation at PBS, and from 1988 to 2000 held the position of Associate Solicitor, heading the Division. As Associate Solictor, Mr. Machiz was the Department of Labor's chief ERISA lawyer charged with responsibility for all enforcement litigation brought by the Secretary of Labor under the statute, which governs the vast majority of privately sponsored health, welfare and pension plans. He was also responsible for all legal advice under the statute provided to the Pension & Welfare Benefits Administration, which administers Title I of ERISA.



Mr. Machiz worked to institute the Department's innovative amicus program which aggressively advocated the Department's views throughout the judicial system on a wide range of ERISA issues ranging from the need to limit ERISA preemption of state worker and consumer protection laws to the need to strengthen participants' rights and remedies under the Act.

Mr. Machiz's expertise in ERISA has been recognized by his colleagues in the ERISA bar, who made him a Charter Fellow of the American College of Employee Benefits Counsel. Mr. Machiz is a frequent speaker on ERISA issues for the ABA, ALI-ABAPLI, and private seminars, and has served as plaintiffs' co-chair of a subcommittees of the Employees Benefits Committee of the ABA's Labor Section. He is also a member of the *BNA Pension and Benefits Reporter* Advisory Board.

Mr. Machiz has authored several articles including *Understanding DOL's New Class Exemption for the Release of Claims and Extensions of Credit in Connection with Litigation*, Pension & Benefits Reporter, Vol. 31, No. 2, January, 2004; and *ESOPS, ERISA, and Employer Stock: A Litigator's Approach*, ATLA Commercial Litigation Section Newsletter, Volume 7, Number 3 (Spring/Summer 2001).

He attended the University of Pennsylvania, where he earned a B.A. in History, and received his law degree from the University of California at Berkeley (Boalt Hall) in 1978.

Mr. Machiz is admitted to practice in the District of Columbia and Pennsylvania.

**Christine E. Webber**

Christine Webber, a Partner at the Firm and a member of the Civil Rights & Employment Practice group, joined Cohen Milstein in 1997. She is the Partner in charge of the law clerk and summer associate program.

Ms. Webber represents plaintiffs in class action employment discrimination and Fair Labor Standards Act cases. Ms. Webber's current docket includes *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), a certified class action for over 1.6 million current and former female employees of Wal-Mart with complaints of discrimination in pay and promotion; *Hnot v. Willis* (S.D.N.Y.), representing a class of women at the vice-president level and above challenging sex discrimination in compensation and promotions; and *Jenkins v. BellSouth* (N.D. Ala.), representing a proposed class of African-American employees challenging race discrimination in promotions and compensation.

She represented plaintiffs in *Beck v. The Boeing Co.* (W.D. Wash.), a class action alleging sex discrimination in compensation and promotions which settled in 2004 for $72.5 million. She was counsel in Trotter *v. Perdue* (D. Del.), representing plaintiffs who were wrongly denied payment of overtime wages, and obtaining a $10 million settlement. She is also representing workers in a similar case against Tyson Foods, Inc.

In 2004, Ms. Webber was named one of the Top Lawyers in Washington, D.C. by *Washingtonian Magazine* and named as one of the 2007 Washington, D.C. *Superlawyers* in the Civil Rights category.

COHEN MILSTEIN
HAUSFELD & TOLL^{PLLC}

Prior to joining Cohen Milstein, Ms. Webber received a Women's Law and Public Policy fellowship and worked for four years at the Washington Lawyers' Committee for Civil Rights and Urban Affairs in their Equal Employment Opportunity Project. She worked on a variety of employment discrimination cases, and focused in particular on the sexual harassment class action *Neal v. Director, D.C. Department of Corrections, et al.* Ms. Webber participated in the trial of this ground-breaking sexual harassment class action in 1995. Ms. Webber also tried the race discrimination case *Cooper v. Paychex* (E.D. Va.), and successfully defended the plaintiffs' verdict before the Fourth Circuit.

Ms. Webber is a member of the National Employment Lawyers' Association (NELA) and co-chair of their Class Action Committee. She speaks regularly at CLE programs on employment discrimination class actions, including presentations for NELA, and most recently participated in a panel on Evidentiary Issues and Jury Instructions in Employment Discrimination Litigation for ALI-ABA's program at Georgetown University Law Center in February 2007.

She graduated from Harvard University with a B.A. in Government (*magna cum laude*, 1988) and the University of Michigan Law School (J.D., *magna cum laude*, 1991, Order of the Coif). Following law school, Ms. Webber clerked for the Honorable Hubert L. Will, United States District Judge for the Northern District of Illinois.

Ms. Webber is admitted to practice in Illinois and the District of Columbia.

**Richard A. Koffman**

Richard Koffman, a Partner at the Firm, joined Cohen Milstein in 2003 and is a member of the Antitrust practice group. He is also a member of the firm's *Pro Bono* Committee.

He is currently serving as counsel for plaintiffs in, among other cases, *In re Rubber Chemicals Antitrust Litigation* (N.D. Ca.); *In re Polyester Staple Antitrust Litigation* (W.D.N.C.); and *In re Urethane Antitrust Litigation* (D. Kan.).

Mr. Koffman came to Cohen Milstein after four years as a senior trial attorney with the Antitrust and Civil Rights Divisions of the United States Department of Justice. Prior to joining the Department of Justice, he spent seven years in private practice, with Fine, Kaplan and Black in Philadelphia (working primarily on antitrust class actions and other complex commercial litigation) and then with Bernabei & Katz in Washington, D.C. (handling employment discrimination cases). While at Fine Kaplan, Mr. Koffman was actively involved in litigating several successful antitrust class actions on behalf of plaintiffs and classes, including *In re Nasdaq Market-Makers Antitrust Litigation* (S.D.N.Y.) (settled for more than $1 billion); *In re Polypropylene Carpet Antitrust Litigation* (N.D. Ga.); *In re Commercial Explosives Antitrust Litigation* (D. Utah); and *In re Drill Bits Antitrust Litigation* (S.D. Tex.).

Immediately after law school, he served as a judicial clerk for Judge James B. McMillan of the Western District of North Carolina, and for Judge Anthony J. Scirica of the U.S. Court of Appeals for the Third Circuit.



COHEN MILSTEIN
HAUSFELD & TOLL™

Mr. Koffman is the author of *It's Not The First Time: Fudging the Truth in Discovery Proceedings Didn't Start with Clinton, Legal Times,* August 24, 1998.

He is a graduate of Yale Law School (J.D., 1990), where he was a Senior Editor of the Law Journal, and Wesleyan University, from which he received a B.A., *with honors,* in English (1986).

Mr. Koffman is admitted to practice in the District of Columbia.

## Agnieszka M. Fryszman

Agnieszka Fryszman, a Partner at the Firm, joined Cohen Milstein in 1998 and is a member of the International Human Rights and Antitrust practice groups.

She currently represents Indonesian villagers in a lawsuit against Exxon Mobil over torture and extrajudicial killings allegedly committed by the defendant's security forces (a unit of the Indonesian military). For the past several years, she has represented the former "comfort women," women and girls who were forced into sexual slavery by the government of Japan during World War II. Her past successes include cases brought by survivors of Nazi-era forced and slave labor against the German and Austrian companies that allegedly used and profited from slave labor, which were resolved by international negotiations that resulted in multi-billion dollar settlements.

In the Antitrust practice group, she represents small businesses that have been victims of alleged price-fixing in the polyester staple and rubber chemicals markets.

She has represented, *pro bono,* a number of victims of the September 11 attack on the Pentagon and obtained significant recoveries, including one of the highest awards for an injured survivor, from the Victim's Compensation Fund. She also represents, *pro bono,* individuals indefinitely detained without charge by the United States at Guantanamo Bay.

Before joining the Firm, Ms. Fryszman was Democratic counsel to the United States House of Representatives Committee on the Judiciary, Subcommittee on Commercial and Administrative Law. She also served as counsel to Representative Henry Waxman, Ranking Member on the House Government Reform and Oversight Committee.

Ms. Fryszman graduated from Brown University with a B.A. in International Relations and Georgetown University Law Center (J.D., *magna cum laude,* 1996, Order of the Coif), where she was a Public Interest Law Scholar.

Ms. Fryszman is admitted to practice in the District of Columbia and New Jersey.

## Charles E. Tompkins

Charles Tompkins, a Partner at Cohen Milstein, joined the Firm in 1999 and is a member of the Antitrust and Civil Rights & Employment practice groups, with an emphasis on obtaining redress on behalf of employees who have not been paid all of the wages they are owed.

14

COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

In the antitrust field, Mr. Tompkins currently represents Registered Nurses employed by hospitals in Albany, Chicago, Detroit, Memphis, and San Antonio in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws. Mr. Tompkins also is serving as a member of the co-lead counsel team in *In Re Air Cargo Antitrust Litigation* (E.D.N.Y.), a multi-billion dollar antitrust action alleging that the world's major cargo airlines colluded in setting the amounts of various surcharges they imposed on their customers, and *In Re Air Transportation Antitrust Litigation* (N.D. Cal.), a federal antitrust action challenging a conspiracy among airlines to fix the amount of the fuel surcharge imposed on flights to and from Heathrow airport in London. Mr. Tompkins was a member of the trial team that, following a two-week jury trial, obtained a $56.4 million judgment on behalf of Maine wild blueberry growers who alleged their suppliers fixed the prices of wild blueberries. Mr. Tompkins also was a member of the team that litigated the federal antitrust action *Paper Systems, Inc. v. Mitsubishi Corp. et al.* (E.D.Wisc.), which settled for $20 million on the eve of trial.

In the employment field, Mr. Tompkins has represented a wide variety of employees, and twice obtained summary judgment on behalf of nationwide classes of Auto Damage Adjusters whose employer, GEICO, refused to pay them overtime. See *Robinson-Smith v. GEICO* (D.D.C.); *Lindsay v. GEICO* (D.D.C.). GEICO began paying overtime shortly after the adjusters' victory, and the United States Department of Labor has since cited *Robinson-Smith* in an official opinion letter. Mr. Tompkins also was part of the legal team that obtained a $10 million settlement on behalf of chicken-processing workers who were not paid for the time they spent putting on and taking off their required safety equipment, *Trotter v. Perdue Farms, Inc., et al.* (D. Del.). Perdue Farms changed its practices as part of a global settlement and now pays its employees for this time. Mr. Tompkins also is a member of the team litigating *Dukes v. Wal-Mart Stores, Inc.* (N.D.Cal.), the largest certified Title VII class action in history, in which female employees of Wal-Mart seek redress for unfair gender discrimination, and *Hnot v. Willis, et al.* (S.D.N.Y.), in which a certified class of over one hundred female insurance brokerage executives allege sexual discrimination in compensation and promotions. Mr. Tompkins also serves, on a *pro bono* basis, as a consultant for the Immigrant and Refugee Rights Project at the Washington Lawyers Committee for Civil Rights And Urban Affairs, providing guidance and oversight in litigations brought on behalf of immigrant workers subject to wage and hour violations.

Mr. Tompkins has significant appellate appearance. He second-chaired the argument of *Free v. Abbott Laboratories* before the United States Supreme Court; briefed and successfully argued *Lindsay v. GEICO* before the United States Court of Appeals for the District Of Columbia Circuit; and briefed and argued *Manchester v. Primerica Financial Services, et al.*, which was successfully settled prior to the issuance of a decision, before the United States Court of Appeals for the Eleventh Circuit.

Mr. Tompkins is the author of "Damages Issues in Fair Labor Standards Act Collective Action Litigation," which is scheduled to appear in Volume 10, Issue Number 2, of the Employee Rights and Employment Policy Journal of the Chicago-Kent School of Law; and the co-author, with Michael Hausfeld and Kalpana Kotagal, of "Innovation, Economics and the Law: The Health Care Industry's Exposure to Antitrust Liability," to be published by the ABA Antitrust Law Section in 2007. He has been asked on several occasions to lecture on employment law matters by both the American Bar Association and the National Employment Law Association.

15

COHEN MILSTEIN
HAUSFELD & TOLL™

Prior to joining Cohen Milstein, Mr. Tompkins was an associate with the Washington, D.C. office of Akin, Gump, Strauss, Hauer & Feld, L.L.P. He graduated *magna cum laude* from Colgate University and received his J.D. from the University of Virginia School of Law. He is licensed to practice in New York and the District of Columbia.

**Julie Goldsmith Reiser**

Julie Goldsmith Reiser, a Partner at the Firm, joined Cohen Milstein in 1999 and has specialized in complex litigation involving violations of the federal securities laws and employment discrimination.

Currently, she is working on *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.) class action which has been certified for 1.5 million current and former female employees of Wal-Mart on complaints of discrimination in pay and promotion, and *In re Parmalat Securities Litigation* (S.D.N.Y.), a securities fraud class action alleging artificial inflation in the price of Parmalat's securities. She has also been involved in the litigation and successful settlement of *Beck v. The Boeing Co.* (W. D. Wash.), which alleged sex discrimination in compensation and promotions; *In re P-Com Securities Litigation* (N.D.Cal.) ($16 million settlement); and *In re Sabratek Securities Litigation* (N.D.Ill.) ($15.3 million settlement).

Ms. Reiser co-authored *Companies in the Cross Hairs: When Plaintiffs Lawyers Choose Their Targets, They Look for These Employment Practices,* The Legal Times, February 21, 2005. In 1999, she co-authored *Antitrust Introduction for the General Practitioner*, a chapter in the Washington Lawyer's Practice Manual.

Prior to joining Cohen Milstein, Ms. Reiser worked in Seattle, Washington where she focused primarily on guardianship and healthcare litigation. She was President of the Board of Directors of Seattle Works and chaired the Nominating Committee for the Board of Directors of the Eastside Domestic Violence Program. She also served a term as a Trustee for the Pacific Northwest Ballet. In 1997, Ms. Reiser worked as a Legal Intern for U.S. Senator Patty Murray.

Julie Reiser graduated from Vassar College (B.A. with honors 1992) and the University of Virginia Law School (J.D. 1997). While in law school, she was a member of the Virginia Journal of Law and Social Policy.

Ms. Reiser is admitted to practice in Washington State and the District of Columbia.

**Victoria S. Nugent**

Victoria Nugent, a Partner at the Firm, joined Cohen Milstein in 2000 and is a member of the Consumer Protection practice group.

Ms. Nugent has focused on consumer protection and public health litigation throughout her career, including *In re StarLink Product Liability Litigation* (N.D. Ill.), representing farmers who sued Aventis Cropscience after an unapproved variety of genetically modified corn was detected in the U.S. corn supply and drove down prices for all U.S. corn exports. More than $100 million was recovered for the class in a landmark settlement. She is currently working on *In re General Motors Dex-Cool Products Liability Litigation* (S.D.Ill.), representing car owners seeking to enforce product warranties for an extended life coolant and *Howell v. State Farm* (D.Md.),

16

COHEN MILSTEIN
HAUSFELD & TOLL™

representing flood policy holders who were denied the full benefits of their government-backed insurance policies following Hurricane Isabel. Ms. Nugent has argued cases before the high courts of Georgia, Nebraska and the District of Columbia, as well as the federal D.C. Circuit Court of Appeals.

Before joining Cohen Milstein, Ms. Nugent worked for seven years at Public Citizen, a national consumer advocacy organization. During that time, she worked on many legislative and regulatory campaigns addressing issues that ranged from automobile safety to international trade policy. In 1998, Ms. Nugent received a two-year fellowship sponsored by the National Association for Public Interest Law (NAPIL). As a NAPIL Fellow, she worked at Trial Lawyers for Public Justice (TLPJ), where she helped develop and prosecute impact litigation in the areas of arbitration, banking, credit and insurance.

Ms. Nugent received her undergraduate degree in History from Wesleyan University in 1991 and graduated from Georgetown University Law Center in 1998.

Ms. Nugent is admitted to practice in the District of Columbia and Maryland.

### Benjamin D. Brown

Benjamin Brown, a Partner at the Firm, joined the firm in 2005 and is a member of the Antitrust practice group. He has extensive experience in complex litigation and class actions.

He is currently serving as counsel for plaintiffs in, among other cases, *In re Aspartame Antitrust Litigation* (E.D. Pa.); *Brookshire Bros., Ltd., et al. v. Chiquita Brands Int'l., Inc., et al.* (S.D. Fla.); *In re Rubber Chemicals Antitrust Litigation* (N.D. Ca.); *In re Pressure Sensitive Labelstock Antitrust Litigation* (M.D. Pa.); and *John Boyd, et al. v. AWB Limited, et al.* (S.D.N.Y.).

Mr. Brown came to Cohen Milstein after four years as a trial attorney with the Antitrust Division of the United States Department of Justice. While there, Mr. Brown led and assisted in numerous investigations, litigations and trials involving anticompetitive conduct and mergers. Mr. Brown also prosecuted criminal cases as a Special Assistant United States Attorney in the Eastern District of Virginia. Prior to joining the Department of Justice, he spent three years as a litigator in private practice: first with Heller Ehrman White & McAuliffe in San Francisco, California, working on complex commercial litigation, including class actions, and then with Covington & Burling in Washington, D.C., handling insurance coverage and antitrust litigation. Prior to practicing, Mr. Brown served as a judicial law clerk for Chief Judge Juan R. Torruella of the U.S. Court of Appeals for the First Circuit.

Since 2005, Mr. Brown has served as a state editor for the ABA's annual survey of state class action law. He also co-authored a chapter on private antitrust recovery actions for the forthcoming 2008 Global Competition Review's Antitrust Review of the Americas. He has been interviewed regarding antitrust class actions by CNBC and various NBC affiliates, and by radio networks including ABC and the AgriBusiness Network.

17

COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

Mr. Brown is a graduate of Harvard Law School (J.D., *cum laude*, 1997), where he was an editor and executive board member of the Harvard Civil Rights - Civil Liberties Law Review, and the University of Wisconsin - Madison (B.A.in Philosophy, with distinction, Phi Beta Kappa, 1992).

Mr. Brown is admitted to practice in California and the District of Columbia.

**Avi S. Garbow**

Avi Garbow, a Partner at the Firm, joined Cohen Milstein in 2005 and is a member of the Securities Litigation practice group and Co-Chair of the International Human Rights practice group.

In the securities field, Mr. Garbow focuses his practice on representing both domestic and international investors. Mr. Garbow is currently involved in several major securities fraud actions, including *In re Parmalat Securities Litigation* (S.D.N.Y.) and *In re Converium Holding AG Securities Litigation* (S.D.N.Y.), and also provides counsel to the independent fiduciary of the Enron employees stock ownership plans in connection with the Enron federal securities class action.

Prior to joining the Firm, Mr. Garbow was a Junior Partner at Wilmer Cutler Pickering Hale and Dorr in their Securities and Litigation Departments , where he focused on complex civil and criminal litigation, with an emphasis on internal investigations and financial fraud matters. Mr. Garbow also served over ten years in government as a federal prosecutor in the Justice Department's Environmental Crimes Section, a Special Assistant United States Attorney, and a Special Assistant to the Assistant Adminstrator for Enforcement at the U.S. Environmental Protection Agency. Mr. Garbow has also served as an instructor at the Justice Department's National Advocacy Center. He received special commendations from both the Department of Justice and the Environmental Protection Agency for his trial work.

Mr. Garbow serves as Co- Chair of the American Bar Association's International Human Rights Committee. He has also done work on behalf of the Robert F. Kennedy Memorial Center for Human Rights, and serves on the Board of Directors for International Rights Advocates (an international human rights organization) and Urban Ecology Institute (an environmental, and community development organization) .

He is a graduate of the University of Virginia School of Law (J.D., 1992) (where he was the recipient of the Robert F. Kennedy Award for Public Service), the University of Virginia Graduate School of Arts and Sciences (M.A. in Marine Affairs, 1994), and the University of Michigan (B.A., *magna cum laude*, 1988). He is also a former firefighter.

Mr. Garbow is a member of the Virginia and District of Columbia bars.

**William P. Butterfield**

William Butterfield, a Partner of the firm, is a member of the Antitrust practice group.



COHEN MILSTEIN
HAUSFELD & TOLL™

For several years, Mr. Butterfield has been leading plaintiffs' discovery efforts in *In Re New Motor Vehicles Canadian Export Antitrust Litigation*, MDL 1532. He is also working on *In Re Hydrogen Peroxide Antitrust Litigation*, (E.D. Pa.), *In Re OSB Antitrust Litigation*, (E.D. Pa.), and *In Re Methyl Methacrylate (MMA) Antitrust Litigation*, (E.D. Pa.).

Previously, Mr. Butterfield was one of the principal attorneys involved in nationwide litigation challenging lending practices conducted by one of the nation's largest sub-prime lenders. In that case, Mr. Butterfield worked extensively with the FTC, and was responsible for generating nationwide media and Congressional attention to lending practices conducted by Associates Finance. Plaintiffs and the FTC eventually settled with Citigroup (which had acquired Associates Finance) for $240 million (*In Re Citigroup Loan Cases*, J.C.C.P. 4197). Mr. Butterfield was also a principal attorney for the plaintiff classes in *In re Prudential Securities Limited Partnerships Litigation*, MDL No. 1005 (S.D.N.Y.), which settled for $137 million, and *In re PaineWebber Securities Litigation*, 94 Civ. 8547 (S.D.N.Y.), which settled for $200 million.

Mr. Butterfield is recognized as a leader in the field of electronic discovery. He has developed electronic document management solutions since the early 1990s, when he helped design and led the implementation of an electronic document repository to manage more than 15 million pages of documents produced in *In re Prudential Securities Limited Partnerships Litigation*, MDL No. 1005 (S.D.N.Y.). That system was recognized by Senior U.S. District Judge Milton Pollack as one of the most innovative and sophisticated high-tech document management/litigation support systems available @ 163 F.R.D. 200, 208 (S.D.N.Y. 1995). In 2005, Mr. Butterfield testified before the U.S. Judicial Conference Rules Committee regarding proposed electronic discovery amendments to the Federal Rules of Civil Procedure. He speaks at conferences internationally on electronic discovery issues. Mr. Butterfield is also a member of The Sedona Conference, a nonprofit research and educational institute dedicated to the advanced study of law and policy. His comments appeared recently in an article entitled, "E-Discovery: Business is Booming and Lawyers are getting in on the Trend." *Lawyers Weekly*, March 14, 2006.

Mr. Butterfield has also served as an adjunct professor at American University, Washington College of Law, where he taught a course in commodities law and regulation.

Before joining CMHT, Mr. Butterfield was a partner at Finkelstein, Thompson & Loughran, where he focused on antitrust, securities, consumer and banking litigation. While at FT&L, he also served extensively as outside counsel for federal banking agencies, where he investigated and litigated claims in connection with failed financial institutions. Mr. Butterfield has also defended individuals and companies in federal courts and administrative tribunals in matters involving securities and commodities fraud, insider trading, takeover litigation, broker-dealer violations and registration issues. He began his legal career as an assistant prosecuting attorney for Montgomery County, Ohio.

Mr. Butterfield graduated from the University of Toledo, College of Law in 1978, and earned his undergraduate degree from Bowling Green State University in 1975.



COHEN MILSTEIN
HAUSFELD & TOLL™

Mr. Butterfield is admitted to practice in the District of Columbia and is an inactive member of the Ohio bar.

## Carol V. Gilden

Carol Gilden, a Partner at Cohen Milstein, is a member of the Securities Fraud/Investor Protection practice group. She is the resident Partner at the Firm's Chicago office.

Prior to joining Cohen Milstein, Ms. Gilden served as the head of Much Shelist's securities class action practice and as the Firm's Vice Chair of the Class Action Department. She also worked as an enforcement attorney with the Midwest Regional Office of the Securities and Exchange Commission.

Ms. Gilden has served as co-lead counsel in the Sears/Sears Acceptance Corp. Securities Litigation, Sara Lee Securities Litigation, 99 Cents Only Stores Securities Litigation, Quokka Sports Securities Litigation and the City of Chicago's case against on-line travel providers. Ms. Gilden also served on the Executive Committees of the Global Crossing Securities Litigation (settlements of $448 million) and the Merrill Lynch & Co. Research Reports cases ($125 million settlement). Among other notable cases, Ms. Gilden served as co-lead counsel in the ML Lee Securities Litigation and Smith Kline Litigation which settled for $33 million and $30 million respectively, as well as lead counsel in *Pacha et. al. v. McKesson Corporation, et.al.*, a private action which settled for a confidential sum, and as liaison counsel and a litigation team member in the Waste Management Litigation, which settled for $220 million. Under her leadership, the firm also served as active members of the litigation teams in the *AOL Time Warner Securities Litigation* ($2.5 billion settlement) and *Salomon Analyst Litigation/In re AT&T* ($75 million settlement).

In addition to her work on behalf of clients, Ms. Gilden publishes scholarly articles and course materials, and lectures at key industry conferences and seminars. She is an author and co-author of articles published by the National Law Journal, *Courts Grapple with Lead-Counsel Auctions*; IICLE on Illinois Causes of Action, *Shareholder Derivative Suits*; the American Bar Association, *The Impact of Central Bank on Securities Fraud Litigation: The Plaintiffs' Perspective*; Illinois Bar Journal, *Proposed Rule 225: A Death Warrant for Class Actions in Illinois* and Practising Law Institute on Class Actions Litigation: Prosecution and Defense Strategies *A Hybrid 23(B)(2) Rule For Hybrid Class Actions? New Developments In The Use Of Rule 23(B)(2) In Class Certification*. In January 2005, Ms. Gilden testified against Proposed Rule 225 before the Illinois Supreme Court's Rules Committee.

Ms. Gilden is a regular presenter at conferences and seminars around the country and has spoken at seminars sponsored by the American Bar Association, Chicago Bar Association, Practising Law Institute, Illinois CPA Foundation, Hines Insurance Symposium, the Ohio and Wisconsin Bar Associations, and the National Association of Shareholders and Consumer Attorneys, as well as at other symposiums.

Ms. Gilden was selected as an "Illinois Super Lawyer" in 2005, 2006, 2007 and 2008 by Law & Politics, which published its selections in Chicago magazine (May 2005, February 2006,

COHEN MILSTEIN
HAUSFELD & TOLL℠

February 2007 and February 2008 issues). Only 5 percent of Illinois attorneys are awarded this honor.

Ms. Gilden also is a frequent commentator in the national media on various class action topics. She frequently appears on CNBC, including on a special segment titled *I Want My Money Back*, where she was described as "one of the top investor advocacy attorneys in the country." She also has been featured on the ABC news programs *World News Tonight*, *World News Now* and *Good Morning America*, as well as has made multiple appearances on *First Business Morning News*. Ms. Gilden recently appeared on the cover of *Chicago Lawyer* in connection with a feature article on The Ebb and Flow of Securities Class Actions.

Ms. Gilden is the President of the National Association of Shareholder and Consumer Attorneys (NASCAT), which is the preeminent trade association for securities class action attorneys, and serves on its Executive Committee. Prior to becoming President, she first served as Treasurer, then President-Elect for NASCAT. Ms. Gilden is the first woman in NASCAT's 18-year history to be elected Treasurer, President-Elect and subsequently, President. Ms. Gilden is also Vice President of the Institute for Law and Economic Policy (ILEP). She also was a member of Illinois Attorney General Lisa Madigan's Prescription Drug Transition Working Group. Ms. Gilden is a member of the American Bar Association, Illinois State Bar Association, Chicago Bar Association and the Association of Securities and Exchange Commission Alumni.

Ms. Gilden is a graduate of the University of Illinois (B.S., Business Administration, 1979). She graduated from Chicago-Kent College of Law (J.D., *with honors*, 1983) where she was a member of the Chicago-Kent Law Review.

Ms. Gilden is admitted to practice in Illinois, the federal district court for the Northern District of Illinois and the U.S. Court of Appeals for the Seventh Circuit.

### Robert G. Eisler

Robert Eisler, a Partner at Cohen Milstein, joined the Firm in 2007 and is a member of the Antitrust practice group. He is the resident partner in the New York office. Prior to joining Cohen Milstein, Mr. Eisler was a partner at Lieff Cabraser Heimann and Bernstein.

Mr. Eisler has extensive experience in complex litigation at the trial and appellate levels, particularly in the prosecution of antitrust class actions. He has served as lead or co lead counsel in many cases in the state and federal courts, including In re Buspirone Antitrust Litigation, ($90 million settlement), In re Oxycontin Antitrust Litigation, and In re Ciprofloxacin Hydrochloride Antitrust Litigation. Mr. Eisler is currently involved in the prosecution of numerous major antitrust actions throughout the United States.

Mr. Eisler is a 1986 graduate of LaSalle University, and a 1989 graduate of Villanova Law School.

He is admitted to practice in New York and Pennsylvania.

### Michael P. Lehmann

COHEN MILSTEIN
HAUSFELD & TOLL™

Michael P. Lehmann has joined Cohen Milstein as a partner and will head our new San Francisco office. Mr. Lehmann brings to the firm 29 years of experience as a business litigator, with a practice that ranged from class action litigation to business litigation on behalf of individual clients to extensive regulatory work before federal, state and international bodies to domestic and international arbitration.

Prior to joining Cohen Milstein, Mr. Lehmann had worked since graduating from law school at what became Furth Lehmann LLP, where he eventually served as Managing Partner and in recent years has served as lead counsel for direct or indirect purchaser classes in numerous antitrust cases.

### Lynda J. Grant

Lynda J. Grant joined Cohen Milstein in 2007 as a Partner in our New York office, and will concentrate her efforts in the securities practice area.

Ms. Grant is an accomplished lawyer with over 20 years of experience at Labaton Sucharow representing shareholders and limited partners. Throughout this time, her practice has consisted of class and derivative actions, ranging from large securities fraud cases to those seeking to enjoin unfair buy outs, acquisitions and mergers. Ms. Grant has also represented employees and pensioners in ERISA class actions. Her clients have included individual shareholders and limited partners, sophisticated hedge fund managers, major state, local and city pension funds, and union funds.

Ms. Grant's early career centered on representing limited partners and REIT holders in high-profile matters. In that capacity, she acted as Lead or Co-Lead Counsel in such cases as: *The Gillette Family Trust v. Insignia Financial Group, Inc., Inc. et al.* (the "Shelter Properties" Action); *Warren Heller v. McNeil Partners, L.P., et al.*; *Irving Zakin v. William Dockser, et al.* (the "CRITEF" Action): *Joan King v. Oxford Tax Exempt Fund II Corporation, and William Wallace v. Devon Associates, et al.* (the "Growth Hotel Investors" Action); and *Carlstrom v. Arvida/JMB Managers, Inc.*, (in which she helped to obtain a preliminary injunction after trial, which stopped a $160 million defensive recapitalization). She also commenced the action, *In Re Estate Associates Limited Partnership Litigation*, which eventually resulted in a $184 million jury verdict. Subsequently, Ms. Grant was part of a team which successfully tried the action *Gelfman, et al. v. Weeden Investors, L.P.*, and helped obtain an injunction in the action *In re MONY Group Inc. Shareholder Lit.*, temporarily stopping the $1.5 billion buyout of MONY Insurance Co. by AXA Financial. Ms. Grant also successfully tried the books and records action captioned *Forsythe, et al. v. CIBC Employee Private Equity Fund (U.S.) L.P. et al.*

More recently, she was instrumental in obtaining a $67.5 million settlement for the class in *In re St. Paul Securities Litigation*, was part of a team which settled the action *In re DHB Industries, Inc. Class Action Litigation*, for $40 million and significant corporate governance reforms, and obtained an $8 million settlement in *In re Van der Moolen Securities Litigation*. She was one of the Lead Counsel in the action *In re Marsh ERISA Litigation*, and *In re St. Paul Travelers Sec. Litig. II*, and numerous other actions.

22

1 | the reserves presented in its August 6, 2007 Form 8-K.  The Form 10-Q filed August 9,
2 | 2007 stated in part:

3 |     Item 1A.    Risk Factors

4 |     Item 1A of our 2006 Annual Report presents risk factors that may
5 | impact the Company's future results. In light of recent developments
6 | in the mortgage; housing and secondary markets, those risk factors are
    supplemented by the following risk factor:

7 | ***Debt and secondary mortgage market conditions could have a***
8 | ***material adverse impact on our earnings and financial condition***

9 |     We have significant financing needs that we meet through the capital
10 | markets, including the debt and secondary mortgage markets. These
11 | markets are currently experiencing unprecedented disruptions, which
12 | could have an adverse impact on the Company's earnings and
    financial condition, particularly in the short term.

13 |     Current conditions in the debt markets include reduced liquidity and
14 | increased credit risk premiums for certain market participants. These
15 | conditions, which increase the cost and reduce the availability of debt,
16 | may continue or worsen in the future. The Company attempts to
17 | mitigate the impact of debt market disruptions by obtaining adequate
18 | committed and uncommitted facilities from a variety of reliable
19 | sources. There can be no assurance however, that the Company will
20 | be successful in these efforts, that such facilities will be adequate or
21 | that the cost of debt will allow us to operate at profitable levels. The
22 | Company's cost of debt is also dependent on its maintaining
    investment-grade credit ratings. Since the Company is highly
dependent on the availability of credit to finance its operations,
disruptions in the debt markets or a reduction in our credit ratings,
could have an adverse impact on our earnings and financial condition,
particularly in the short term.

23 |     The secondary mortgage markets are also currently experiencing
24 | unprecedented disruptions resulting from reduced investor demand for
25 | mortgage loans and mortgage-backed securities and increased investor
26 | yield-requirements for those loans and securities. These conditions
27 | may continue or worsen in the future. In light of current conditions,
28 | we expect to retain a larger portion of mortgage loans and mortgage-
backed securities than we would in other environments. While our
capital and liquidity positions are currently strong and we believe we

1
2
3
4
5

have sufficient capacity to hold additional mortgage loans and mortgage backed securities until investor demand improves and yield requirements moderate, our capacity to retain mortgage loans and mortgage backed securities is not unlimited. As a result, a prolonged period of secondary market illiquidity may reduce our loan production volumes and could have an adverse impact on our future earnings and financial condition.

6
7

Countrywide Financial Corp. Quarterly Report (Form 10-Q) (Aug. 9, 2007) (emphasis added).

8
9
10
11
12
13
14
15
16

139.   On August 15, 2007, Countrywide shares sank 13 percent, their biggest one-day decline since the 1987 stock market crash, on fears that the largest U.S. mortgage lender could face bankruptcy, spurred by a downgrade of Countrywide stock from a "Buy" recommendation to "Sell" by Merrill Lynch analyst Kenneth Bruce. Bruce stated that "[i]f enough financial pressure is placed on Countrywide or if the market loses confidence in its ability to function properly, then the model can break, leading to an effective insolvency. . . .  If liquidations occur in a weak market, then it is possible for Countrywide to go bankrupt.'" Jonathan Stempel, *Countrywide Plunges on Bankruptcy Fear*, Reuters, Aug. 15, 2007.

17
18
19
20
21
22

140.   The following day, August 16, 2007, Countrywide announced that it had drawn down its $11.5 billion credit facility to supplement its funding liquidity position. According to David Sambol, President and Chief Operating Officer:   "Along with reduced liquidity in the secondary market, funding liquidity for the mortgage industry has also become constrained." Countrywide Financial Corp. Current Report (Form 8-K) (Aug. 16, 2007).

23
24
25
26
27

141.   Analysts characterized Countrywide's chosen course as a move made in desperation: "Countrywide said it would tap its $11.5 billion bank line of credit to provide liquidity.  And tap is the right word, because usually a bank line like this is your liquidity source of last resort, which you use only when you're tapped out." Randall W. Forsyth, *On Borrowed Time*, Barron's Online, Aug. 20, 2007.

28

1    142.  Upon news of the downgrade and the announcement that the Company had

2    drawn down its *entire* credit facility, Countrywide shares tumbled and closed at $18.95

3    per share, a decline of 42 percent from the start of the Class Period.

4    143.  As of August 17, 2007, Countrywide began laying off employees involved

5    in loan origination – only two weeks after it reported hiring loan officers from rivals

6    forced to close shop.  James R. Hagerty, *Countrywide Begins Staff Layoffs*, Wall St. J.,

7    Aug. 20, 2007, at A6.

8    144.  On August 22, 2007, Countrywide issued a press release in which the

9    Company announced that it had received a much needed infusion of cash in the form of a

10   $2 billion equity investment from Bank of America.  The investment is in the form of a

11   non-voting convertible preferred security yielding 7.25 percent annually.  Under the

12   terms of the agreement, the security can be converted into common stock at $18 per

13   share, with resulting shares subject to restrictions on trading for 18 months after

14   conversion.  Defendant Mozilo, in the Company's press release, stated in part:

15
16
17
18
> Bank of America's investment in Countrywide represents a vote of
> confidence and strengthens our balance sheet, enabling us to position
> Countrywide for future growth and success. This transaction benefits
> all of Countrywide's constituents, including investors, shareholders,
> mortgage customers, deposit holders, business partners and
> employees.

19
20
21
22
23
Countrywide Financial Corp. Press Release, *Countrywide Receives $2 Billion Strategic Equity Investment From Bank of America*, attached as Exhibit 99.1 to Countrywide Financial Corp, Current Report (Form 8-K) (Aug. 23, 2007).  However, analysts characterized the agreement as highly *unfavorable* to Countrywide:

24
25
26
27
> As it turned out, Bank of America's generous gesture was not entirely
> altruistic.  In return for the $2 billion, it got a preferred that paid
> 7.25%, a much heftier yield than the 2.5% to 3.5% converts issued by
> Countrywide a scant three months earlier.  Moreover, the preferred
> sold to Bank of America is convertible at a surprisingly 20% below
> then market price of Countrywide common.

28   Alan Abelson, *Up and Down Wall Street*, Barron's Online, Aug. 27, 2007.

1    145. The investment by Bank of America was supposed to strengthen
2    Countrywide's financials, but was met with skepticism in the market. "Two billion
3    dollars from Bank of America is not a lot compared to what they may need," said Stuart
4    Plesser, an equity analyst at Standard & Poor's in New York. James R. Hagerty and
5    Karen Richardson, *Why is Countrywide Sliding? It's Unclear, That's the Issue,* Wall St.
6    J., Aug. 29, 2007.

7    146. On September 7, 2007, Countrywide announced that it would cut up to
8    12,000 additional jobs, amounting to as much as 20 percent of the Company's workforce.
9    *Countrywide Announces Plan to Address Changing Market Conditions Including*
10    *Workforce Reductions*, attached as Exhibit 99.1 to Countrywide Financial Corp, Current
11    Report (Form 8-K) (Sept. 7, 2007). Countrywide also announced plans to revise its
12    product offerings to include only high quality prime loans or loans that can be sold in the
13    secondary market. *Id.*

14    147. On September 11, 2007, it was announced that Countrywide had hired
15    Goldman Sachs Group, Inc. to help it find additional financing for the second time in less
16    than a month. Steve Dickson, *Countrywide Shares Fall on Report Lender Needs Cash,*
17    Bloomberg News, Sept. 11, 2007. As a result of this news, Company stock fell 5 percent
18    to $16.18, its lowest closing price in four years.

19    148. On September 13, 2007, the Company announced that it had secured an
20    additional $12 billion in secured borrowing through new or existing credit lines. Lingling
21    Wei, *Countrywide Loan Fundings Fall; Lender Lines Up $12 Billion Credit*, Wall St. J.,
22    Sept. 13, 2007.

23    **C.    Defendants Knew or Should Have Known That Countrywide Stock Was an**
24    **Imprudent Investment.**

25    149. During the Class Period, as described herein, Defendants knew or, had they
26    properly discharged their fiduciary obligations, would have known that Countrywide stock
27    was imprudent investment alternatives for the Plan due to Countrywide's serious
28    mismanagement and improper business practices, including, among other practices: (a)

-44-

marketing and extending subprime mortgage loans, made on a "low documentation" basis, without adequate consideration of the borrower's ability to repay and with unreasonably high risk of borrower default; (b) intentionally marketing subprime loans with high risk of default to borrowers who qualified for prime-rate loans in order to increase Company profits; (c) encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions; (d) representing that Countrywide had strict and selective underwriting and loan origination practices; (e) representing that Countrywide had sufficient reserves set aside to cover the high-risk loans it was selling; (f) operating with inadequate liquidity in relation to the volatility of Countrywide's business lines and assets; and (g) operating without the requisite internal controls to determine appropriate loan loss provisions.

150. As a result, Countrywide's stock price and the price of the Fund were artificially inflated making them an imprudent investment for the Plan.

151. As a result of Defendants' knowledge of the public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Countrywide stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

152. Defendants also failed to take into account the changing risk profile of the Countrywide stock investment as a result of the above circumstances and the Company's deteriorating financial circumstances as demonstrated by objective indicators for evaluating a company's ongoing viability.

153. The Defendants failed to conduct an appropriate investigation into whether Countrywide stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Countrywide's tremendous problems so that participants could make informed decisions regarding their investments in Countrywide stock in the Plan.

154.  An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, investment by the Plan in Countrywide stock was excessively and unduly risky, and, thus, imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

155.  Because Defendants knew or should have known that Countrywide was not a prudent investment option for the Plan, they had a fiduciary duty to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Countrywide stock.

156.  Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures, as necessary; divesting the Plan of Countrywide stock; discontinuing further contributions to and/or investment in Countrywide stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Countrywide they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Countrywide stock.

157.  Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Countrywide stock.  In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as Countrywide's problems came to light.

158.  In addition, the Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

159.  When it came to their own personal holdings of Countrywide stock, however, the Insider Selling Defendants sold millions of dollars of the stock, effectively cashing in while hanging Plan participants out to dry.  Such conduct violated the duties of prudence and loyalty under ERISA.

-46-

**D.    Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Countrywide Stock in the Plan.**

160.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

161.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with participants in the Plan which included statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents, in which Defendants failed to disclose that Company stock was not a prudent retirement investment, and which were incorporated by reference in Plan documents.  The Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plan.  2006 Form 11-K at 10.

162.    Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

(a).    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b).    Out of loyalty, employees tend to invest in company stock;

(c).    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d).    Employees tend not to change their investment option allocations in the plan once made;

(e).    No qualified retirement professional would advise rank and file

employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f).    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g).    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

163.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plan and its participants from their heavy investment in an imprudent retirement vehicle, Countrywide stock.

164.    In addition, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company.    As such, participants in the Plan could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plan.

165.    Specifically, Defendants failed to provide the Plan's participants with complete and accurate information regarding Countrywide's serious mismanagement and improper business practices, including, among other practices:    (a) marketing and extending subprime mortgage loans, made on a "low documentation" basis, without adequate consideration of the borrower's ability to repay and with unreasonably high risk of borrower default; (b) intentionally marketing subprime loans with high risk of default to borrowers who qualified for prime-rate loans in order to increase Company profits; (c) encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions; (d) representing that Countrywide had strict and selective underwriting and loan origination practices; (e) representing that Countrywide had sufficient reserves set aside to cover the high-risk loans it was selling;

1  (f) operating with inadequate liquidity in relation to the volatility of Countrywide's

2  business lines and assets; and (g) operating without the requisite internal controls to

3  determine appropriate loan loss provisions.

4  166. As such, the participants were not informed of the true risks of investing

5  their retirement assets in the Plan in Countrywide stock.

6  **E.    Defendants Suffered From Conflicts of Interest.**

7  167. As ERISA fiduciaries, Defendants are required to manage the Plan's

8  investments, including the investment in Countrywide stock, solely in the interest of the

9  participants and beneficiaries, and for the exclusive purpose of providing benefits to

10  participants and their beneficiaries. This duty of loyalty requires fiduciaries to avoid

11  conflicts of interest and to resolve them promptly when they occur.

12  168. Conflicts of interest abound when a company that invests plan assets in

13  company stock founders. This is because as the situation deteriorates, plan fiduciaries are

14  torn between their duties as officers and directors for the company on the one hand, and

15  to the plan and plan participants on the other. As courts have made clear "'[w]hen a

16  fiduciary has dual loyalties, the prudent person standard requires that he make a careful

17  and impartial investigation of all investment decisions.'" *Martin v. Feilen,* 965 F.2d 660,

18  670 (8th Cir.1992) (citation omitted). Here, Defendants breached this fundamental

19  fiduciary duty.

20  169. First, Defendants failed to investigate whether to take appropriate and

21  necessary action to protect the Plan, and instead, chose the interests of the Company over

22  the Plan by continuing to offer Countrywide stock as a Plan investment option, and

23  maintain investment in Countrywide stock in the Plan.

24  170. Second, certain of the Defendants who knew or should have known of

25  Countrywide's inflated stock price during much of the Class Period, benefited directly

26  from this knowledge or neglect by selling their personal holdings of Countrywide stock

27  for significant gain. During the Class Period, the Insider Selling Defendants sold

28  approximately 7,804,506 shares of Countrywide stock for proceeds of over $294 million.

The following is a summary of the insider sales by these Plan fiduciaries since January 2006:

| Name | Sales | Shares Sold | Proceeds of Sales |
|------|-------|-------------|-------------------|
| Mozilo | 116 | 6,451,463 | $242,912,933 |
| Cisneros | 3 | 79,407 | $3,052,506 |
| Cunningham | 12 | 75,000 | $3,004,450 |
| Donato | 2 | 54,142 | $2,142,052 |
| Dougherty | 12 | 227,905 | $9,182,698 |
| Gates | 4 | 75,000 | $2,978,475 |
| Heller | 3 | 106,540 | $4,014,688 |
| Kurland | 34 | 413,049 | $15,211,426 |
| Robertson | 3 | 152,000 | $5,966,400 |
| Snyder | 6 | 170,000 | $6,462,738 |
| **TOTALS:** | **196** | **7,804,506** | **$294,928,366** |

171.   In particular, Defendant Mozilo engaged in significant selling during the Class Period.  Upon review of the Form 4s filed in the last year alone, Defendant Mozilo made a profit of $129 million from the sale of Company stock, approximately one-third of the amount he has reaped over the past 23 years.  Defendant Mozilo continues to hold approximately 500,000 shares in Countrywide stock.  Form 4 (Aug. 13, 2007).

172.   The Insider Selling Defendants breached their fiduciary duties to the Plan and its participants, as, rather than ensure that the Plan discontinued investment in Company stock or informing Plan participants regarding the material negative information concerning the Company's above-outlined problems, they chose to remain quiet and reap the benefit of their insider knowledge by selling their personal holdings of Countrywide for enormous gain.

173.   While the above Defendants protected and enriched themselves, they stood idly by as the Plan lost well over one hundred million dollars because of its investment in Countrywide stock.  This is precisely the type of conflicted and disloyal action that ERISA was intended to prevent.

# VIII.  THE RELEVANT LAW

174.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

175.  ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

176.  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

177.  ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

178.  These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Howard v. Shay,* 100 F.3d 1484, 1489 (9th Cir. 1996).  They entail, among other things:

1
2
3

and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance Countrywide stock, to ensure that each investment is a suitable option for the plan;

4
5
6

(b). The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

7
8
9
10
11
12
13

(c). The duty to follow the terms of the plan document only "insofar as such documents and instruments are consistent with the provisions of [title I] and title IV" of ERISA. 29 U.S.C. § 1104(a)(1)(D). Therefore, if a plan's terms are inconsistent with ERISA, a prudent fiduciary acting in the best interests of the plan's participants must effectively override the plan's terms. The Department of Labor's regulations interpreting ERISA also demonstrate that the fiduciary's duty of prudence trumps even his obligations to comply with plan terms, including statements of investment policy or plan design; and

14
15
16
17

(d). The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

18
19

179. ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

20
21
22

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

23
24
25

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

26
27
28

(2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

180.  Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach.  . . .  [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

181.  Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## IX. ERISA § 404(c) DEFENSE INAPPLICABLE

182.  ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over

-53-

1  investment decisions. In order for § 404(c) to apply, participants must in fact exercise

2  "independent control" over investment decisions, and the fiduciaries must otherwise

3  satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29

4  U.S.C. § 1104(c), and the regulations promulgated under it.

5      183. ERISA § 404(c) does not apply here for, among others, the following three

6  reasons.

7      184. First, ERISA § 404(c) does not and cannot provide any defense to the

8  fiduciaries' imprudent decision to select and continue offering Countrywide stock as an

9  investment option in the Plan, or to continue matching in Countrywide stock, as these are

10  not decisions that were made or controlled by the participants. *See* Final Reg. Regarding

11  Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final

12  404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992)

13  (codified at 29 C.F.R. § 2550) (noting that "the act of limiting or designating investment

14  options which are intended to constitute all or part of the investment universe of an

15  ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary

16  designation or express plan language, is not a direct or necessary result of any participant

17  direction of such plan").

18      185. Second, as to participant directed investment in Countrywide stock, ERISA

19  § 404(c) does not apply because Defendants failed to ensure effective participant control

20  by providing complete and accurate material information to participants regarding

21  Countrywide stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be

22  provided with "sufficient information to make informed decisions"). As a consequence,

23  participants in the Plan did not have informed control over the portion of the Plan's assets

24  that were invested in Countrywide stock as a result of their investment directions, and the

25  Defendants remain entirely responsible for losses that result from such investment.

26      186. Third, upon information and belief, the Plan participants were not informed

27  that the Plan intended to comply as a § 404(c) plan in the manner required by ERISA and

28  applicable regulations. Therefore, §404(c) of ERISA does not apply to participants'

-54-

"investment decisions" regarding Countrywide stock, and Defendants remain liable for losses suffered by participants during the Class Period as a result of such decisions.

187.   Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plan, the Plaintiff and the Class (as defined below) for losses caused by the Plan's investment in Countrywide stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

## X. DEFENDANTS' INVESTMENT IN COUNTRYWIDE STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

188.   The presumption of prudence that some courts have held applies to the decision to make and maintain investment in company stock in an ESOP does not apply here because the Plan was not, in fact, designed to require the offering of Company stock as a Plan investment option.   Rather, Company stock is a discretionary feature of the Plan.   Accordingly, the Plan lacks the principle feature on which the presumption of prudence is based – namely a need to balance two competing objectives of typical ESOPs – retirement savings on the one hand, and the goal of long term employee ownership on the other.  Here, the Plan's only long-term purpose is retirement savings.

189.   To the extent that a presumption of reasonableness applies to the decision to maintain investments in company stock in the purported ESOP portion of the Plan, such presumption is overcome by the facts alleged here, including, among other averments:

- A precipitous stock price decline from over $32.49 to $19.81 during the Class Period;

- Serious and gross mismanagement evidenced by, among other things:
  - marketing and extending subprime mortgage loans, made on a "low documentation" basis, without adequate consideration of the borrower's ability to repay and with unreasonably high risk of borrower default;
  - intentionally marketing subprime loans with high risk of default to borrowers who qualified for prime-rate loans in order to increase

-55-

Company profits;

- o encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions;

- o representing that Countrywide had strict and selective underwriting and loan origination practices;

- o representing that Countrywide had sufficient reserves set aside to cover the high-risk loans it was selling;

- o operating with inadequate liquidity in relation to the volatility of Countrywide's business lines and assets; and

- o operating without the requisite internal controls to determine appropriate loan loss provisions

- o the artificial inflation of Countrywide stock as a result of the above improper business practices.

- • Countrywide's deteriorating financial condition calling into question the Company's ongoing viability as a result of the Company's inadequate reserves and risky and inappropriate lending practices; and

- • Insider self-dealing by Defendants identified above.

190.    The imprudence of continued investment by Defendants in Countrywide stock during the Class Period runs afoul of Department of Labor regulations:

> [B]ecause every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. § 2509.94-1.  Defendants had available to them investment alternatives to Countrywide stock that had either a higher rate of return with risk commensurate to Countrywide stock or an expected rate of return commensurate to Countrywide stock but with less risk.

-56-

191.  Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in Countrywide stock, and, effectively, to do nothing at all to protect the Plan from large losses as a result of such investment during the Class Period.

## XI.  CAUSES OF ACTION

**A.    Count I:  Failure to Prudently and Loyally Manage the Plan and Assets of the Plan.**

192.  Plaintiff incorporates by this reference the paragraphs above.

193.  This Count alleges fiduciary breach against: the Company, the Director Defendants and the Administrative Committee Defendants during such time as each served as the Plan Administrator, respectively, and the Investment Committee Defendants.

194.  The Defendants named in this Count were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

195.  As alleged above, the scope of the fiduciary duties and responsibilities of the Defendants included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the Trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

196.  Yet, contrary to their duties and obligations under the Plan documents and ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, these Defendants knew or should have known that Countrywide stock no longer was a suitable and appropriate investment for the Plan, but

1  was, instead, a highly speculative and excessively risky investment in light of the
2  Company's fundamental weaknesses, deteriorating financial circumstances, and
3  challenges to its ongoing viability.   Nonetheless, during the Class Period, these
4  Defendants continued to offer Countrywide stock as an investment option for participant
5  contributions in the Plan, as well as the sole investment receptacle for Employer
6  Matching Contributions in the Plan during the Class Period, even though the Defendants
7  named in this Count had: (1) the discretion to suspend offering Company stock as a Plan
8  investment option; (2) the discretion to suspend making matching contributions and
9  discretionary contributions in Company stock, and instead, invest such amount in cash,
10  and (3) the discretion to adopt rules permitting participants to elect to invest all or a
11  portion of the Company Stock held in their accounts in another Fund. *See* Section V. ,
12  *supra.*

13       197.  Defendants could have and should have taken action to protect Plan
14  participants from unnecessary losses by utilizing their discretion under the Plan
15  Document and ERISA to suspend offering Company stock as a Plan investment option
16  during the Class Period and matching in the stock.  Instead, the Defendants continued to
17  offer Countrywide stock in the Plan despite the fact that they clearly knew or should have
18  known that such investment was unduly risky and imprudent due to the Company's
19  serious mismanagement and improper business practices, described herein.

20       198.  The Defendants were obliged to prudently and loyally manage all of the
21  Plan's assets. However, their duties of prudence and loyalty were especially significant
22  with respect to Company stock because:  (a) company stock is a particularly risky and
23  volatile investment, even in the absence of company misconduct; and (b) participants
24  tend to underestimate the likely risk and overestimate the likely return of investment in
25  company stock.  In view of this, the Defendants were obliged to have in place a regular,
26  systematic procedure for evaluating the prudence of investment in Company stock.

27       199.  The Defendants had no such procedure.  Moreover, they failed to conduct an
28  appropriate investigation of the merits of continued investment in Countrywide stock

1  even in light of the losses, the Company's highly risky and inappropriate practices, and
2  the particular dangers that these practices posed to the Plan. Such an investigation would
3  have revealed to a reasonably prudent fiduciary the imprudence of continuing to make
4  and maintain investment in Countrywide stock under these circumstances.

5  200. The Defendants' decisions respecting the Plan's investment in Countrywide
6  stock described above, under the circumstances alleged herein, abused their discretion as
7  ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would
8  have made different investment decisions. Specifically, based on the above, a prudent
9  fiduciary could not have reasonably believed that further and continued investment of the
10 Plan's contributions and assets in Countrywide stock was in keeping with the Plan's
11 settlor's expectations of how a prudent fiduciary would operate.

12 201. The Defendants were obligated to discharge their duties with respect to the
13 Plan with the care, skill, prudence, and diligence under the circumstances then prevailing
14 that a prudent man acting in a like capacity and familiar with such matters would use in
15 the conduct of an enterprise of a like character and with like aims. ERISA §
16 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

17 202. According to DOL regulations and case law interpreting this statutory
18 provision, a fiduciary's investment or investment course of action is prudent if: (a) he
19 has given appropriate consideration to those facts and circumstances that, given the scope
20 of such fiduciary's investment duties, the fiduciary knows or should know are relevant to
21 the particular investment or investment course of action involved, including the role the
22 investment or investment course of action plays in that portion of the plan's investment
23 portfolio with respect to which the fiduciary has investment duties; and (b) he has acted
24 accordingly.

25 203. Again, according to DOL regulations, "appropriate consideration" in this
26 context includes, but is not necessarily limited to:

27  • A determination by the fiduciary that the particular investment or investment
28    course of action is reasonably designed, as part of the portfolio (or, where

applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  o The composition of the portfolio with regard to diversification;

  o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  o The projected return of the portfolio relative to the funding objectives of the plan.

204.    Given the conduct of the Company as described above, the Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Countrywide stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plan:

  o marketing and extending subprime mortgage loans, made on a "low documentation" basis, without adequate consideration of the borrower's ability to repay and with unreasonably high risk of borrower default;

  o intentionally marketing subprime loans with high risk of default to borrowers who qualified for prime-rate loans in order to increase Company profits;

  o encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions

  o representing that Countrywide had strict and selective underwriting and loan origination practices;

  o representing that Countrywide had sufficient reserves set aside to cover

the high-risk loans it was selling;

    o  operating with inadequate liquidity in relation to the volatility of Countrywide's business lines and assets; and

    o  operating without the requisite internal controls to determine appropriate loan loss provisions; and

    o  the artificial inflation of Countrywide stock as a result of the above improper business practices.

- The risk associated with the investment in Countrywide stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plan's participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plan's participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan or any participant from investing the Plan's assets in Countrywide stock; and

- Further, knowing that the Plan was not a diversified portfolio, but was heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

205. The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. On information and belief, the Insider Selling Defendants acted in their own self-interest in benefiting from selling huge amounts of Company stock at fraudulently inflated values. Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is

1  untainted by the conflict and made in a disinterested fashion, typically by seeking

2  independent financial and legal advice obtained only on behalf of the plan.

3      206.  The Insider Selling Defendants breached their duty to avoid conflicts of

4  interest and to promptly resolve them by, *inter alia*, failing to engage independent

5  advisors who could make independent judgments concerning the Plan's investment in

6  Countrywide; failing to notify appropriate federal agencies, including the DOL, of the

7  facts and circumstances that made Countrywide stock an unsuitable investment for the

8  Plan; failing to take such other steps as were necessary to ensure that participants'

9  interests were loyally and prudently served; with respect to each of these above failures,

10  doing so in order to avoid adversely impacting their own compensation or drawing

11  attention to Countrywide's inappropriate practices; engaging in insider sales of

12  Countrywide stock and yet, taking no action to disclose to the Plan's participants the

13  reason for their sales or to protect the Plan's holdings of Countrywide stock once proper

14  disclosure was made; and by otherwise placing their own and Countrywide's improper

15  interests above the interests of the participants with respect to the Plan's investment in

16  Countrywide stock.

17      207.  As a consequence of the Defendants' breaches of fiduciary duty alleged in

18  this Count, the Plan suffered tremendous losses.  If the Defendants had discharged their

19  fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan

20  would have been minimized or avoided.  Therefore, as a direct and proximate result of

21  the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the

22  other Class members, lost well over one hundred million dollars of retirement savings.

23      208.  Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),

24  1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plan caused by

25  their breaches of fiduciary duties alleged in this Count and to provide other equitable

26  relief as appropriate.

27

28

**B.    Count II:  Failure to Monitor Fiduciaries.**

209.   Plaintiff incorporates by this reference the allegations above.

210.   This Count alleges fiduciary breaches against the following Defendants:  the Company, Director Defendants and Compensation Committee Defendants, through which the Company and the Board of Directors acted in carrying out their appointment responsibilities (collectively, the "Monitoring Defendants").

211.   As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

212.   As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| Countrywide | Investment Committee Administrative Committee | ¶ 63 |
| Director Defendants | Compensation Committee Investment Committee Administrative Committee | ¶¶ 67-69 |
| Compensation Committee | Investment Committee Administrative Committee | ¶¶ 74-76 |

213.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

214.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic

1   reports on their work and the plan's performance, and by ensuring that they have a
2   prudent process for obtaining the information and resources they need). In the absence of
3   a sensible process for monitoring their appointees, the appointing fiduciaries would have
4   no basis for prudently concluding that their appointees were faithfully and effectively
5   performing their obligations to plan participants or for deciding whether to retain or
6   remove them.

7       215.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries
8   with complete and accurate information in their possession that they know or reasonably
9   should know that the monitored fiduciaries must have in order to prudently manage the
10  plan and the plan assets, or that may have an extreme impact on the plan and the
11  fiduciaries' investment decisions regarding the plan.

12      216.   The Monitoring Defendants breached their fiduciary monitoring duties by,
13  among other things: (a) failing, at least with respect to the Plan's investment in Company
14  stock, to monitor their appointees, to evaluate their performance, or to have any system in
15  place for doing so, and standing idly by as the Plan suffered enormous losses as a result
16  of their appointees' imprudent actions and inaction with respect to Company stock; (b)
17  failing to ensure that the monitored fiduciaries appreciated the true extent of
18  Countrywide's highly risky and inappropriate business and accounting practices, and the
19  likely impact of such practices on the value of the Plan's investment in Countrywide
20  stock; (c) to the extent any appointee lacked such information, failing to provide
21  complete and accurate information to all of their appointees such that they could make
22  sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing
23  to remove appointees whose performance was inadequate in that they continued to make
24  and maintain investments in Countrywide stock despite their knowledge of practices that
25  rendered Countrywide stock an imprudent investment during the Class Period for
26  participants' retirement savings in the Plan, and who breached their fiduciary duties
27  under ERISA.

28

-64-

217. As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost well over one hundred million dollars of retirement savings.

218. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.    Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries.**

219. Plaintiff incorporates by this reference the allegations above.

220. This Count alleges fiduciary breach against: the Company, the Director Defendants and the Administrative Committee Defendants.

221. At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

222. At all relevant times, the scope of the fiduciary responsibility of the Defendants included the communications and material disclosures to the Plan participants and beneficiaries.

223. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options such that participants can make informed decisions with regard to the

1    prudence of investing in such options made available under the plan. This duty applies to
2    all of the Plan's investment options, including investment in Countrywide stock.

3        224. Because investments in the Plan were not diversified (*i.e.* the Defendants
4    chose to invest the Plan's assets, and/or allow those assets to be invested so heavily in
5    Countrywide stock), such investment carried with it an inherently high degree of risk.
6    This inherent risk made the Defendants' duty to provide complete and accurate
7    information particularly important with respect to Countrywide stock.

8        225. The Defendants breached their duty to inform participants by failing to
9    provide complete and accurate information regarding Countrywide's serious
10   mismanagement and improper business practices, public misrepresentations and material
11   accounting irregularities, and the consequential artificial inflation of the value of
12   Countrywide stock, and, generally, by conveying incomplete information regarding the
13   soundness of Countrywide stock and the prudence of investing and holding retirement
14   contributions in Countrywide equity. These failures were particularly devastating to the
15   Plan and its participants; a heavy percentage of the Plan's assets were invested in
16   Countrywide stock during the Class Period and, thus, losses in this investment had a
17   significant impact on the value of participants' retirement assets.

18       226. Defendants' omissions clearly were material to participants' ability to
19   exercise informed control over their Plan accounts, as in the absence of the information,
20   participants did not know the true risks presented by the Plan's investment in
21   Countrywide stock.

22       227. Defendants' omissions and incomplete statements alleged herein were Plan-
23   wide and uniform in that the Defendants failed to provide complete and accurate
24   information to any of the Plan's participants.

25       228. Defendants in this Count were unjustly enriched by the fiduciary breaches
26   described in this Count.

27       229. As a direct and proximate result of the breaches of fiduciary duties alleged
28   herein, the Plan, and indirectly Plaintiff and the Plan's other participants and

1   beneficiaries, lost a significant portion of their retirement investment.

2       230.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a),

3   29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan

4   caused by their breaches of fiduciary duties alleged in this Count.

5   **D.     Count IV: Co-Fiduciary Liability.**

6       231.   Plaintiff incorporates by this reference the allegations above.

7       232.   This Count alleges co-fiduciary liability against the following Defendants:

8   all Defendants (the "Co-Fiduciary Defendants").

9       233.   As alleged above, during the Class Period the Co-Fiduciary Defendants were

10  named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto*

11  fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.

12  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

13      234.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a

14  fiduciary, in addition to any liability which he may have under any other provision, for a

15  breach of fiduciary responsibility of another fiduciary with respect to the same plan if

16  knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a

17  breach. The Co-Fiduciary Defendants breached all three provisions.

18      235.   **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29

19  U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by

20  another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he

21  makes reasonable efforts under the circumstances to remedy the breach. Each Defendant

22  knew of the breaches by the other fiduciaries and made no efforts, much less reasonable

23  ones, to remedy those breaches. In particular, they did not communicate their knowledge

24  of the Company's improper activity to the other fiduciaries.

25      236.   Countrywide, through its officers and employees, engaged in highly risky

26  and inappropriate business practices, withheld material information from the market, and

27  profited from such practices, and, thus, knowledge of such practices is imputed to

28  Countrywide as a matter of law.

237. Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Countrywide's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

238. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Countrywide knowingly participated in the fiduciary breaches of the Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for the Plan's participants. Likewise, the Monitoring Defendants knowingly participated in the breaches of the Investment and Administrative Committee Defendants because, as alleged above, they had actual knowledge of the facts that rendered Countrywide stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Defendants to breach their duties.

239. **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

240. The Monitoring Defendants' failure to monitor the Defendants, particularly the Investment and Administrative Committee Defendants, enabled that committee to breach their duties.

241. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost well over one hundred million dollars of retirement savings.

1    242.  Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),

2    1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the

3    Plan caused by their breaches of fiduciary duties alleged in this Count and to provide

4    other equitable relief as appropriate.

5    **E.    Count V:  Knowing Participation in a Breach of Fiduciary Duty.**

6    243.  Plaintiff incorporates the allegations contained in the previous paragraphs of

7    this Complaint as if fully set forth herein.

8    244.  To the extent that Countrywide is found not to have been fiduciary or to

9    have acted in a fiduciary capacity with respect to the conduct alleged to have violated

10   ERISA, Countrywide knowingly participated in the breaches of those Defendants who

11   were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief

12   as a result of participating in such breaches.

13   245.  Countrywide benefited from the breaches by discharging its obligations to

14   make contributions to the Plan in amounts specified by the Plan, contributing

15   Countrywide stock to the Plan while the value of the stock was inflated as the result of

16   Countrywide's highly risky and improper business practices, and providing the market

17   with materially misleading statements and omissions.  Accordingly, Countrywide may be

18   required to disgorge this benefit or a constructive trust should be imposed on treasury

19   shares of Countrywide stock which would have been contributed to the Plan, but for

20   Countrywide's participation in the foregoing breaches of fiduciary duty.

21                          **XII.  CAUSATION**

22   246.  The Plan suffered enormous losses because substantial assets of the Plan

23   were imprudently invested or allowed to be invested by Defendants in Countrywide stock

24   during the Class Period, in breach of Defendants' fiduciary duties.

25   247.  Defendants are liable for the Plan's losses in this case because: (a) most of

26   the Plan's investment in Countrywide stock was the result of the Defendants' decisions to

27   invest Employer Matching Contributions in the Plan in Countrywide stock and (b) as to

28   the portion of Plan's assets invested in Countrywide stock as a result of participant

1 │ contributions, the Defendants are liable for these losses because they failed to take the

2 │ necessary and required steps to ensure effective and informed independent participant

3 │ control over the investment decision-making process, as required by ERISA § 404(c), 29

4 │ U.S.C. § 1104(c), and the regulations promulgated thereunder.

5 │     248.  The Defendants also are liable for losses that resulted from their decision to

6 │ invest a majority of the assets of the Plan in Countrywide stock rather than cash or other

7 │ investment options, and clearly prudent under the circumstances presented here.

8 │     249.  Had the Defendants properly discharged their fiduciary and co-fiduciary

9 │ duties, including the monitoring and removal of fiduciaries who failed to satisfy their

10 │ ERISA-mandated duties of prudence and loyalty, eliminating Countrywide stock as an

11 │ investment alternative when it became imprudent, and divesting the Plan of Countrywide

12 │ stock when maintaining such an investment became imprudent, the Plan would have

13 │ avoided some or all of the losses that it, and indirectly, the participants suffered.

14 │     **XIII.  REMEDY FOR BREACHES OF FIDUCIARY DUTY**

15 │     250.  The Defendants breached their fiduciary duties in that they knew or should

16 │ have known the facts as alleged above, and therefore knew or should have known that the

17 │ Plan's assets should not have been invested in Countrywide stock during the Class

18 │ Period.

19 │     251.  As a consequence of the Defendants' breaches, the Plan suffered significant

20 │ losses.

21 │     252.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to

22 │ bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section

23 │ 409 requires "any person who is a fiduciary. . . who breaches any of the. . . duties

24 │ imposed upon fiduciaries. . . to make good to such plan any losses to the plan. . . ."

25 │ Section 409 also authorizes "such other equitable or remedial relief as the court may

26 │ deem appropriate. . . ."

27 │     253.  With respect to calculation of the losses to the Plan, breaches of fiduciary

28 │ duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would

1  not have made or maintained their investments in the challenged investment and, instead,
2  prudent fiduciaries would have invested the Plan's assets in the most profitable
3  alternative investment available to them. Alternatively, losses may be measured not only
4  with reference to the decline in stock price relative to alternative investments, but also by
5  calculating the additional shares of Countrywide stock that the Plan would have acquired
6  had the Plan fiduciaries taken appropriate steps to protect the Plan. The Court should
7  adopt the measure of loss most advantageous to the Plan. In this way, the remedy
8  restores the Plan's lost value and puts the participants in the position they would have
9  been in if the Plan had been properly administered.

10      254.  Plaintiff and the Class are therefore entitled to relief from the Defendants in
11  the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the
12  Plan resulting from the breaches of fiduciary duties alleged above in an amount to be
13  proven at trial based on the principles described above, as provided by ERISA § 409(a),
14  29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the
15  breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§
16  1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant
17  to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-
18  fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by
19  ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable
20  law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such
21  other legal or equitable relief as may be just and proper.

22      255.  Under ERISA, each Defendant is jointly and severally liable for the losses
23  suffered by the Plan in this case.

24              **XIV.  CLASS ACTION ALLEGATIONS**

25      256.  **Class Definition.** Plaintiff brings this action as a class action pursuant to
26  Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of
27  Plaintiff and the following class of persons similarly situated (the "Class"):
28

1

2

3

All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between January 31, 2006 and the present, and whose accounts included investments in Countrywide stock.

4  257.  **Class Period.**  The fiduciaries of the Plan knew or should have known at

5  least by January 31, 2006 that the Company's material weaknesses were so pervasive that

6  Countrywide stock could no longer be offered as a prudent investment for the retirement

7  Plan.

8  258.  **Numerosity.**  The members of the Class are so numerous that joinder of all

9  members is impracticable.  While the exact number of Class members is unknown to

10  Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff

11  believes there are, based on the Plan's Form 5500 for Plan year 2005, 46,047 active

12  participants in the Plan who participated in, or were beneficiaries of, the Plan during the

13  Class Period.

14  259.  **Commonality.**  Common questions of law and fact exist as to all members

15  of the Class and predominate over any questions affecting solely individual members of

16  the Class.  Among the questions of law and fact common to the Class are:

17  (a).  whether Defendants each owed a fiduciary duty to Plaintiff and

18  members of the Class;

19  (b).  whether Defendants breached their fiduciary duties to Plaintiff and

20  members of the Class by failing to act prudently and solely in the interests of

21  the Plan's participants and beneficiaries;

22  (c).  whether Defendants violated ERISA; and

23  (d).  whether the Plan has suffered losses and, if so, what is the proper

24  measure of damages.

25  260.  **Typicality.**  Plaintiff's claims are typical of the claims of the members of the

26  Class because:  (1) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to

27  ERISA § 502(a)(2), his claim on behalf of the Plan is not only typical to, but identical to

28  a claim under this section brought by any Class member; and (2) to the extent Plaintiff

seeks relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class members equally.

261. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

262. **Rule 23(b)(1)(B) Requirements.** Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

263. **Other Rule 23(b) Requirements.** Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A. A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B. A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Countrywide stock;

F.    Actual damages in the amount of any losses the Plan suffered;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

DATED this 26th day of September, 2007.

BRAUN LAW GROUP, P.C.

Michael D. Braun (167416)
service@braunlawgroup.com
BRAUN LAW GROUP, P.C.
12400 Wilshire Blvd., Suite 920
Los Angeles, CA 90025
Telephone: (310) 442-7755
Facsimile: (310) 442-7756
Local Counsel for Plaintiff

-74-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Derek W. Loeser
dloeser@kellerrohrback.com
Erin M. Riley
eriley@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Counsel for Plaintiff